**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| RICHARD HAWES, Individually and on Behalf of All Others Similarly Situated,<br><br>                              Plaintiff,<br><br>         v.<br><br>ARGO BLOCKCHAIN PLC, PETER WALL, ALEX APPLETON, MATTHEW SHAW, SARAH GOW, COLLEEN SULLIVAN, and MARIA PERRELLA,<br><br>                              Defendants. | Case No. 1:23-cv-07305-CM<br><br>**AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................................... 2

JURISDICTION AND VENUE .................................................................................. 6

PARTIES ..................................................................................................................... 7

    A.    Securities Act and Exchange Act Plaintiff............................................. 7

    B.    Securities Act Defendants ...................................................................... 7

    C.    Exchange Act Defendants ...................................................................... 9

    D.    Confidential Witnesses ........................................................................ 10

BACKGROUND ....................................................................................................... 12

    A.    Company Background ........................................................................... 12

    B.    Bitcoin Mining ..................................................................................... 14

SECURITIES ACT ALLEGATIONS AND CLAIMS .............................................. 16

    A.    Argo's Mining Strategy ....................................................................... 17

    B.    Argo's IPO ............................................................................................ 19

    C.    Untrue Statements And Omissions In The Offering Documents......................... 19

CLAIMS FOR RELIEF UNDER THE SECURITIES ACT ..................................... 23

COUNT I ................................................................................................................... 23

COUNT II .................................................................................................................. 24

THE EXCHANGE ACT CLAIMS............................................................................ 26

I.       BACKGROUND OF THE EXCHANGE ACT CLAIMS ............................... 26

    A.    Background of Argo ............................................................................. 26

    B.    Argo's Financial Position ..................................................................... 30

II.      EXCHANGE ACT DEFENDANTS ISSUED FALSE AND MISLEADINNG STATEMENTS DURING THE CLASS PERIOD ........................ 35

III.    THE TRUTH IS GRADUALLY DISCLOSED TO THE MARKET ............................. 40

IV.    ARGO DROPS A BOMBSHELL ON THE MARKET ANNOUNCING MAJOR INITIATIVES TO CUT COSTS AND RAISE LIQUIDITY............................. 47

V.     POST CLASS PERIOD EVENTS........................................................................ 50

VI.    ADDITIONAL SCIENTER ALLEGATIONS ................................................... 53

    A.    *Respondeat Superior* and Agency Principles Apply .............................. 53

    B.    The Exchange Act Defendants Knew Or Were Reckless In Not Knowing That Argo Had Far Too Little Cash On Hand To Operate Helios And To Withstand Foreseeable Risks ................................................................................. 53

        1.    Argo's Operating Costs and Balance Sheet ................................ 53

        2.    ERCOT's Requirements for a Fixed-Price PPA ........................ 57

        3.    Argo's Loans and Equipment Financing Agreement ............................... 59

        4.    Argo's Significant Holdings in Bitcoin ..................................... 62

    C.    Core Operations ......................................................................... 64

    D.    The Sudden Departures of the Company's CEO and CFO Support a Strong Inference of Scienter ...................................................................... 65

    E.    Defendants' Certifications Pursuant to the Sarbanes-Oxley Act of 2002 Demonstrate Scienter ................................................................ 67

VII.    LOSS CAUSATION ................................................................................. 67

VIII.    CONTROL PERSON LIABILITY ............................................................ 69

IX.    APPLICABILITY OF THE FRAUD ON THE MARKET DOCTRINE ....................... 70

X.    THE AFFILIATED UTE PRESUMPTION ................................................. 71

XI.    NO SAFE HARBOR ............................................................................. 72

CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT ............................................... 73

COUNT I ....................................................................................................... 73

COUNT II ...................................................................................................... 76

CLASS ACTION ALLEGATIONS ......................................................................... 77

PRAYER FOR RELIEF ..................................................................................... 80

JURY TRIAL DEMAND .................................................................................... 80

This is a federal securities class action on behalf of two proposed classes:

(i) All persons and entities that purchased or otherwise acquired the American Depository Receipts ("ADRs") of Argo Blockchain, plc ("Argo" or the "Company") pursuant and/or traceable to the Offering Documents (defined below) issued in connection with the Company's initial public offering conducted on or about September 23, 2021 (the "IPO" or "Offering"), for violations of Sections 11 and 15 of the Securities Act of 1933 (the "Securities Act") 15 U.S.C. §§ 77k ("Securities Act Class"), and

(ii) All persons and entities that purchased or otherwise acquired Argo ADRs between September 23, 2021 and October 10, 2022, both dates inclusive (the "Class Period") for violations of and 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. 17 C.F.R. § 240.1b-5, and 20(a) of the Exchange Act ("Exchange Act Class").

Lead Plaintiff Richard Hawes ("Plaintiff") individually and on behalf of all others similarly situated, by Plaintiff's undersigned counsel alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the substantial investigation conducted by and through Plaintiff's counsel into the facts and circumstances alleged herein, which included, among other things, (i) a review and analysis of the public filings referenced herein made by Argo  with the United States ("U.S.") Securities and Exchange Commission ("SEC") filings; (ii) review and analysis of press releases issued by the Argo, transcripts of Argo's public conference calls, , analysts' reports concerning Argo, media reports about the Company, and (iii) interviews with third parties conducted by counsel and/or investigators retained by counsel. Plaintiff believes that substantial

additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## **INTRODUCTION**

1.      Argo was founded in 2017 and engages in the cryptocurrency[1] mining business worldwide, including the mining of Bitcoin[2] or Bitcoin equivalents (together, "BTC").  Bitcoin mining is the process of creating "new" Bitcoins by devoting computing power to the Bitcoin network that confirms new transactions and creates new Bitcoin.  This work is performed by high-powered computers that consume large amounts of electricity.  These computers are known as miners.  The entities that operate the miners are rewarded for their efforts with ownership of new Bitcoin.  Bitcoin is an extremely volatile currency.  For example, one Bitcoin was worth over $64,000 in November 2021 and is currently equal to only $26,093.  Anyone with an internet connection can become a "miner" so it is a very competitive pursuit.

2.      Bitcoin mining is extremely energy-intensive.  For example, it is estimated that one Bitcoin transaction takes 1,449 kilowatt hours ("kWh") to complete, or the equivalent of approximately 50 days of power for the average U.S. household.

---

[1]      The Merriam Webster Dictionary defines cryptocurrency as any form of currency that only exists digitally, that usually has no central issuing or regulating authority but instead uses a decentralized system to record transactions and manage the issuance of new units, and that relies on cryptography to prevent counterfeiting and fraudulent transactions. https://www.merriam-webster.com/dictionary/cryptocurrency (last visited Sep. 25, 2023).

[2]      The Merriam Webster Dictionary defines Bitcoin as a digital currency created for use in peer-to-peer online transactions.  Introduced in 2008 by a person or group using the name Satoshi Nakamoto, Bitcoin is the most prominent of a group of virtual currencies—money that exists mainly as computer code—that have no central issuing authority.  https://www.merriam-webster.com/dictionary/Bitcoin (last visited Sep. 25, 2023).

3.      In early 2021, Argo sought to transition from mining Bitcoin with machines located in third-parties' facilities to owning and operating its own machines, which it believed would decrease costs and improve its profitability.

4.      To that end, Argo embarked on a capital-intensive plan to "cost-effectively acquire the latest generation mining machines and install them in North American facilities that utilize predominantly **renewable and inexpensive power**."  This is false.  In early 2021, Argo bought two mining facilities in Quebec, Canada, which consumed a combined 20 megawatts ("MW") of power.  Their largest facility, Helios, was in Texas where 79% of the electricity sold is generated by fossil fuels or nuclear power.

5.      The centerpiece of Argo's strategy, however, was the "Helios Facility," which was to be built on 160 acres of land in western Texas with access to up to 800 MW of power on its power grid.  Phase 1 of development was scheduled to be completed in the first half of 2022, and included facilities that were expected to support 100 megawatts of power capacity at an estimated cost of $50 million.  Phase 2 of development was expected to be completed in the second half of 2022, and would support an additional 100 megawatts of power capacity at an estimated cost of $30 million.  Additional funds would be needed to buy mining machines.

6.      To fund its expansion plans, Argo launched its initial public offering on September 23, 2021, raising approximately $105 million.  Argo also entered into various loans and note agreements which, together with the IPO proceeds, garnered the Company $229.8 million in cash by the end of 2021.  Additionally, Argo carried Bitcoin on its balance sheet, holding approximately $79 million worth at the beginning of the Class Period.

7.      During the Class Period, Defendants continuously represented to investors that the Company was in a strong financial position, and that it had sufficient resources to continue to

fund the Company's expansion.  To support their statements touting Argo's financial position, Defendants frequently explained that two of Argo's largest financial burdens, the cost of the Helios Facility and the cost of power, were not a concern because energy prices in Texas were extremely low, and Phase 1 of the Helios Facility development was nearly paid off.  For example, Argo represented to investors that energy costs would only be approximately $0.02 per kilowatt hour, in part because the Company was planning to enter into a fixed-price power purchase agreement ("Fixed-Price PPA") with Texas's Electric Reliability Council ("ERCOT"). This would allow Argo to buy a fixed quantity of energy over an extended period of time at a set, discounted rate.

8.      Argo ultimately never entered into a Fixed-Price PPA and instead entered into an alternative agreement known as a Spot-Price PPA, which was based on the index prices for energy.  As a result of the variably-priced agreement, when power prices were high due to increased demand, Argo shut down its mining operations, and when power prices were low due to decreased demand, Argo mined as much Bitcoin as it could.

9.      Despite this less advantageous agreement, the Exchange Act Defendants assured the market that with its "cash on hand" and Bitcoin holdings, the Company "has sufficient flexibility to be able to pursue our strategic growth plans in Texas, infrastructure, and machines, etc;" that its "runway for growth is unmatched by Argo's peers, and we have built a robust foundation upon which we can scale efficiently and profitably[,]" and that, based on Argo's "very strong position," which included "a significant amount of bitcoin,"  was not reliant on debt and "could almost self mine."

10.     Unbeknownst to the market, however, Argo was severely undercapitalized  and had far too little cash (or bitcoin) on hand to (1) operate a facility the size and scale of Helios and

(2) withstand foreseeable setbacks, such as seasonally higher energy prices and the decrease in the price of Bitcoin.

11.      The truth began to leak out when, on June 7, 2022, Argo disclosed that it mined approximately 25% fewer Bitcoin in May 2022 compared to April 2022 because of, *inter alia*, increased network difficulty, higher electricity prices, and the curtailment of mining operations at its Helios facility.

12.      On this news, Argo's ADR price fell $0.28 per ADR, or 4.4%, to close at $6.09 per ADR on June 7, 2022.

13.      Then, on October 7, 2022, Argo announced "several strategic actions that are intended to bring in additional capital to the business and ensure that the Company has the working capital necessary to execute its current strategy and meet its obligations over the next twelve months."  In addition to measures undertaken to reduce costs and preserve capital, the Company had signed a non-binding letter of intent with an affiliate of New York Digital Investment Group ("NYDIG") to amend an existing equipment financing agreement and plans to sell 3,499 mining machines for cash proceeds of £6 million, all in a desperate effort to to raise approximately 24 million pounds of needed capital.

14.      This completely unexpected move left no doubt that the company's plans had failed and all of its false hype about its solvency just that.  On this news, Argo's ADR price fell $0.97 per ADR, or 23.26%, to close at $3.20 per ADR on October 7, 2022.

15.      Then, on October 11, 2022, Argo issued another gloomy press release providing an operational update, in which it announced that "[d]uring the month of September, Argo mined 215 [Bitcoin] compared to 235 [Bitcoin] in August 2022" which was "primarily due to a 12% increase in average network difficulty during September."  Argo also stated that it "is continuing

to curtail operations at its Helios facility" "during periods of high electricity prices" and was replacing the Company's Chief Technology Officer.

16.     On this news, Argo's ADR price fell $0.27 per ADR, or 10.98%, to close at $2.19 per ADR on October 11, 2022.

17.     As a result of defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities when the true facts came to light, Plaintiff and other Class Members have suffered significant losses and damages.

## JURISDICTION AND VENUE

18.     Certain non-fraud claims asserted herein arise under Sections 11 and 15 of the Securities Act (15 U.S.C. §§ 77k and 77o). Certain other claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, (15 U.S.C. §§ 78j(b) & 78t(a)), and SEC Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

19.     This Court has jurisdiction over the action pursuant to 28 U.S.C. § 1331, Section 22 of the Securities Act (15 U.S.C. § 77v), and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

20.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa) as alleged misstatements were made and subsequent damages took place in this Judicial District.  The Company issued 7.5 million ADRs in its IPO and was approved for listing on the Nasdaq.  Currently, according to public filings and other financial media sources, with respect to Argo's domestic trading activity, there are over 35 million "shares" (on information and belief this refers to Argo ADRs) outstanding.[3]

---

[3]      https://finance.yahoo.com/quote/ARGO/key-statistics/ (last visited Sep. 25, 2023).

Accordingly, there are presumably thousands of investors in Argo's ADRs, some of whom undoubtedly reside in this District.

21.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

### A.     Securities Act and Exchange Act Plaintiff

22.     As shown in his PSLRA Certification, Plaintiff purchased Argo ADRs pursuant to the Offering Documents and was injured thereby. Plaintiff also purchased Argo ADRs at artificially inflated prices during the Class Period and weas injured thereby.  *See* ECF No. 24-2.

### B.     Securities Act Defendants

23.     Defendant Argo was founded in 2017 and is organized under the laws of England and Wales with principal executive offices located at 9th Floor, 16 Great Queen Street, London WC2B, England. Argo operates as a blockchain technology company focused on large-scale mining of Bitcoin and other cryptocurrencies. Its shares trade on the London Stock Exchange ("LSE") under the symbol "ARB".  The Company's Prospectus filed with the SEC for its domestic IPO in the U.S. represented that it was offering 7.5 million ADSs representing 75 million ordinary shares (a 1-10 ratio).  Argo's American Depositary Shares ("ADSs") were approved for listing on the Nasdaq Stock Market ("NASDAQ") under the symbol "ARBK". Each ADS represents ten of the Company's ordinary shares.  According to Argo's SEC filings, the Company is a dual-listed company.  Argo's American Depositary Receipts ("ADRs") were issued as part of the IPO and have traded trade on the NASDAQ since the IPO.

24.     Defendant Wall served as Argo's CEO from January 2020 to February 2023 and Interim Chairman of the Company's Board of Directors from July 2021 to February 2023. According to Argo, Defendant Wall "was a member of the management team that founded Argo and has been responsible for day-to-day operations since the company launched."  Wall reviewed, contributed to, signed or authorized the signing of the Registration Statement filed with the SEC.

25.     Defendant Appleton served as Argo's CFO from September 2020 to December 2022 and a member of Argo's Board from July 2021 to December 2022.  Appleton reviewed, contributed to, signed or authorized the signing of the Registration Statement filed with the SEC.

26.     Defendant Shaw served as a Member of the Board at all relevant times and as Chairman of the Board since February 2023.  Shaw reviewed, contributed to, signed or authorized the signing of the Registration Statement filed with the SEC.

27.     Defendant Gow served as a Member of the Board from July 2021 to February 2023. Gow reviewed, contributed to, signed or authorized the signing of the Registration Statement filed with the SEC.

28.     Defendant Sullivan served as a Member of the Board at the time of the IPO. Sullivan reviewed, contributed to, signed or authorized the signing of the Registration Statement filed with the SEC.

29.     Defendant Perrella has served as a Member of the Board at all relevant times. Perrella reviewed, contributed to, signed or authorized the signing of the Registration Statement filed with the SEC.

30.     Wall, Appleton, Shaw, Gow, Sullivan and Perrella may be referred to as the "Individual Securities Act Defendants" and together with Argo collectively the "Securities Act Defendants."

31.     As directors, executive officers, and/or major shareholders of the Company, the Individual Securities Act Defendants participated in the solicitation and sale of Argo ADRs in the IPO for their own benefit and the benefit of the Company.  The Individual Securities Act Defendants were key members of the IPO working group and executives of the Company who pitched investors to purchase shares sold in the IPO.

### C.     Exchange Act Defendants

32.      Argo, Wall and Appleton are named as Defendants under the Exchange Act. Wall and Appleton may also be referred to as the "Individual Exchange Act Defendants". Argo, Wall and Appleton may also be collectively with Argo, the "Exchange Act Defendants".

33.     The Individual Exchange Act Defendants, because of their positions with the Company, possessed the authority to control, correct, and/or update the contents of Argo's public disclosures to the market.  Each of the Individual Exchange Act Defendants had the duty to exercise due care and diligence and the duty of full and candid disclosure of all material facts relating to the Company's financial results and operations.  The Individual Exchange Act Defendants further had the duty to correct and/or update any previously issued statements that were untrue or became materially misleading or untrue, so that the market price of the Company's public securities would be based upon truthful, complete, and accurate information. To discharge their duties, the Individual Exchange Act Defendants were required to exercise reasonable and prudent supervision over the dissemination of information concerning the Company's financial results and operations.  By virtue of such duties, these officers and directors were required, *inter alia*, to:

a)       conduct and supervise the business of Argo in accordance with federal laws;

b)       supervise the preparation of Argo's SEC filings and approve any reports
concerning Argo's financial reporting and results; and

c)       ensure that Argo established and followed adequate internal controls.

34.      As officers, directors, and/or controlling persons of a publicly-held company
which is registered with the SEC under the federal securities laws and the securities of which
were traded on the NASDAQ and governed by the provisions of the federal securities laws, the
Individual Exchange Act Defendants each had a duty to (1) promptly disseminate complete,
accurate and truthful information with respect to the Company's financial statements and
operations; (2) correct any previously issued statements that were materially misleading or
untrue so that the market could accurately price the Company's publicly traded securities based
upon truthful, accurate, and complete information; and (3) update any previously-issued
statements that became materially misleading or untrue so that the market could accurately price
the Company's publicly traded securities based upon truthful, accurate, and complete
information.

35.      The Individual Exchange Act Defendants are each primarily liable for the
misrepresentations and misleading statements alleged herein and are also liable as controlling
persons of Argo.  The scheme deceived the investing public regarding Argo's financial
condition, which caused Plaintiff and other members of the Class to purchase Argo securities at
artificially inflated prices during the Class Period and suffer damages as a result.

**D.      Confidential Witnesses**

36.      Former Company employees have provided information demonstrating
that Defendants' Class Period statements were false and misleading, that Defendants knew or
recklessly disregarded the falsity or misleading nature of their statements, and that Defendants

engaged in a scheme to defraud investors. The confidential witnesses ("CWs") include individuals formerly employed at the Company during the Class Period, whose accounts corroborate one another, other sources set forth herein, and facts now admitted by Argo. The CWs provided information to Plaintiff's counsel and/or Plaintiff's counsel's investigators on a confidential basis and are particularly described by job description and/or responsibility, and duration of employment, thereby providing sufficient detail to establish their reliability and personal knowledge. As discussed herein, the information provided by the CWs supports a strong inference that the Defendants acted with scienter.

37.     **Confidential Witness No. 1 ("CW-1")** is a former supervisor working at the Argo Helios facility in Texas beginning in January 2022.  CW-1 was responsible for installing and deploying mining machines.  As a supervisor, CW-1 was responsible over approximately 15 technicians who were responsible for deploying the mining machines.  CW-1 also tracked the inventory of mining equipment being received at the facility.

38.     **Confidential Witness No. 2 ("CW-2")** is a former data technician at the Argo Helios facility in Texas from May 2022 to December 2022. CW-2 was hired to handle the mining machines.  CW-2's duties entailed unpacking the machines upon arrival at the facility, setting up and installing the machines in the tanks of oil.  CW-2 explained that it only took "minutes" to install one machine, which were small like a microwave size, so it was possible to install a number of machines in one day.

39.     **Confidential Witness No. 3 ("CW-3")** is a former data center manager from January 2022 through December 2022 at the Argo Helios facility in Texas. CW-3 interacted a few times with Wall. CW-3 was familiar with the third-party software called Grafana that assisted Argo to determine how much to mine and when to mine to manage energy costs.

According to CW-3, Grafana showed the real-time hash rate (a measure of computational power), which CW-3 believed everyone directly involved in bitcoin mining and executives would have been monitoring to know this information, including Appleton, Wall, and the Chief Operating Officer Saif El-Bakly, because this information was so important to the Company.

## BACKGROUND

### A.    Company Background

40.    Argo is a blockchain technology company focused on large-scale mining of Bitcoin and other cryptocurrencies.  As discussed in further detail below, Blockchain mining is the process by which new bitcoins are entered into circulation.  It is also the way the network confirms new transactions and is a critical component of the blockchain ledger's maintenance and development.  "Mining" is performed using sophisticated hardware that solves extremely complex computational math problems.  The first computer to find the solution to the problem receives the next block of bitcoins and the process begins against.

41.    Argo mines using purpose-built computers (or "mining machines") to solve complex cryptographic algorithms in the blockchain in exchange for rewards and fees denominated in the native token of that blockchain network.  Argo's mining strategy was to cost-effectively acquire and deploy the most advanced mining technology solutions in North American facilities that utilize predominantly renewable and inexpensive power.

42.    Argo was originally incorporated as GoSun Blockchain Limited, a private limited company that was organized under the laws of England and Wales, on December 5, 2017.  On December 21, 2017, GoSun Blockchain Limited changed its name to Argo Blockchain Limited. It then re-registered as a public limited company: Argo Blockchain plc. Also on December 21, 2017, Argo acquired the subsidiary, Argo Blockchain Canada Holdings Inc., incorporated in Canada on January 12, 2018.

12

43.    On August 3, 2018, Argo was listed on the London Stock Exchange's main market under the ticker symbol "ARB[.]"  On September 1, 2018, Argo Blockchain plc "acquired 100% of Argo Innovation Labs Limited (formerly Argo Mining Limited) for £1[.]"  On January 13, 2021, Argo listed its shares on the U.S.-based over-the-counter exchange, OTCQB Venture Market, under the ticker symbol "ARBKF[.]"  On February 24, 2021, Argo was upgraded to the over-the-counter exchange, OTCQX.

44.    Argo Blockchain plc is the parent holding company of the Group, with the Group consisting of Argo Blockchain plc and the following subsidiaries:

- Argo Innovation Labs Inc. (previously Argo Blockchain Canada Holdings Inc.), a wholly owned subsidiary incorporated and registered in British Columbia, Canada.  Argo Blockchain Canada Holdings Inc. was acquired upon its incorporation on January 12, 2018.  On January 8, 2019, it changed its name to Argo Innovation Labs Inc.;

- Argo Innovation Labs Limited (previously Argo Mining Limited), a wholly owned subsidiary incorporated and registered in England and Wales.  Argo Mining Limited was acquired for £1 on September 1, 2018 and has remained dormant since its acquisition. On January 14, 2019, it changed its name to Argo Innovation Labs Limited; and

- Argo Innovation Facilities (US), Inc., a wholly owned subsidiary, incorporated in Delaware on February 25, 2021. This subsidiary acquired DPN LLC and, consequently, acquired one-hundred-and-sixty (160) acres of land in western Texas with the option to purchase an adjacent one-hundred-and-fifty-seven (157) acres of land, with access of up to 800 MW in electrical power.

B.       **Bitcoin Mining**

45.      At a basic level, blockchains are shared databases that store and verify information in a cryptographically secured way.  A blockchain is like a spreadsheet, but instead of being housed on one device, it is maintained by a network of computers all over the world. These computers, known as miners, are responsible for storing their own copies of the database, adding and verifying new entries, and securing the database against hackers.  Blockchains are typically a public, open source, meaning that anyone can inspect a blockchain's code or see a record of any transaction.

46.      Bitcoin, the first-ever cryptocurrency, uses a blockchain to keep track of transactions.  This allows people to send and receive money over the internet without the involvement of a central authority.  There are now approximately 10,000 different cryptocurrencies in existence.

47.      Bitcoin mining refers to the process where a global network of computers run the Bitcoin code work to ensure that transactions are legitimate and added correctly to the cryptocurrency's blockchain.  High-powered computers operated by miners compete to be the first to validate a series of transactions called a "block," and add the block to the blockchain. Miners are then paid transaction fees and 6.25 Bitcoin per block for their efforts.

48.      The more computing power a miner has, the more likely it is to win blocks.  A new Bitcoin can be mined every 10 minutes based on how much computing power is used.  To ensure that new Bitcoins are mined roughly every 10 minutes, an automatic system is in place that adjusts the difficulty depending on how many miners are competing to discover them.

49.      A hash rate is the measure of the computational power used per second when mining Bitcoin.  Before new transactional data can be added to the next block in the chain, miners must compete using their machines to guess a number by solving an equation.  The more

machines dedicated to solving the equation, the higher the hash rate rises and the harder it becomes to disrupt the network.  The current generation of computers dedicated to Bitcoin mining, also known as "rigs[,]" generate possible answers to the Bitcoin block equations at around 100 trillion hashes per second.  A bitcoin mining company's hash rate is an important metric reported to market and considered by analysists.

50.     Bitcoin mining is usually a large-scale commercial operation conducted by corporations using data centers, also known as mining farms, with purpose-built servers.  Mining farms are usually held in large warehouses filled with rigs.  Many companies join Bitcoin mining pools.  Bitcoin mining pools are networks of different Bitcoin miners who cooperate to mine blocks together and distribute any payments earned based on each entity's contribution to the pool.

51.     The rigs used to mine Bitcoin emit so much heat that in the absence of a cooling mechanism, they are at risk of explosion or technical damage.  There are two types of cooling systems: traditional air cooling and liquid/immersion cooling.  Normally, air cooling systems are comprised of winged revolvers or fans — small or big — that help to remove hot air or heat from the mine.  With immersion cooling, the mining rigs are immersed into a tank where a liquid coolant constantly circulates around the machine.

52.     Mining rigs consume an immense amount of power.  For example, one Bitcoin transaction takes approximately 1,449 kilowatt hours to complete, or the equivalent of approximately 50 days of power for the average U.S. household.  It is estimated that Bitcoin mining consumes 127 terawatt-hours (TWh) of electricity per year.  That usage exceeds the entire annual electricity consumption of Norway.  Therefore, the cost of energy is an important factor in

determining the profitability of Bitcoin mining.  For this reason, Bitcoin mining companies are attracted to locations with abundant, inexpensive sources of electricity.

53.     West Texas has quickly become an emerging global center for cryptocurrency mining due to its deregulated power grid, increasing renewable energy, and political leaders that are publicly pro-crypto.  The Electric Reliability Council of Texas ("ERCOT"), which primarily manages the Texas power grid, has stated that prospective crypto miners have applied to connect and draw about 20 gigawatts—or 20,000 megawatts—of power from the grid in West Texas.  That's roughly equal to the amount of electricity used by the Houston metropolitan area on the hottest days.

54.     In 2021, Bitcoin had a record year.  On February 19, 2021, Bitcoin hit $1 trillion in market value for the first time and by November 2021, a single bitcoin reached the record price of nearly $69,000.  These milestones were reached in part because major institutional investors and reputable financial companies threw their support behind the cryptocurrency.  Concerned with rising inflation in traditional currencies, investors were turning to Bitcoin as an alternative investment.

## SECURITIES ACT ALLEGATIONS AND CLAIMS

55.     In this part of the Complaint, separate and apart from the claims set forth under the Exchange Act, Plaintiff asserts, on behalf of the Class, strict liability claims under Section 11 and 15 of the Securities Act.  These claims are based on untrue statements and omissions made in the 2021 Offering Documents[4] filed in connection with Argo's IPO.  Plaintiff expressly

---

[4]     The term "Offering Documents" refers to the Company's IPO-related SEC filings. These filings include the Prospectus that was filed by the Company on September 23, 2021, all amendments thereto, and prior filings related to the IPO including the Registration Statement with the preliminary prospectus filed on Form F-1 on August 19, 2021, as well as all other preliminary filings, updates and supplements thereto related to the IPO, which were incorporated into and formed a part of the Prospectus.

disclaims any allegations of fraud for these Securities Act claims.

**A.      Argo's Mining Strategy**

56.      When the Company was founded in 2017, it focused on providing mining capacity as a service to its customers. In this initial model, customers contracted Bitcoin mining services from Argo for a fee, and customers would earn the Bitcoin rewards generated from the contracted mining services directly to their cryptocurrency wallet address. Argo mined Bitcoin with machines located in facilities operated by third parties to which Argo paid a hosting fee for the right to use the machines.

57.      Beginning in 2019, the Company chose to wind down its mining-as-a-service business and shifted to mining for its own account to increase revenues and margins. In 2019 and 2020, mining-as-a service revenue comprised 3.1% and less than 0.1% of its total revenue, respectively.

58.      Upon the shift to mining for the Company's own account, Argo began substantially increasing its investment in mining machines, and initially had mining machines hosted in facilities operated by third parties. As its mining business grew, the Company began investing in facilities such that it will own both the mining machines and the facilities in which it operates.

59.      Argo's strategy was to vertically integrate by purchasing, building and operating its own mining facilities.  It believed that increasing its level of control through owning the infrastructure and operating its mining rigs would improve both profitability and performance. Thus, the Company embarked on a plan to "cost-effectively acquire the latest generation mining machines and install them in North American facilities that utilize predominantly renewable and inexpensive power."

60.     As part of its expansion plan, on February 2, 2021, Argo acquired two Bitcoin mining facilities in Quebec, Canada for £10.7 million.  Argo chose to mine in Quebec due to its plentiful renewable energy resources, primarily hydroelectric power generated by several dams in the area.

61.     By September 30, 2021, Argo had approximately 1,075 petahash of mining capacity,[5] of which approximately 215 petahash was located in its two Quebec facilities, and approximately 860 petahash was located in four hosted facilities in the United States and Canada.  In the six months ended June 30, 2021, Argo mined approximately 883 Bitcoin and Bitcoin Equivalents, which equated to a net income of £7,213,997.

62.     Argo is part of the mining pool called Terra Pool.  Argo created Terra Pool with fellow miner DMG Blockchain to attempt to provide a carbon-neutral Bitcoin mining pool in order to accelerate the implementation of eco-friendly crypto mining solutions.

63.     In March 2021, Argo acquired 160 acres of land in rural Dickins County Texas with the intent to build a 200-megawatt mining plant called the "Helios Facility[.]"  Phase 1 of development was scheduled to be completed in the first half of 2022, and included facilities that were expected to support 100 megawatts of power capacity at an estimated cost of $50 million.  Phase 2 of development was expected to be completed in the second half of 2022, and would support an additional 100 megawatts of power capacity at an estimated cost of $30 million.  Estimates for the total cost to build and kit out an 800 MW mining facility ranged from $1.5 to $2 billion.  In July 2021, Argo broke ground on the Helios Facility.  By November 2021, Argo

---

[5]     1 petahash per second is equal to one quadrillion (1,000,000,000,000,000) hashes per second.

had begun to construct the foundation and frame of the building that would hold the mining computers.

**B.      Argo's IPO**

64.     On August 19, 2021, Argo filed a registration statement on Form F-1 with the SEC in connection with the IPO, which after several amendments was declared effective by the SEC on September 22, 2021 (the "Registration Statement").

65.     On September 23, 2021, Argo filed a prospectus on Form 424B4 with the SEC in connection with the IPO, which incorporated and formed part of the Registration Statement (the "Prospectus" and, together with the Registration Statement, the "Offering Documents").

66.     On or about September 23, 2021, pursuant to the Offering Documents, Argo conducted the IPO, issuing 7.5 million ADRs to the public at the Offering price of $15 per ADR for approximate proceeds of $105 million to the Company before expenses and after applicable underwriting discounts and commissions.

67.     The Offering Documents issued by the Securities Act Defendants for the IPO contained untrue statements and failed to include highly material facts regarding the Company's liquidity (or lack thereof), working capital and ability to finance operations.

**C.      Untrue Statements And Omissions In The Offering Documents**

68.     In their capacities as signers of the Offering Documents and/or an issuer, statutory seller, offeror, and control persons of the ADRs sold pursuant to the Prospectus, each of the Securities Act Defendants are liable for the misstatements and omissions alleged herein pursuant to §§ 11 and 15 of the Securities Act.

69.     The Offering Documents touted Argo's commitment to investing in reliable, low-cost power, stating, in relevant part:

*Reliable, Low-Cost, Renewable Power.* We believe the combination of increased mining difficulty, driven by greater hash rates, and the periodic adjustment of reward rates, such as the halving of Bitcoin rewards, will drive the increasing importance of power efficiency in cryptocurrency mining over the long term. As a result, we are focused on deploying our mining machines at locations with access to reliable, renewable power sources, as successfully doing so should enable us to reduce our power costs.

70.     The Securities Act Defendants also touted Argo's "Smart Growth" strategy:

*Smart Growth*. We aim to optimize our mining by **identifying and purchasing the most profitable mining machines with industry-leading returns on investment and actively monitoring and adjusting the operation of those machines to enhance their performance**. We believe this smart-growth strategy, including our commitment to mining efficiency and return on investment in mining machines, will enable us to build value over the long term.

71.     Securities Act Defendants also touted in the Prospectus that Argo was investing heavily in purchasing, building and operating its own mining facilities:

*Own and Operate Our Mining Facilities*. **We are investing heavily in purchasing, building and operating our mining facilities.** By owning and operating our mining machines at facilities that **offer competitive advantages**, including access to reliable, low-cost, renewable power and room for expansion, we expect to have greater control over the timing of the purchase and deployment of our mining machines. We also may enhance our ability to intelligently and quickly adapt our operating model and reap savings compared to paying for outsourced operations and infrastructure.

72.     However, according to CW-1, Argo would receive mining machines in shipments that were not immediately deployed for mining. CW-1's primary goal was the deployment of machines as quickly as possible so that Helios could mine as much bitcoin as possible. However, after the IPO, CW-1 had concerns about the financial status of the Company when a shipment of machines was received and sat in the warehouse without being deployed.

73.     Further, the Prospectus touted Argos' liquidity and capital resources:

Since our inception, we have financed our operations primarily through **cash generated by sales of cryptocurrency and sales of equity**

20

**securities**. Our primary requirements for liquidity and capital are to finance working capital, capital expenditures and general corporate purposes. **We believe that our sources of liquidity and capital resources will be sufficient to meet our existing business needs for *at least* the next 12 months.** From time to time, we may raise additional capital through the issuance of debt or equity securities or additional borrowings to the extent required, or to the extent that we believe such capital is available on favorable terms. **Our primary sources of liquidity are our cash and cash equivalents and cryptocurrency held in treasury**.

74.     The Prospectus also claimed that the Company could "control and manage" the volatility in crypto currency pricing:

To **control and manage the volatility in cryptocurrency pricing**, we engage in **planned selling of cryptocurrency over an extended period in advance of forecasted fiat cash requirement**s. In the future, as with any business which mines a commodity, we expect to sell Bitcoin to **satisfy our fiat cash requirements**, at least until Bitcoin is accepted more broadly as a medium of exchange.

75.     Moreover, the Offering Documents assured investors that Argo's "investments in mining facilities are designed to significantly expand our mining capacity and provide us with meaningful control over our mining operations."

76.     The statements referenced in ¶¶ 69-76 were materially false and misleading when made because they failed to disclose, misrepresented, and omitted material adverse facts, material adverse trends, material uncertainties, or significant risks that existed prior to and at the time of the IPO, including that Argo (i) could not "control and manage the volatility in cryptocurrency pricing", (ii)  did not have sufficient liquidity and capital resources beyond 12 months not sufficiently capitalized, (iii) had far too little cash on hand to operate the Helios facility without taking drastic cost-cutting measures and capital raises, such as selling mining machines, that would negatively impact the Company's ability to mine, including its hash rate,

and (iv) was not able to withstand foreseeable setbacks inherent to any cryptocurrency mining operation, such as higher energy prices and the decrease in the price of Bitcoin.

77.    On October 7, 2022, despite the representations in the Prospectus that the Company could "control and manage the volatility in cryptocurrency pricing" and had sufficient liquidity and capital resources, the Company announced desperate strategic initiatives to maintain solvency and raise working capital including selling 3,400 machines that had been purchased to mine bitcoin.  The Company also issued approximately 87 million shares of new stock and sold them for $27 million to an undisclosed strategic investor.  This was all due in part to the "decline in the price of Bitcoin since March 2022", increased "mining difficulty".

78.    Analysts reacted negatively to the news. Barclays issues a report on October 7, 2022, stating that it was "awaiting clarity on [Argo's] ongoing financing and operational headwinds" noting that Wall had described the situation as a "cash crunch." By the end of November 2022, Barclays had discontinued coverage of Argo due in part of the unresolved liquidity concerns, noting that while the sale of 3,400 mining machines may help meet short term liquidity needs, the sale (that including a hosting side agreement for the machines) would lower the all critical hash rate metric at a time when Argo competitors have been moving this metric up more consistently.

79.    When Argo announced the drastic strategic actions to "strengthen the Company's balance sheet", the market reacted swiftly. Argo's ADR price fell $0.27 per ADR, nearly 11% on the news to close at $2.19 on October 11, 2022 – **nearly 86% less than the $15.00 IPO offering price.**

## CLAIMS FOR RELIEF UNDER THE SECURITIES ACT

### COUNT I

**For Violations of Section 11 of the Securities Act
Against The Securities Act Defendants**

80.     Plaintiff repeats and realleges each Securities Act allegation above as if fully set forth herein.  This Count does not sound in fraud.  Any allegations of fraud or fraudulent conduct and/or motive are specifically excluded.  For purposes of asserting this and other claims under the Securities Act, Plaintiff does not allege that the Securities Act Defendants acted with intentional, reckless or otherwise fraudulent intent. For purposes of this Claim, Plaintiff asserts only strict liability and negligence claims and expressly disclaims any claim of fraud or intentional misconduct.

81.     This Count is asserted against the Securities Act Defendants for violations of Section 11 of the Securities Act (15 U.S.C. § 77k), on behalf of all Class members who purchased Argo ADRs sold in or traceable to the Argo IPO.

82.     Plaintiff acquired Argo ADRs pursuant to the Argo IPO.

83.     The Registration Statement contained untrue statements of material facts, omitted to state other material facts required to be stated in order to make the statements contained therein not misleading, and omitted to state material facts required to be stated therein.

84.     The Securities Act Defendants are strictly liable for the misstatements and omissions.

85.     None of the other Securities Act Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true or that there was no omission of material facts necessary to make the statements made therein not misleading.

86.     The Securities Act Defendants issued, caused to be issued, and participated in the issuance of untrue statements of material fact to the investing public that were contained in the Registration Statement.

87.     In connection with offering the registered ADRs to the public and the sale of those securities, the Securities Act Defendants named in this Count, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mails, and a national securities exchange.

88.     At the time of their purchase of Argo ADRs, Plaintiff and other members of the Securities Claims Class did not know, nor in the exercise of reasonable diligence could they have known, that the Registration Statement contained untrue statements of material fact and omitted to state material facts required to be stated or necessary to make the statements particularized above not misleading when they purchased the registered securities.

89.     This claim was brought within one year after the discovery of the untrue statements and/or omissions (and within one year after such discovery should have been made in the exercise of reasonable diligence) and within three years after the IPO.  It is therefore timely.

90.     As a result of the foregoing, the Securities Act Defendants are liable for violations of Section 11 of the Securities Act to Plaintiff and the other Class members who purchased the ADRs sold in or traceable to the Argo IPO.

## COUNT II

**For Violations of Section 15 of the Securities Act Against
the Individual Securities Act Defendants**

91.     Plaintiff repeats and realleges each Securities Act allegation above as if fully set forth herein.  This Count does not sound in fraud.  Any allegations of fraud or fraudulent conduct and/or motive are specifically excluded.  For purposes of asserting this and other claims under

the Securities Act, Plaintiff does not allege that the Securities Act Defendants acted with intentional, reckless or otherwise fraudulent intent. For purposes of this Claim, Plaintiff asserts only strict liability and negligence claims and expressly disclaims any claim of fraud or intentional misconduct.

92.     This Count is alleged against the Individual Securities Act Defendants for violations of Section 15 of the Securities Act (15 U.S.C. § 77o), on behalf of Plaintiff and the other Class members who purchased Argo ADRs sold in or traceable to the Argo IPO.

93.     As set forth in Count One of the Securities Act Claims, Argo is liable pursuant to Section 11 of the Securities Act.  At all relevant times, the Individual Securities Act Defendants were controlling persons of Argo within the meaning of Section 15 of the Securities Act.  The Individual Securities Act Defendants served as executive officers and/or directors of Argo prior to and at the time of the IPO as alleged herein.

94.     Each of the Individual Securities Act Defendants was a culpable participant in the violations of Section 11 of the Securities Act alleged herein, based on their having signed the Registration Statement and having otherwise participated in the process that allowed the Offering to be successfully completed.  The Individual Securities Act Defendants, by virtue of their managerial and/or board positions with the Company, controlled the Company, as well as the content of the Registration Statement, at the time of the Offering.  Each of the Individual Securities Act Defendants was provided with or had unlimited access to the Registration Statement, and had the ability to prevent its issuance or cause it to be corrected.

95.     As a direct and proximate result of the Individual Securities Act Defendants' wrongful conduct, the market price for Argo ADRs was artificially inflated in the Offering, and

Plaintiff and the Class suffered substantial damages in connection with the purchase of Argo ADRs during the Class Period.

96.     This claim was brought within one year after the discovery of the untruthfulness of the statements and omissions or after such discovery should have been made by the exercise of reasonable diligence and within three years after Argo ADRs were offered to the public.

97.     As a result of the aforementioned, the Individual Securities Act Defendants are liable under Section 15 of the Securities Act, to the same extent that Argo is liable under Section 11 of the Securities Act, to Plaintiff and the other Class members who purchased securities pursuant or traceable to the Argo IPO.

## THE EXCHANGE ACT CLAIMS

98.     These claims brought under the Exchange Act are asserted against Argo, Wall, and Appleton, who, during the Class Period, intentionally and/or recklessly made materially false or misleading statements or omissions to the market and/or employed devices, schemes, and artifices to defraud; and engaged in acts, practices, and a course of conduct that operated as a fraud or deceit upon Plaintiff and other members of the Class.

## I.     BACKGROUND OF THE EXCHANGE ACT CLAIMS

### A.     Background of Argo

99.     The Helios Facility is a massive, 1,050 foot-long, 125,000 square foot warehouse that is powered by its own electric substation.  The facility is designed to hold more than 20,000 mining rigs and to house one of the largest immersion-cooled mining operations in the world. There were 40 full time employee positions at the Helios Facility.  In the time leading up to its energization in May of 2022, the Helios facility was referred to as "transformational" and "state of the art," a "grand opportunity" for Argo; the company's "flagship mining facility[;]" "a potential game-changer against low expectations," and as having the potential to boost

production, enhance margins, and drive scale for Argo. Helios was anticipated to "be home to the large majority of Argo's mining capacity going forward."

100.     On May 5, 2022, Argo announced the Helios Facility was finally energized and ready for operation. At that time, the delivery and installation of the first 20,000 mining rigs had commenced and the remaining machines were expected to be delivered and installed in batches until October 2022. This mining capacity represents an increase of 243% in Argo's hashrate to an anticipated 5.5 exahash per second by the end of 2022. *Id.* An aerial image of the Helios Facility from June 27, 2022 is included below:



101.     Coined by CEO Wall as "Bitcoin mining nirvana[,]" Argo purposefully chose a location in Western Texas due to the availability electricy, including some made from renewable sources. Given that the Helios Facility pulls more power than some Texas cities, the source and cost of electricity is very important to Argo's bottom line.

102.     Texas's main grid operator is called the Electric Reliability Council of Texas ("ERCOT"). ERCOT manages the flow of electric power to more than 26 million Texas customers—representing about 90 percent of the state's electric load. As the independent system

operator for the region, ERCOT schedules power on an electric grid that connects more than

52,700 miles of transmission lines and 1,100 generation units, including Private Use Networks.

103.    ERCOT offers some unique ancillary programs for large power users in Texas

like Bitcoin miners.  For example, ERCOT has a "Controlled Load Response" option where

Bitcoin miners can shut down all or part of their operations at peak times in exchange for certain

types of incentives, including lower energy prices.  This allows ERCOT to stabilize the power

grid by ensuring a base level of demand and offloading power when demand gets too high.

Bitcoin mining is one of the few companies that can shut off operations at a moment's notice and

give energy back to the grid, which makes mining companies a beneficial industry for the Texas

power grid.

104.    Another program offered by ERCOT are power purchase agreements ("PPAs").

There are two types of PPAs, Fixed-Price PPAs and Spot-Price PPAs.  Fixed-Price PPAs are

long-term energy contracts under which a power user agrees to purchase a fixed quantity of

energy over an extended period of time at a set, discounted rate.  The benefit of a Fixed-Price

PPA is that it protects against energy price volatility.  The buyer is shielded from energy prices

that rise above the PPA price, and the seller is shielded from energy prices that dip below the

PPA price.

105.    Before a company may enter into a Fixed-Price PPA, ERCOT often requires some

form of credit support, either liquid credit support in the form of cash or letters of credit, or a

guarantee from the buyer in order to prove that it will be able to pay for the contracted energy.

Given that Bitcoin miners are relatively new companies, they can face credit risks if they need

more revenue to pay for the electricity they use under the terms of the Fixed-Price PPA.

106.    Spot-Price PPAs are also energy contracts under which a power user agrees to purchase a fixed quantity of energy, usually over a shorter period of time, based on market prices for energy.  Spot-Price PPAs are more common when energy prices are volatile because the shorter duration allows the sellers and purchasers to frequently assess their options in an ever-changing market.  ERCOT provides both Day-Ahead Market (DAM) prices on a daily basis and Real-Time Market (RTM) prices on an interval basis which constitute the market prices for energy usage.

107.    Regardless, both types of PPAs can help miners secure a reliable source of energy and avoid interruptions to their operations, ensuring that they can access the energy needed to mine Bitcoin.

108.    From the early days of operating the Helios Facility, Argo represented to investors that energy costs would be very low, in part because the Company was planning to enter into a fixed-price PPA with ERCOT.  For example, in its July 2022 Operational Update dated August 5, 2022, Argo provided that it was "evaluating options for a long-term, fixed price PPA to sign in the near future."  In its August 2022 Operational Update Press Release dated September 9, 2022, Argo provided that it "will continue to monitor the market and evaluate our options for securing a long-term fixed price PPA."

109.    Indeed, Argo repeatedly told the market that its net electricity costs for Helios would be below $0.02 per kilowatt hour.  For example, during an interview with an online finance guru on December 16, 2021, Wall stated that "in Texas you can actually get sub two cents um per kilowatt hour which is really amongst the cheapest power anywhere in the world[.]"

110.    By the end of the Class Period, Argo had 9,000 machines up and running in Texas.  9,000 of Argo's S19J Pro Bitmain machines would use 27.45 megawatts per hour, which

is equivalent to 27,450 kilowatts per hour.  Based on Argo's anticipated cost of electricity at $0.02 kilowatts per hour, it would cost Argo approximately $400,770 per month to power the miners.

111.    However, Argo was never able to enter into a Fixed-Price PPA with ERCOT. Instead, the Company entered into a Spot-Price PPA which was based on the index prices for energy.  As a result of the higher-priced agreement, when power prices were high due to increased demand, Argo would shut down its mining operations, and when power prices were low due to decreased demand, Argo mined as much Bitcoin as it could.  The excuse that Argo and Wall provided for not entering into a Fixed-Price PPA is that since May 2022, power prices have been "really high so it's like signing a mortgage when interest rates are really high you have to wait for them to come down[,] that's expected to happen um closer to the end of the summer into September and then we will be able to to hopefully lock in a very good fixed price ppa[.]"

### B.    Argo's Financial Position

112.    Given that Argo anticipated that it would cost more than $200 million to construct the Helios facility to utilize just a fraction of the MW power capacity, the Company needed a major cash infusion to launch its expansion plans.  Therefore, in June 2021, Argo entered into a $20 million term loan agreement with Galaxy Digital LP ("Galaxy")—a company that offers financing options to digital asset companies (the "Galaxy Term Loan").  The loan was collateralized with Argo's cryptocurrency holdings, was due in six months, and had a 12.5% interest rate.

113.    In September 2021, Argo entered into an additional $25 million term loan agreement with Galaxy (the "**New Galaxy Term Loan**") to finance the continued development of the Helios Facility.  The New Galaxy Term Loan was scheduled to mature on October 29, 2021 and had an

interest rate of 4.5%.  The Galaxy Term Loan was subsumed into the New Galaxy Term Loan for total borrowings of $45 million under the New Galaxy Term Loan.

114.    Then, on September 27, 2021, Argo completed its United States initial public offering ("IPO") of 8,525,000 ADRs at a price of $15.00 per ADR, pursuant to a registration statement on Form F-1.  The IPO raised net proceeds of approximately $114.80 million and allowed Argo to be listed on the NASDAQ Global Select Market under the ticker symbol ("ARBK").

115.    As a foreign private issuer, Argo is required under SEC regulations to annual financial reports – and did so during the Class Period for the year ended December 31, 2021 on May 5, 2022 - and one interim financial report for the six months ended June 30, 2022 on August 24, 2022.

116.    On October 29, 2021, Argo used a portion of the proceeds from the IPO to repay $25 million of the principal amount outstanding under the New Galaxy Term Loan and entered into a callable loan agreement for the remaining $20 million principal outstanding that would mature in October 2022 (the "Galaxy Callable Loan Agreement").

117.    Argo also used a substantial portion of the IPO proceeds to pay for the construction of the Helios Facility and the mining rigs that would be housed there.  Argo represented to investors that almost all of the infrastructure for Phase I of the Helios Facility had been funded in the first half of 2022.  For example, on June 14, 2022, Peter Wall stated, in part, "the good news is that we have paid for over 90% of those machines, you know, the 20,000 machines that we ordered from Bitmain that are being installed.  The other good news is that, you know, 95% of the facility is paid for, for that first 200 megawatts of phase 1.  All of which means that the first 3.6 exahash from those 20k machines is on track and is paid for."

118.    In November 2021, Argo issued $40 million in senior notes with an interest rate of 8.75% due in 2026 (the "Notes").

119.    Also in November 2021, Argo issued a press release regarding the disclosure of inside information because, during a meeting, Argo representatives "inadvertently disclosed certain information that could be viewed as material non-public information under US securities laws[.]"In the press release, Argo stated that "Argo representatives disclosed in a forward-looking statement that the total cost to build and kit out an 800 megawatt mining facility in Texas could be US$1.5-2.0 billion."

120.    Then, on December 23, 2021, Argo entered into another loan agreement with Galaxy for a loan of $30 million to help fund further build-out of the Helios Facility.  The loan was collateralized by Argo's Bitcoin holdings and had an interest rate of 8%.  Around that time, Argo paid $15 million on the Galaxy Callable Loan Agreement.   Therefore, by December 31, 2021, Argo owed a total of $35 million to Galaxy, due in October 2022.

121.    Together, the loans, IPO, and notes resulted in proceeds of $229.8 million to Argo in 2021.

122.    On March 10, 2022, Argo announced that it had entered into an equipment financing agreement with New York Digital Investment Group LLC ("NYDIG")—a Bitcoin company that offers borrowing options to help fund Bitcoin operations.  Under the equipment financing agreement, NYDIG loaned $26.66 million to Argo to finance the purchase of infrastructure equipment for construction of the Helios Facility.  The loan was collateralized by the equipment purchased by Argo, carried an 8.25% interest rate, and had a term of four years.

123.    Additionally, on May 4, 2022, Argo entered into an additional equipment financing agreement with NYDIG.  Under the second equipment financing agreement, Argo

borrowed $70.6 million through a series of eight loans with staggered funding dates in order to recapitalize the purchase of mining rigs for the Helios Facility.  The loans were collateralized by Argo's mining machines, carried a 12% interest rate, and were due beginning in May 2024.

124.    The vast majority of the cash loaned to and raised by Argo was used to fund construction of the Helios Facility.  The chart below shows Argo's cash holdings reported during the Class Period:

| Time Period | Cash Held |
| --- | --- |
| Quarter ended 06/30/21 | $22,155,329 |
| Quarter ended 09/30/21 | $85,840,094 |
| Year ended 12/31/21 | £11,803,000 |
| Quarter ended 03/31/22 | $11,900,000 |
| Six months ended 06/30/22 | £9,210,000 |

125.    Argo also carried Bitcoin on its balance sheet as an alternative to cash.  Known as "HODL" or "hold on for dear life[,]" Argo's Bitcoin holdings made up a significant portion of its financial position.  For example, when the Class Period began at the end of September 2021, Argo held 1,836 Bitcoin, which at that time was valued at approximately $79 million.  By the end of January 2022, Argo held 2,748 Bitcoin, which was valued at approximately $105.75 million.   The chart below shows Argo's Bitcoin HODL positions during the Class Period:

| Time Period | Bitcoin Held | Approximate Cash Value |
| --- | --- | --- |
| Quarter ended 06/30/21 | 1,268 | $44,431,785.12 |
| Quarter ended 09/30/21 | 1,836 | $80,400,074.04 |
| Year ended 12/31/21 | 2,595 | $120,165,237.75 |
| Month ended 01/30/22 | 2,748 | $104,197,564.80 |
| Month ended 02/28/22 | 2,685 | $115,973,822.55 |

| | | |
|---|---|---|
| Month ended 03/31/22 | 2,700 | $122,954,436.00 |
| Month ended 04/30/22 | 2,682 | $101,151,308.16 |
| Month ended 05/31/22 | 2,379 | $75,633,905.49 |
| Month ended 06/30/22 | 1,953 | $38,639,577.69 |
| Month ended 07/30/22 | 1,295 | $30,634,791.95 |
| Month ended 08/31/22 | 1,098 | $22,014,636.48 |
| Month ended 09/30/22 | 512 | $9,949,076.48 |

126.     Argo generated revenue from its Bitcoin mining operations.  Argo's mining revenue consisted of its share of the block reward the pool earned for solving the block, and its share of transaction fees associated with the transactions comprising the block.  Argo's share of the block reward and related transaction fees was determined by the proportion of hash power the Company contributed toward the pool as a whole.  The chart below shows the revenue Argo earned from mining Bitcoin during the Class Period:

| Time Period | Bitcoin Mined | Mining Revenue | Mining Margin |
|---|---|---|---|
| Month ended 09/30/21 | 165 | $7.59 million | 84% |
| Month ended 11/30/21 | 185 | $11.2 million | 86% |
| Month ended 12/31/21 | 214 | $10.55 million | 83% |
| Month ended 01/31/22 | 172 | $7.1 million | 74% |
| Month ended 02/28/22 | 135 | $5.58 million | 71% |
| Month ended 03/31/22 | 163 | $6.92 million | 74% |
| Month ended 04/30/22 | 166 | $6.83 million | 75% |
| Month ended 05/31/22 | 124 | $3.89 million | 62% |
| Month ended 06/30/22 | 179 | $4.35 million | 50% |
| Month ended 07/31/22 | 219 | $4.73 million | 37% |
| Month ended 08/30/22 | 235 | $5.23 million | 20% |
| Month ended 09/30/22 | 215 | $4.27 million | 25% |
| Month ended 10/31/22 | 204 | $4.00 million | 32% |

127.    Argo's "mining margin" is defined as the difference between Bitcoin mining revenue and the costs to mine Bitcoin, expressed as a percentage.  At the end of 2021, Argo's mining margin was 84%, which it boasted was among the highest of all of the Company's peers.

128.    Despite raising a significant amount of capital in 2021 and early 2022 and running a profitable business, Argo was burning through cash fast.  The high costs of running its facilities and funding its operations plunged Argo to the verge of bankruptcy only a year after its IPO.

## II.    EXCHANGE ACT DEFENDANTS ISSUED FALSE AND MISLEADINNG STATEMENTS DURING THE CLASS PERIOD

129.    During the Class Period, the Exchange Act Defendants continuously represented to investors that the Company was in a strong financial position, and that it had sufficient resources to continue to fund the Company's expansion, including in particular at the Helios facility.  To support their statements touting Argo's financial position, the Exchange Act Defendants frequently explained that two of Argo's largest financial burdens, the cost of the Helios Facility and the cost of power, were not a concern because energy prices in Texas were extremely low, approximately $0.02 per kilowatt hour, and phase 1 of the Helios Facility was nearly paid off.  What the Exchange Act Defendants failed to disclose was that the Company was burning through cash at an alarming rate and that in a matter of months it would not have sufficient funds to run its Helios Facility.

130.    For example, during Argo's earnings conference call for the third quarter of 2021 held on November 2, 2021, Appleton stated, in part:

> [O]ur ***balance sheet is being strengthened significantly this year***, especially taking into account the recent capital raise, as part of the NASDAQ listing.  In addition, I'd also highlight our holding, which at the end of September, our digital currencies holding was 1,836 Bitcoin, which at that time, was valued at $79 million, as of the end of September . . . ***We have very little debt overall***, even [adding that in], we have the lease, we have the mortgage, and we have that Bitcoin backed loan.  And [W]ith

> *that cash on hand, and our hodl, you know, Argo has sufficient*
> *flexibility to pursue our strategic growth plans in Texas, infrastructure,*
> *and machines, et cetera.*

131.     The statements by Argo and Appleton in ¶ 131 above were false and/or misleading when made because the Exchange Act Defendants failed to disclose that Argo was not sufficiently capitalized and had far too little cash on hand to (1) operate a facility the size and scale of Helios and (2) withstand foreseeable setbacks inherent to any cryptocurrency mining operation, such as higher energy prices and the decrease in the price of Bitcoin.

132.     During two separate interviews conducted on November 21, 2021, and December 16, 2021, Wall told the market that in Texas, Argo had access to "the cheapest power anywhere in the world" at less than two cents a kilowatt hour.

133.     In an interview with CNBC conducted on December 21, 2021, Wall represented that Argo was "***extremely on the profitable end of things right now***."  Wall added that despite more mining machines coming online, Argo's "margins are still very, very strong and you know ***we are on the extreme end of profitability right now***."

134.     The statements by Argo and Wall in ¶¶ 133-34 above were false and/or misleading when made because Defendants failed to disclose that Argo was not sufficiently capitalized and had far too little cash on hand to (1) operate a facility the size and scale of Helios and (2) withstand foreseeable setbacks inherent to any cryptocurrency mining operation, such as higher energy prices and the decrease in the price of Bitcoin.

135.     On April 27, 2022, Argo filed its Annual Report for the year ended December 31, 2021 with the SEC on Form 6-K (the "2021 Form 6-K").  The 2021 Form 6-K was signed by Peter Wall and stated in part:

> Our strategic focus in 2022 is to execute on our plans at Helios and to
> scale our operations. As we near the completion of Helios Phase 1, Argo is

poised to significantly increase its hash rate and continue building out infrastructure. While Phase 1 of Helios will utilize 200 MW of electricity, our interconnection agreement provides us with access to up to an additional 600 MW of capacity. ***This runway for growth is unmatched by Argo's peers, and we have built a robust foundation upon which we can scale efficiently and profitably***.

136.     The statements by Argo and Wall in ¶¶ 136 above were false and/or misleading when made because Defendants failed to disclose that Argo was not sufficiently capitalized and had far too little cash on hand to (1) operate a facility the size and scale of Helios and (2) withstand foreseeable setbacks inherent to any cryptocurrency mining operation, such as higher energy prices and the decrease in the price of Bitcoin.

137.     On April 28, 2022, Argo held a conference call to discuss the financial results for the year ended December 31, 2021.  During the conference call, Appleton stated, in part:

> So a really pleasing year, and one we're really proud of. And 'd say, ***we're well-positioned to continue on the growth phase and continue a very profitable level***. ***The balance sheet. So this year, as Peter said, –we've had a number of private placements which has really strengthened the balance sheet***. ***So you could see the end of the year, we've got a very strong balance sheet, significantly stronger than last year in terms of our net***. Our net assets are well into the $200 million -- $220 million or so. . . . And we're seeing continued downward pressure on the cost of capital. ***So we're very pleased with where we sat. And as we look forward, we look forward with optimism into the coming year*** . . .
>
> * * *
>
> We think we have more room to take on more debt, and still stay within our prudent internal EBITDAs, debt ratios, et cetera, et cetera, and all of those good things. ***But where we stand today, we stand in a very strong position, because we don't – we've got on our balance sheet a significant amount of Bitcoin as well***.  So we are not wholly reliant on debt. ***In fact, we could almost self mine*** -- and use the --and look at using just parts of debt, et cetera. As we said, that's going to be our process going forward. ***So we're in really strong position to move forward.  Our debt market remains strong***.

138.    The statements by Argo and Appleton in ¶ 138 above were false and/or misleading when made because Defendants failed to disclose that Argo was not sufficiently capitalized and had far too little cash on hand to (1) operate a facility the size and scale of Helios and (2) withstand foreseeable setbacks inherent to any cryptocurrency mining operation, such as higher energy prices and the decrease in the price of Bitcoin.

139.    On May 2, 2022, Argo filed its Annual Report for the year ended December 31, 2021 filed with the SEC on Form 20-F (the "2021 Form 20-F").  The 2021 Form 20-F was signed by Peter Wall and stated, in part:

> Since our inception, we have financed our operations primarily through cash generated by sales of cryptocurrency and sales of equity securities. Our primary requirements for liquidity and capital are to finance working capital, capital expenditures and general corporate purposes. ***We believe that our sources of liquidity and capital resources will be sufficient to meet our existing business needs for at least the next 12 months.***

140.    The statements by Argo and Wall in ¶ 140 above were false and/or misleading when made because Defendants failed to disclose that Argo was not sufficiently capitalized and had far too little cash on hand to (1) operate a facility the size and scale of Helios and (2) withstand foreseeable setbacks inherent to any cryptocurrency mining operation, such as higher energy prices and the decrease in the price of Bitcoin.

141.    In the same annual report filed on May 2, 2022, Defendants again reiterated how inexpensive power at the Helios Facility would be, stating that they "anticipate that our net electricity costs will be below $0.02/kWh after including the benefits of participating in demand response programs offered by" ERCOT.

142.    On May 18, 2022, Argo held a conference call to discuss the financial results for the first quarter of 2022.  During the conference call, Appleton stated, in part:

> *We're in a very healthy position at the moment in terms of our hodl, how much of our hodl is unencumbered, or is capitalized against loan, et cetera, and we're very comfortable with our position today.  So, in terms of filling that gap for the $50 million that we talked about to build out the rest of phase 1, we're well positioned.  And of course, every day we mine more and more Bitcoin, and so that position, is is, you know, improves with every day that passes*.

143.     The statements by Argo and Appleton in ¶ 143 above were false and/or misleading when made because Defendants failed to disclose that Argo was not sufficiently capitalized and had far too little cash on hand to (1) operate a facility the size and scale of Helios and (2) withstand foreseeable setbacks inherent to any cryptocurrency mining operation, such as higher energy prices and the decrease in the price of Bitcoin.

144.     Analysts were buying Argo's narrative.  A Roth Capital Partners analyst report published that day stated, in part, "we believe ARBK should begin to see improved leverage with Helios online and [ARBK] can begin to retake network share along with lower direct costs. . . . we believe 2H22 should be a turning point for ARBK to regain share and operating efficiency." On May 20, 2022, Canaccord Genuity published an analyst report stating that "Argo's execution and forward outlook underscore our view that the company remains on an attractive ramp in digital asset mining."

145.     On June 7, 2022, Peter Wall joined the YouTube show called "Wolf of All Streets" hosted by Scott Melker to discuss Argo's future.  During the episode, Wall stated, in part:

> So on the capital side, so we used our capital from 2021 to get where we are now, so now looking at capital, looking at just the second half of this year and 2023, *how are we going to continue to grow?  And that's a question that a lot of investors ask right?*  They're like, great Peter, you've got all of this power, great, you've got a great relationship with intel, how are you going to fund it?  Are you going to sell equity again? Are you going to dilute us?  . . . Are you going to sell bitcoin?  Or are you going to take on debt, those are the levers, right?  Debt, equity, and

39

bitcoin.  So we have not, I'm going to leave you hanging on this, because we have not announced our capital plan yet, our numbers are coming out soon, . . . *but we feel like we've got an awesome path to capital, to get us to the kind of growth that we need to fully build out the next 800 megawatts over the next couple of years*.

146.    The statements by Argo and Wall in ¶ 146 above were false and/or misleading when made because Defendants failed to disclose that Argo was not sufficiently capitalized and had far too little cash on hand to (1) operate a facility the size and scale of Helios and (2) withstand foreseeable setbacks inherent to any cryptocurrency mining operation, such as higher energy prices and the decrease in the price of Bitcoin.

## III.    THE TRUTH IS GRADUALLY DISCLOSED TO THE MARKET

147.    Based on the foregoing statements, the market was under the impression that Argo was in a strong financial position and was sufficiently capitalized for continued growth. On June 7, 2022, during pre-market hours, Argo issued a press release providing an operational update for May 2022 that began to leak the truth about Argo's operations and financial condition, including at the Helios Facility, that began to partially reveal the statements described above were false and misleading.  The press release gave the first glimpse into what was really going on at Argo.  The Company reported that it had mined approximately 25% fewer Bitcoin compared to April 2022 because of, *inter alia*, increased network difficulty, higher electricity prices, and the curtailment of mining operations at its Helios facility. Specifically, that press release stated, in relevant part:

> During the month of May, Argo mined 124 Bitcoin or Bitcoin Equivalents (together, BTC) compared to 166 BTC in April 2022. The reduction in BTC mined is attributable to several factors:
>
> - The Bitcoin network experienced an increase in difficulty, leading to fewer BTC mined.

- The Company's hashrate on Terra Pool produced substantially lower Bitcoin than in previous months, primarily due to short-term probabilistic outcomes. The Company continues to explore all options to optimize its hashrate across alternative pools.

- High temperatures in Texas led to increased energy demand and higher electricity prices, to which the Company responded by voluntarily curtailing mining operations and reducing its energy usage at Helios.

- The Company faced some limited instances of unplanned downtime at Helios while bringing the new facility online.

148.    On this news, Argo's ADRs price **fell $0.28 per ADR, or 4.4%, to close at $6.09** per ADR on June 7, 2022.  Despite this decline in the Company's ADR price, Argo securities continued to trade at artificially inflated prices throughout the remainder of the Class Period because of the Exchange Act Defendants' misstatements and omissions regarding the Company's business and financial prospects.

149.    Indeed, that same day, June 7, 2022, Wall gave an interview with podcaster Scott Melker where he touted the competitiveness of the Texas energy grid and discussed the key factors Argo needed to succeed in its mining endeavors, stating, in relevant part:

> In general, from our approach, we like to bet on ourselves. Again, we haven't announced it. We're leaning a certain way, but when the time is right, we'll announce it. Scott, in this space, in the mining space, you need three things. It's a simple business. ***You need rigs, you need power, and you need capital. If you think about 2021, we used our Nasdaq IPO and a couple other little fundraisers before that to get the capital we needed to get the power and the rigs that we needed. We now have an enormous runway of power. 800 megawatts of power in West Texas in a particular part of the grid where there's an overabundance of renewable energy. That is a lot of it's going to waste because there's not enough transmission lines to take that power to market in Southern Texas. Texas is an energy island. You can't export across the state line to New Mexico or to Oklahoma. That power that's generated in Texas has to stay in Texas. It's not connected to the national grid. On top of that, Texas is also a competitive grid. It's a deregulated market. Meaning, you can buy your power from a host of retailers, and because of that, ERCOT, who manages the grid, incentivizes large load users like ourselves to participate in these demand response programs. What they***

>    ***call ancillary services. These auxiliary services allow miners to shut
>    down.***

150.    During the same interview, Wall stated that with respect to the location of the

Helios Facility "[t]here's not a load. There's just not a lot of power demand in those regions, but

there's an overabundance of supply."

151.    The statements by Argo and Wall in ¶¶ 150-51 above were false and/or

misleading when made because Defendants failed to disclose that Argo was not sufficiently

capitalized and had far too little cash on hand to (1) operate a facility the size and scale of Helios

and (2) withstand foreseeable setbacks inherent to any cryptocurrency mining operation, such as

higher energy prices and the decrease in the price of Bitcoin.

152.    Further, just two days later Defendants picked up where they left off and

continued to misrepresent the strength of Argo's balance sheet.  On June 9, 2022, Wall appeared

for an interview with CoinDesk and stated, in part:

>    Wall: In 2021, when things were crazy and everyone was raising equity, we went
>    out and we did that. We IPO'ed in the NASDAQ. We raised a couple hundred
>    million dollars last year, but ultimately for us, ***we never set unrealistic,
>    unrealistic expectations for the future.*** We always knew that there might be a
>    drawback. ***We didn't over-promise anything. So our motto has been, you know,
>    under-promise over-deliver.***…"It's going to be a really interesting second half of
>    the year because, you know, ***the strong survive the bear markets***, you know, so
>    you gotta be smart and you gotta be strong, and I ***I like where we're positioned***.

153.    Further, just a week later, Defendants continued to misrepresent the strength of

Argo's balance sheet.  On June 14, 2022, Argo held its annual general meeting.  During the

question and answer session after the meeting, Wall and Appleton stated, in part:

>    Wall: [O]n ***top of a kind of low cost of production, our balance sheet is
>    also strong enough to be able to withstand lower prices*** and then
>    potentially take advantage of an increased market share that would come
>    with that and then any potential downturn in the price of machines.  ***So we
>    feel like we're in a really good place as a miner, we feel like we're really
>    well positioned, and that's a testament to the work that we did in 2021,***

*and to really kind of overdelivering and under promising*, which has kind of been the theme for us for the first half of this year.

\*   \*   \*

Appleton: ***We own our own infrastructure. We are close to our machines. This gives us more control in a bear market. We've talked about the runway before and Peter has talked about the runway that we have in Texas.*** We have the ability to control what we own and how we manage it. ***So, we're in a really good place from that point of view.*** We're also developing propriety emerging technology and designing custom rigs to use Intel chips. And we are still very profitable, and in terms of mining. We're in that Tier A and that's how you should think about this. That's how we think about it, ***maintaining that economic advantage over our peers and the mining margins that you see that we can achieve using our own equipment and from our own facility.  So we are well placed***

154.     The statements by Argo, Appleton, and Wall in ¶¶ 152-53 above were false and/or misleading when made because Defendants failed to disclose that Argo did not have a low cost of production, was not sufficiently capitalized and had far too little cash on hand to (1) operate a facility the size and scale of Helios and (2) withstand foreseeable setbacks inherent to any cryptocurrency mining operation, such as higher energy prices and the decrease in the price of Bitcoin.

155.     During the Q&A session, in order to assure the market that Argo was in a strong financial position, Wall explained that the majority of the Helios Facility had already been paid for, stating, "the good news is that we have paid for over 90% of those machines, you know, the 20,000 machines that we ordered from Bitmain that are being installed.  The other good news is that, you know, 95% of the facility is paid for, for that first 200 megawatts of phase 1.  All of which means that the first 3.6 exahash from those 20k machines is on track and is paid for."

156.     On June 23, 2022, Peter wall spoke at the 2022 Sequire Decentralized Web Conference.  During the conference, he stated in part:

We did $100 million in revenue last year, that's USD, and this year, with the additional capacity coming online, we expect to mine a significant amount of bitcoin on a monthly basis.  What does our margin look like?  Our margins for 2021 were fantastic, even for the first quarter of this year, they have been very strong.  ***You know, definitely in the top echelon amongst our peers, and that's really just by being able to optimize our capex and really kind of protecting, being efficient on our costs, making sure that we have some of the lowest costs in this space for operations***.

157.    The statements by Argo and Wall in ¶ 156 above were false and/or misleading when made because Defendants failed to disclose that Argo's costs had spiraled out of control, and therefore the Company was not sufficiently capitalized and had far too little cash on hand to (1) operate a facility the size and scale of Helios and (2) withstand foreseeable setbacks inherent to any cryptocurrency mining operation, such as higher energy prices and the decrease in the price of Bitcoin.

158.    On July 7, 2022, Argo issued a press release with its June 2022 operational update.  In the press release, Argo provided a financing update, stating, in part, "***The Company is confident that it possesses sufficient liquidity to avoid any potential liquidation*** of the BTC-backed loan if Bitcoin prices continue to decline.  Since Q4 2021, the Company has been using derivatives to limit downside risk."  Wall also stated, "***We have seen positive results from our risk management strategy*** through which we have reduced the Company's exposure to its BTC-backed loan, and we have hired a full-time derivatives trader.  ***We believe the Company is well positioned to navigate the current market conditions and further increase our efficiencies***."

159.    The statements by Argo and Wall in ¶ 158 above were false and/or misleading when made because Defendants failed to disclose that Argo's costs had spiraled out of control, and therefore the Company was not sufficiently capitalized and had far too little cash on hand to (1) operate a facility the size and scale of Helios; and (2) withstand foreseeable setbacks inherent

to any cryptocurrency mining operation, such as higher energy prices and the decrease in the price of Bitcoin.

160.    Analysts still remained confident about Argo's future in light of the Company's misleading statements touting its balance sheet.  For example, on August 1, 2022, Roth Capital Partners published an analyst report stating, in part that, "we believe ARBK remains on solid footing both in terms of growing its scale and from a financial perspective."

161.    On August 24, 2022, Argo filed its interim half year results for the period ended June 30, 2022 with the SEC on Form 6-K.  The interim results were signed by Peter Wall and stated, in part:

> During the period, there has been a global macroeconomic pullback as investors and central bankers grapple with inflation, the war in Ukraine, and rising interest rates.  These headwinds have impacted all financial assets, including Bitcoin and the equity of publicly traded Bitcoin miners.
>
> ***Argo is well positioned to weather the current downturn with its large and highly efficient mining infrastructure, runway for growth, and experienced management team, which has successfully navigated the Group through previous crypto winters. In response to the challenging market environment, we have adjusted our treasury management strategy***.  Throughout the period, we have been steadily selling Bitcoin, utilizing derivatives to obtain a higher realized price than simply selling into the market.  In Q2 2022, we sold Bitcoin at an average realized price of approximately $28,500, realizing hedge gains in excess of $1,500 per Bitcoin.  Proceeds from these sales have been used for operating expenses, capital expenditures, and to reduce exposure on our Bitcoin-backed loan.
>
> ***Despite the challenging economic environment in 2022, we continue to focus on our strategic priority of completing Phase 1 of Helios and laying the groundwork to further scale operations***.
>
> \*   \*   \*
>
> Responsibility Statement.  ***We confirm that to the best of our knowledge:***
>
> - ***the Interim Report*** has been prepared in accordance with International Accounting Standards 34, Interim Financial Reporting; and

- ***gives a true and fair view of the assets, liabilities, financial position and profit/loss of the Group***;

162.     The statements by Argo and Wall in ¶ 161 above were false and/or misleading when made because Defendants failed to disclose that Argo was not sufficiently capitalized and had far too little cash on hand to (1) operate a facility the size and scale of Helios; and (2) withstand foreseeable setbacks inherent to any cryptocurrency mining operation, such as higher energy prices and the decrease in the price of Bitcoin.

163.     The following day, Argo held its earnings conference call for the second quarter of 2022.  During the call, Wall and Appleton stated, in part:

> Wall: ***Mining margin for the first six months of 2022 was 71%, continues to be the highest amongst our peers, down from 81% but from the first half of 2021, still a very good margin.  I'm proud of the team for continuing to have really good efficiencies, even as, the price of Bitcoin has [fell] during the first half of the year***.  And the mining margin of 71% translates to an average cost per Bitcoin of roughly $10,000.  And again, that's for the first half of the year.
>
> *   *   *
>
> Appleton: ***In terms of our balance sheet, I think the first thing really to mention is how we've despite significant headwinds that we've had this year, our rigorous approach to cash flow and treasury management has meant that we have been cash neutral. So we're well placed there***.

164.     The statements by Argo, Appleton, and Wall in ¶ 163 above were false and/or misleading when made because Defendants failed to disclose that Argo was not sufficiently capitalized and had far too little cash on hand to (1) operate a facility the size and scale of Helios; and (2) withstand foreseeable setbacks inherent to any cryptocurrency mining operation, such as higher energy prices and the decrease in the price of Bitcoin.

165.     Analysts were still buying into Argo's positive, but false, narrative regarding its strong financial position.  For example, on August 25, 2022, Barclays published an analyst report

that stated, in part, "While the company reduced its hash rate capacity guidance for FY22, we reiterate our confidence in ARBK's business model."  That same day, finnCap published an analyst report that stated, in part, "Through the currently challenging conditions, management has focused on scaling Helios without diluting existing shareholders, and its experience in navigating previous crypto winters means we expect it will be excellently positioned to capitalise when conditions change."  On August 26, 2022, Canaccord Genuity published an analyst report in which it stated, in part, "Argo remains on an attractive ramp in digital asset mining. . . . Despite the recent volatility in cryptocurrencies, many leading bitcoin miners, including Argo, remain quite profitable."

166.    On September 9, 2022, Argo released its August 2022 operational update video. In the video, Wall stated, in part:

> In terms of our HODL, we sold about 450 bitcoin this month, ended the month just under 1,100 bitcoin, . . . *We have a derivatives trader that's now in place, and he is very focused on managing our treasury, making sure he's protecting the downside given all of the volatility that's going on, as well as making sure that we are able to benefit from the upside that we believe is coming in, you know, in the medium and long term, we are still bullish on Bitcoin in the long term, and again, are actively using, you know, derivatives to make sure that we're, you know, getting the balancing act right*.

167.    The statements by Argo and Wall in ¶ 166 above were false and/or misleading when made because Defendants failed to disclose that Argo was not sufficiently capitalized and had far too little cash on hand to (1) operate a facility the size and scale of Helios and (2) withstand foreseeable setbacks inherent to any cryptocurrency mining operation, such as higher energy prices and the decrease in the price of Bitcoin.

## IV.    ARGO DROPS A BOMBSHELL ON THE MARKET ANNOUNCING MAJOR INITIATIVES TO CUT COSTS AND RAISE LIQUIDITY

168.    On October 7, 2022, during pre-market hours, Argo shocked the market by

announcing several drastic actions the Company was forced to take in order to stave off bankruptcy.  The Company issued a press release disclosing that the headwinds in the price of electricity, the geopolitical situation in Europe, and the decline in the price of Bitcoin since March 2022 "have reduced the Company's profitability and free cash flow generation."  During a video posted by Argo that day, Wall elaborated that the Company's spot-price PPA in Texas had exposed Argo to higher electricity prices, and Bitcoin prices had decreased dramatically over the course of the year, which together lowered Argo's mining margin and caused a cash crunch for Argo.  Therefore, during that month, power would have cost Argo approximately $1,808,406.

169.    Argo stated that in addition to measures being undertaken to reduce costs and preserve capital, Argo had initiated three financing transactions.

170.    First, Argo had signed a non-binding letter of intent with an affiliate of NYDIG to amend an existing equipment financing agreement.  More specifically, the "amendment releases approximately £5.0 million ($5.7 million) of restricted cash and modifies the amortisation schedule for the Company's existing loans. The transaction significantly reduces the Company's debt service payments . . . .  In exchange, the Company will provide NYDIG with an expanded collateral package."

171.    Second, the Company planned to sell 3,400 mining machines at the Helios Facility for cash proceeds of $6.8 million.  Under the terms of the sale, Argo would host the machines for the purchaser and enter into a profit sharing agreement.

172.    Third, Argo had entered into a non-binding letter of intent with a strategic investor pursuant to which the investor would purchase 87 million ordinary shares for gross proceeds of $27 million.  As a result of the agreement, "the Investor will hold 15.46% of the

Company's enlarged issued share capital.  The Investor will have the right to nominate two new non-executive directors to the Board, subject to the Company's approval."

173.    The market was shocked by this news, especially in light of the fact that Argo had continually represented that energy would cost only $0.02 per kilowatt hour, that the Helios Facility had been completely paid for in the first half of 2022, and that its liquidity position was sound.  Thus, following the disclosures, Argo's **ADR price fell $0.97 per ADR, or 23.26%, to close at $3.20 per ADR on October 7, 2022**.

174.    Analysts were stunned by the news. Barclays issued a report on October 7, 2022 "Awaiting Clarity on Capital Structure" stating that Wall had described the situation as a "cash crunch" and while the sale of the mining machines may meet short-term liquidity needs, the sale also would result in lowering the company's hash rate guidance and "may give investors pause in the near term given that many key peers have moving this metric up more consistently."

175.    Barclays also downgraded Argo's rating to Equal Weight and dropped the price target from $7 to $3.  Roth downgraded Argo to Neutral and lowered its price target from $10 to $2.

176.    Retail investors also expressed their frustration with this news.  On Twitter, a commentor named Sam Hedges wrote, "Not sure how many can believe a word Peter says now. BTC hasn't been performing. But I seem to recall Peter saying 'we have listened and won't be diluting anymore shares' or something similar. Zero confidence now."  Steve Healy wrote, "Wow you have really screwed over the investors, i tried to ignore the doubters but they have been proven correct. This is just poor business management, You need an experienced leader to run the company and the CFO just needs to go."  Jase Bartram wrote, "no wonder the share price is in free fall, so far in 23 you have not delivered on any promise and now people have no

confidence in your competence[.]"  Brett wrote, "Smart Growth, Under Promise over deliver ?

Struggling to square all this with those Mantras."

177.    Then, on October 11, 2022, during pre-market hours, Argo issued a press release

providing an operational update, stating, in relevant part:

> During the month of September, Argo mined 215 [BTC] compared to 235 BTC in August 2022. The decrease in BTC mined is primarily due to a 12% increase in average network difficulty during September. Additionally, the Company is continuing to curtail operations at its Helios facility in Dickens County, Texas during periods of high electricity prices.
>
> ***
>
> **Organisational Changes**
>
> Effective October 15, Perry Hothi is stepping down from his role as [CTO] at Argo and will serve as a transitional advisor to the Company. The technology function will be led by Jean Esquier, who currently serves as Vice President of Technology and Development.

178.    On this news, Argo's **ADR price fell $0.27 per ADR, or 10.98%, to close at**

**$2.19 per ADR on October 11, 2022.**

## V.    POST CLASS PERIOD EVENTS

179.    Unfortunately, several weeks later, on October 31, 2022, Argo announced that the

proposed subscription agreement fell through.  The Company issued a press release stating,

"[t]he Company no longer believes that this subscription will be consummated under the

previously announced terms. Argo is continuing to explore other financing opportunities."  Argo

elaborated that it was in a dire financial position without the agreement, stating:

> Should Argo be unsuccessful in completing any further financing, Argo would become cash flow negative in the near term and would need to curtail or cease operations. The Company is endeavoring to complete such financing transactions to provide the Company with working capital sufficient for its present requirements, that is for at least the next twelve months from the date of this announcement.

180.     On this news, Argo's securities fell even further, dropping $1.06, or more than 54%, from a close of $1.97 on October 28, 2022 to a close of $0.91 on November 1, 2022.

181.     As a result of this announcement, Jefferies downgraded Argo to Hold and lowered its price target from $13 to $1.10.  Roth downgraded Argo to Sell and dropped its price target from $2 to $0.25.  Cannacord Genuity downgraded Argo to Hold and dropped its price target from $10 to $1.

182.     The fallout from Argo's cash flow constraints continued for the remainder of the year.

183.     In a press release dated December 28, 2022, Argo announced that it was "sell[ing] its Helios facility and real property in Dickens County, Texas and related assets to Galaxy for $65 million (£54 million)[.]"

184.     Argo abruptly announced in a press release dated February 1, 2023 that Appleton was resigning from his positions as CFO and Executive Director of Argo "to pursue other opportunities."  Appleton's resignation was abrupt, occurring within approximately nine months of the partial corrective disclosure of June 7, 2022, less than six months after Argo announced the drastic measures it was taking to stave off bankruptcy on October 7, 2022, and less than six weeks after Argo announced that it was selling Helios.

185.     Just eight days later, Argo abruptly announced in a press release dated February 9, 2023 that Wall was resigning as CEO and Interim Chairman "to pursue other opportunities." The Board appointed Seif El-Bakly, CFA, as Argo's Interim CEO, and Wall "agreed to remain as an advisor to Argo over the next three months to support the transition."  Further, Shaw was appointed Chairman of the Board.  *Id*.  Wall's resignation was abrupt, occurring within approximately nine months of the partial corrective disclosure of June 7, 2022, within six months

51

of Argo announcing the drastic measures it was taking to stave off bankruptcy on October 7, 2022, less than seven weeks after Argo announced that it was selling Helios, and within just eight days of Appleton's resignation announcement.

186.    After Galaxy acquired Helios, the Company announced that it had entered into a fixed-price PPA with ERCOT.  Contrary to Argo's explanations that the Company had not entered into a fixed-price PPA due to high energy costs, Galaxy revealed on a conference call on March 28, 2023 that the reason that Argo was not able to enter into such an agreement was that Argo was not creditworthy, stating, in part, "While the previous owner was generally unable to enter into fixed price hedges, we do have this capability due to our credit-worthiness and have already begun to implement this strategy."  Also, on May 9, 2023, Galaxy explained that the fixed-price PPA "actually has been a big benefit to the site which the site was unable to access before our stewardship with it, and so our balance sheet has allowed us to actually do that, which we then created value on day one for the Helios site.  It wasn't unlocking prior to that."

187.    Indeed, a Jefferies Analyst Report noted that, following the sale of Helios to Galaxy, "Galaxy should be better positioned to negotiate a favorable fixed-price PPA with ERCOT, given its ability to post collateral." As one analyst report noted, "a PPA typically requires a multi-million dollar up front deposit," and this appeared "to be off the table [for Argo] sans an additional capital injection." This analyst report further noted that, in the analysts' opinion, "ARBK needs about £10M in additional capital at a minimum to have enough liquidity to make the required deposit on a PPA, which we estimate could be £5.5-6M, and still have a cash cushion."

188.    According to CW-2, meanwhile, Argo did not have enough capital for the PPA process.

## VI.    ADDITIONAL SCIENTER ALLEGATIONS

### A.    *Respondeat Superior* and Agency Principles Apply

189.    Argo is liable for the acts of the Individual Exchange Act Defendants and other Company officers, directors, employees, and agents under the doctrine of *respondeat superior* and common law principles of agency as all of the wrongful acts complained of herein were carried out within the scope of their employment or agency with the authority or apparent authority to do so.  The scienter of the Individual Exchange Act Defendants and other Company officers, directors, employees, and agents is similarly imputed to Argo under *respondeat superior* and agency principles.

### B.    The Exchange Act Defendants Knew Or Were Reckless In Not Knowing That Argo Had Far Too Little Cash On Hand To Operate Helios And To Withstand Foreseeable Risks

190.    All Exchange Act Defendants had possession of or access to information indicating that their statements regarding the state of its finances were false and/or misleading.

#### 1.    Argo's Operating Costs and Balance Sheet

191.    All Exchange Act Defendants had possession of or access to information showing Argo's operating costs and balance sheet.

192.    CW-3 stated that Argo used a third-party software called Grafana to help the company manage energy costs.  Grafana showed how much Bitcoin was being mined in real time.  It was CW-3's understanding that all of Argo's executives, including Appleton, Wall, and El Bakly monitored Grafana.  The Helios Facility would occasionally have mechanical or network issues where the mining rigs were not operating, which would be reflected in Grafana.  When such an issue arose, CW-3 would receive a call from Papadakis representing that Wall or El Bakly had requested that CW-3 look into and resolve the issue with the miners.  According to CW-3, in addition to reflecting the amount of Bitcoin being mined, Grafana also collected data

regarding the energy costs of mining.  The software contained a function that allowed Argo to shut down its miners based on energy costs, such that when energy costs reach a certain threshold, the machines would be turned off to avoid incurring additional expenses.  Therefore, by routinely monitoring this software, Appleton, Wall, and El Bakly were aware of the amount of Bitcoin being mined and the energy costs of doing so in real time.

193.    Wall and Appleton were aware of the costs of operating the Helios Facility because they frequently discussed such costs, indicating that they either reviewed those costs and knew what they were talking about, or were reckless in speaking about operating costs without reviewing that information.  For example, during a conference call on April 28, 2022, Appleton stated in part, "In terms of operating costs and expenses, yes, they have increased, . . . . we moved to the owned and operating model we'll also we take it on more staff in terms of employee costs et cetera."  During that call, Wall stated that "our mining margin was very strong and consistent in the eighties for the entire year.  This was driven largely by the high price of Bitcoin as well as us really being able to control our operating costs."

194.    On June 7, 2022, during an operational update video, Wall stated in part, "There was higher temperatures in Texas for the month of May, and so we curtailed, we voluntarily curtailed, a couple of times, energy prices went up, we gave that power back to the grid, and that happened on a couple of occasions . . . that was probably worth about five Bitcoin, in terms of higher temperatures, that self-curtailment."

195.    Then, during an operational update video posted on August 5, 2022, Wall stated, in part, "alright on to power costs so for the Helios Power Update month of of July and also for June and also for this month our power costs in Texas are higher than we expected them to be

and that's because we currently have a PPA a power purchase agreement that is connected to the index price the spot prices[.]"

196.    During a conference call several weeks later, on August 25, 2022, Wall stated the following in regards to the costs of the Helios Facility: (1) "we had higher operating costs at Helios than we anticipated, largely due to higher power prices.  The power prices are driven by macroeconomic factors"; (2) "[w]e've had some issues on the cost side with the higher cost at Helios, which we believe are temporary as we ramp up operations"; (3) "we had to add some extra power costs on because our power costs have gone up."  During that call, Appleton stated that the "Helios facility coming online" contributed to an increase in "administrative expenses[.]"

197.    Wall and Appleton made numerous detailed statements during the Class Period evincing that they had extensive knowledge about Argo's financial positions and balance sheet, and specifically, the amount of cash Argo had on hand during the Class Period.  More specifically, on November 2, 2021, Appleton stated, in part, "Onto our balance sheet . . . our digital currencies holding was 1,836 Bitcoin, which at that time was valued at $79 million as at the end of September . . . .  We had $86 million of cash on hand at the end of the quarter, some of which, subsequent to the quarter we've used to pay back part of the Galaxy loan."  During that call, Wall also stated, in part, "We generated record revenue of $26 million and record EBITDA of $28 million. . . .  We mined 597 Bitcoin this quarter, which was a 20% increase over the second quarter of this year.  And that brings our total Bitcoin hold to 1,836 as of September 30, 2021."

198.    During the earnings conference call on April 28, 2022, Appleton stated in part, "we've got a very strong balance sheet, significantly stronger than last year.  In terms of our net

assets are well into the $200 million -- $220 million or so.  And we are – what have we done with the cash that we've actually raised?  So the great majority of that has gone into machines . . . we've also invested obviously heavily in Helios and that asset as well. There's over 70 million pounds[.]"  Wall stated, in relevant part, "Our revenue went from 26 million, these are all figures in U.S., [$]26 million to [$]100 million.  Our money margin also doubled up to 84%.  Our EBITDA went from [$]11 million in 2020 to [$]71 million in 2021.  Net income from about [$]2 million to [$]42 million.  And our cash and digital assets at year end went down from [$]9 million to [$]125 million, at the end of December 2021."

199.    On August 25, 2022, during Argo's earnings conference call, Appleton stated, in part, "in terms of our weighted average cost of capital, we're still below 10%, . . . . In terms of our balance sheet, . . . despite significant headwinds that we've had this year, our rigorous approach to cash flow and treasury management has meant that we've been cash neutral. . . . In terms of our debt profile, . . . our Galaxy loan was USD 50 million.  We reduced it to – as at the end of June, it was around about USD 22 million.  It's now USD 7 million."  Wall stated, in part, "our adjusted EBITDA for Q2 was $3.2 million or GBP 2.6 million . . . So for the quarter, we had a net loss of $38 million, which is driven mostly by the $38 million negative change in fair market value of our Bitcoin holdings . . . we realized incremental $1,500 per Bitcoin sold through the use of derivatives, and this generated approximately $2 million in additional proceeds. . . . So through a combination of derivatives and leveraging we have significantly reduced our exposure on the Bitcoin back loan, and we now have only $6.7 million outstanding on the loan."

200.    Every month during the Class Period, Wall presented the operational updates for Argo on video.  During the videos, Wall discussed the mining revenue for the month, the amount

of Bitcoin held, and the Company's mining margin, which is based on the amount of Bitcoin mined and the operating costs to do so.  The fact that Wall provided these updates means that he was frequently apprising himself of the Company's financial position.

201.    During the Class Period, Argo represented to investors that "Management update[d] cashflow projections on a regular basis and closely monitor[ed] the cryptocurrency market on a daily basis.  Accordingly, [Argo's] controls over expenditure [we]re carefully managed, in order to maintain its cash reserves."  The Company also had a Treasury Committee in place to make decisions regarding Argo's financial positions.  As explained in an SEC filing, "[t]he Treasury committee meets on a weekly basis to make decisions around future cashflows and working capital requirements. Decisions may include considering debt/equity options alongside selling Bitcoin."  Presumably as CFO of the Company, Appleton either sat on the Treasury Committee or received reports from the Treasury Committee given that he was ultimately responsible for decisions regarding future cashflows and working capital requirements.

## 2.    ERCOT's Requirements for a Fixed-Price PPA

202.    All Exchange Act Defendants had possession of or access to information about ERCOT's requirements for obtaining a Fixed-Price PPA and either knew or recklessly disregarded the fact that Argo did not meet these requirements.

203.    Argo repeatedly talked about its intention to obtain a Fixed-Price PPA.  For example, in its July 2022 Operational Update, dated August 5, 2022, the Company provided that it was "evaluating options for a long-term, fixed price PPA to sign in the near future."  During the S1 2022 Earnings Call that was held on August 25, 2022, Wall said that "[w]e've obviously had higher energy prices than were anticipated particularly in the spring, kind of April, May,

when we were kind of looking to lock in a fixed price PPA and those have continued throughout

the summer.  So we're expecting, again, those to come back down in the next couple of months

to lock in a PPA and then kind of be able to move from there and participate in all those ancillary

services that the ERCOT grid has to offer."  In its August 2022 Operational Update Press

Release dated September 9, 2022, Wall provided that Argo "will continue to monitor the market

and evaluate our options for securing a long-term fixed price PPA."  As late as October 7, 2022,

Argo provided in a Press Release that it "remains optimistic about securing a long term, low-

collateral, fixed price PPA[.]"

204.    The statements where Argo expressed an intention to obtain a Fixed-Price PPA

support an inference that Defendants reviewed and were well aware of ERCOT's requirements,

including the credit standards, for obtaining a Fixed-Price PPA, and Argo's ability to meet these

requirements.

205.    Defendant Wall, as Argo's Chief Executive Officer from January 2020 to

February 2023, would have been involved in determining whether Argo met ERCOT's

requirements, particularly concerning credit, for entering into a Fixed-Price PPA, as he must

have had access to Argo's financial records as part of his duties and responsibilities as CEO.

206.    In addition, Defendant Appleton, as Argo's Chief Financial Officer from

September 2020 to December 2022, would have been involved in determining whether Argo met

ERCOT's requirements, particularly concerning credit, for entering into a Fixed-Price PPA, as

he would have had access to Argo's financial records as part of his duties and responsibilities as

CFO.

207.    During the S1 2022 Earnings Call held on August 25, 2022, Wall stated, in

response to a question about whether there was an ideal price target for the PPA that Argo was

looking to sign in the Fall, that "we'll see what the market is like in the next month or two. And I can tell you those conversations are ongoing." This statement supports an inference that Defendants discussed with ERCOT its requirements – including regarding credit – for entering into a Fixed-Price PPA, and Argo's ability to meet these requirements. Wall's statement also supports an inference that Defendant Appleton, as Argo's Chief Financial Officer, would also have been directly involved in discussions with ERCOT concerning its requirements, particularly regarding credit, for entering into a Fixed-Price PPA and Argo's ability to meet these requirements, as part of his duties and responsibilities as CFO.

### 3.    Argo's Loans and Equipment Financing Agreement

208.    All Exchange Act Defendants had possession of or access to information about Argo's loans with Galaxy and its equipment financing agreements with NYDIG.

209.    In September 2021, Argo entered into the New Galaxy Term Loan for $45 million, and Wall signed the Loan Term Sheet. This Loan Term Sheet evinces that Defendants, including Wall, were aware of the terms of this loan and, by extension, the increasingly precarious financial position Argo was putting itself in, which became painfully evident when Argo undertook the drastic measures it did to stave off bankruptcy, causing the stock to drop precipitously.

210.    In addition, Defendant Appleton, as Argo's Chief Financial Officer, would have known about the terms of the New Galaxy Term Loan and how this would affect Argo's ability to stay sufficiently capitalized.

211.    On October 29, 2021, Argo entered into a callable loan agreement for the remaining $20 million, and Wall signed the Loan Term Sheet. This Loan Term Sheet evinces that Defendants, including Wall, were aware of the terms of this loan and, by extension, the increasingly precarious financial position Argo was putting itself in, which became painfully

evident when Argo undertook the drastic measures it did to stave off bankruptcy, causing the stock to drop precipitously.

212.    In addition, Defendant Appleton, as Argo's Chief Financial Officer, would have known about the terms of the callable loan agreement and how this would affect Argo's ability to stay sufficiently capitalized.

213.    On December 23, 2021, Argo entered into another loan agreement with Galaxy for a loan of $30 million.  Due to their positions within the Company, Wall and Appleton would have been aware of the terms of this loan and, by extension, the increasingly precarious financial position Argo was putting itself in, which became painfully evident when Argo undertook the drastic measures it did to stave off bankruptcy, causing the stock to drop precipitously.

214.    Beginning in March 2022, Argo entered into two equipment financing agreements with NYDIG, pursuant to which Argo borrowed a total of $98 million.  Given their positions within the Company, Wall and Appleton would have been aware of the terms of the agreements and, by extension, the increasingly precarious financial position Argo was putting itself in, which became painfully evident when Argo undertook the drastic measures it did to stave off bankruptcy, causing the stock to drop precipitously.

215.    Additionally, the Individual Exchange Act Defendants discussed the terms of their loans with Galaxy and their agreements with NYDIG in detail throughout the Class Period. For example, on April 28, 2022, Appleton discussed the terms of the NYDIG agreement, stating in part, "It's for electrical infrastructure that we have on the ground at the moment. We were really pleased with NYDIG.  NYDIG's a great partner to have in this space. And again, back to the interest rate, 8.25% is very competitive when compared with the traditional sector."  In regard to the Galaxy loans, Appleton stated, in part, "We're actually seeing low interest rates

come down, I remember the first bitcoin [backed loan] that we had back in June '21, the interest rate was over 12%, we've seen that fall significantly during the year. At the year-end interest rate was 8% and we're seeing continued downward pressure, on the cost of capital."

216.    During a conference call held on May 18, 2022, Wall described the details of the NYDIG agreements, stating, in part, "We signed an agreement with them to borrow $27 million for building out parts of Helios and that was secured by some of that electrical infrastructure at Helios. So then we build upon that relationship with NYDIG and now have this $71 million financing agreement.  The borrowings from this deal, . . . that'll be funded in tranches over the next few months, as we take delivery of the S19J Pro that are coming into the facility. The interest rate is 12% on this loan[.]"  Wall also described how he and Appleton negotiated the terms of the second equipment financing agreement, stating, "When Alex and I started the machine financing with people not that long ago, 18 months ago. 24 months ago, rates were 24%, 25%, 27%. They've been in the high teens for most of the last 12 months. So getting down to 12% is a good number."  Appleton also explained the different interest rates for the NYDIG agreements, stating, "the infrastructure is as Peter said earlier, high power transformers, medium power transformers, etc. So those are assets which are easily transferable to another technology at another sector etc. and therefore the risk around those assets is much less and therefore the interest that we have to pay around those assets is much less.  When you look at bitcoin mining machines, bitcoin mining machines have one use and one purpose. . . . it attracts a higher interest rate."

217.    On June 23, 2022, during the question and answer session after the annual shareholder meeting, Appleton stated in part that, "earlier this year we took on the NYDIG infrastructure financing, so that was $27 million worth.  And then we also have the NYDIG

machine financing. Now, that's really a facility of $71 million which we keep drawing down as we are receiving the machines that that is collateralized against. There is also some small mortgages."

218.    During a conference call held on August 25, 2022, Wall discussed the Galaxy loans, stating, in part, "So through a combination of derivatives and leveraging we have significantly reduced our exposure on the Bitcoin back loan, and we now have only $6.7 million outstanding on the loan. We now only have $6.7 million outstanding on the loan as of July 31." Appleton also discussed payment of the Galaxy loans, stating, "our Galaxy loan was USD 50 million. We reduced it to -- as at the end of June, it was around about USD 22 million. It's now USD 7 million. And I had to liken this to – we've used an overdraft, if you like, to build a house. And because you cannot get -- you can't use your machines as collateral and so you actually have them in your possession. You can't use infrastructure and so you have it built as financing, we've used a stock up of the (inaudible) loan to help fund these things which we have to pay in advance. And then as we've got them on the ground and we've refinanced, we've releveraged, we changed our debt profile so that the profit generating unit, the machines themselves, the debt is matched against profit generating units themselves to the infrastructure."

219.    These detailed discussions about the loans throughout the Class Period demonstrate that the Individual Exchange Act Defendants were well-versed in the terms of these agreements and knew how taking out well over $100 million in loans would put Argo in a precarious financial position such that it would have to take drastic measures to stave off bankruptcy.

### 4.    Argo's Significant Holdings in Bitcoin

220.    All Exchange Act Defendants had possession of or access to information about its significant holdings in Bitcoin (or HODL) and, in turn, the fact that the decrease in the price of

Bitcoin was a foreseeable setback inherent to any cryptocurrency mining operation.

221.    Argo discussed its significant holdings in Bitcoin throughout the Class Period.
For example, when the Class Period began at the end of September 2021, Argo held 1,836
Bitcoin, which at that time was valued at approximately $79 million.  By the end of January
2022, Argo held 2,748 Bitcoin, which was valued at approximately $105.75 million.  By the end
of July 2022, Argo's HODL was 1,295.

222.    These discussions and references to Argo's Bitcoin HODL throughout the Class
Period support the inference that Defendants would have been aware of the precarious financial
position Argo was putting itself in by holding such a significant amount of a cryptocurrency as
volatile as Bitcoin, which became painfully evident when Argo undertook the drastic measures it
did to stave off bankruptcy, causing the stock to drop precipitously.

223.    Additionally, Defendant Appleton, as Argo's Chief Financial Officer, would have
known about the volatility of Bitcoin and how holding such a significant amount of this volatile
cryptocurrency would affect Argo's ability to stay sufficiently capitalized.

224.    Argo also discussed the devaluing of Bitcoin that occurred, which was a
foreseeable consequence inherent to any cryptocurrency mining operation.  For example, Wall
stated in the Q2 2022 Earnings Call that "I'm proud of the team for continuing to have really
good efficiencies even as the price of Bitcoin has fell [sic] during the first half of the year.  And
the money margin of 71% translates into an average cost per Bitcoin of roughly $10,000.  And
again, that's for the first half of the year."  He further stated that the price of Bitcoin "fell from
an average price in Q1 of about 42,000 to 33,000 in this quarter, which was about a 20%
decrease as well."  For further perspective, as per Appleton in the Q3 2021 Earnings Call dated
November 2, 2021, the price of Bitcoin was over $60,000 in 2021.  It is reasonable to infer from

these discussions that Defendants were well-versed in the decline of Bitcoin's value and what

that would mean for Argo's ability to stay sufficiently capitalized.

### C.      Core Operations

225.    Because the fraud alleged herein relates to the core business of Argo, knowledge

of the facts underlying the fraudulent scheme may be imputed to the Individual Exchange Act

Defendants.  Indeed, Argo repeatedly acknowledged the significance of its mining operations

and the Helios facility to its operations.  In fact, one analyst referred to Helios as "Argo's

flagship mining monument in northwest Texas[.]"  Therefore, the Individual Exchange Act

Defendants, as senior level executives and/or directors, were in such positions at the company to

access all material, non-public information concerning the Company's mining operations and the

cost of running those mining operations.

226.    Indeed, Argo acknowledged that its "total revenue and cash flow is substantially

dependent on the market value of digital assets and the volume of digital assets received from

our mining efforts."  Argo's ability to receive those digital assets was largely dependent on its

ability to obtain power at a low cost.  As the Company explained, "Mining cryptocurrency is a

highly power-intensive process, with electrical power required both to operate the mining

machines and to dissipate the significant amount of heat generated by operating the machines."

Argo endeavored to obtain such power "from clean power sources as much as possible."

227.    To that end, the Company sought to move from a strategy where it leases

machines for mining to one where it "own[s] and operate[s]" its own mining facilities.  Key to

that strategy was the Company's Helios facility in Texas, which it acquired in 2021.  Helios'

importance to the Company was well-documented throughout the Class Period.  As Defendant

Wall explained, "I can't overstate how important that low-cost power, that low-cost renewable

power [in Texas] is going to be for us to be the captains of our own ship, for us to be able to control all aspects of our mining operations."

228.    The importance of obtaining low-cost power to Argo, and Helios itself, is also made apparent by the amount of time the Company devoted to discussing it.  It is mentioned during every earnings call held during the Class Period.

229.    Argo has a relatively small number of employees.  In 2021, the Company grew from seven people to around 39 people, and rose to about 100 people in the middle of 2022. Notably, there were 40 full time employee positions at the Helios Facility.

**D.    The Sudden Departures of the Company's CEO and CFO Support a Strong Inference of Scienter**

230.    That both Argo's CEO and CFO abruptly departed within eight days of each other and within approximately nine months of the Company issuing its partial corrective disclosure as the truth began to emerge about Argo not being sufficiently capitalized and having far too little cash on hand, further supports a strong inference of scienter.

231.    Argo abruptly announced in a Press Release dated February 1, 2023 that Defendant Appleton was resigning from his positions as CFO and Executive Director of Argo "to pursue other opportunities."  Just eight days later, Argo abruptly announced in a Press Release dated February 9, 2023 that Defendant Wall was resigning as CEO and Interim Chairman "to pursue other opportunities."

232.    Defendant Appleton's and Defendant Wall's abrupt terminations shortly after Argo issued its partial corrective disclosure and shortly after Argo announced the drastic measures it would be taking to stave off bankruptcy support a strong inference of scienter because it can be inferred that the sharp decline of the Company, due to its insufficient capitalization and having far too little cash in hand, which culminated in the selling of the Helios

facility in December 2022, led to the termination of Defendants Appleton and Wall.  Analyst

Kevin Dede, CFA of H.C. Wainwright & Co., in a report dated February 10, 2023, titled "CEO

and CFO Depart in Corporate Transition to Hosting Client; Reit Neutral," noted that "Argo's

borrowing predicament worked against it as crypto prices fell" and that "while the sale [of

Helios] saved the company to 'live to fight another day,' the transaction was most likely seen as

a disappointment to the board of directors given the opportunity Helios' access to 800MW and

wind power generation presented the company and its investors."  The sudden departures of

Defendants Wall and Appleton support the inference that the selling of Helios was the final straw

for the Board of Directors, who in the months leading up to that selling had seen the Company's

stock precipitously decline, thereby leading to the abrupt terminations of Defendants Wall and

Appleton less than two months later.

      233.    Indeed, comments made by Seif El-Bakly, who took over as CEO in 2023, during

the Q4 2022 Earnings call, provide useful context and insight when considered in light of Argo's

partial corrective disclosure and disclosure of October 7, 2022.  Seif begins the call by noting

that Argo has "been working really hard to clean up house and establish a new solid foundation

for Argo and its future success."  Seif later goes on to say that Argo learned some "very, very

valuable lessons" coming out of 2022, that the focus since his appointment as CEO has been on,

amongst other things, "financial discipline[,]" and that he "fe[lt] we are in a much better place to

get Argo back on track."  Seif expanded on what financial discipline meant, saying that Argo

was "making sure that we are well capitalized, well funded and have a solid runway to give us

the opportunity to solidify the current foundation."  (Seif stated that he "wanted to remind

everyone of our top priorities for the next couple of quarters. These priorities include financial

discipline and deleveraging, which is top of mind[.]").

E.     **Defendants' Certifications Pursuant to the Sarbanes-Oxley Act of 2002 Demonstrate Scienter**

234.    Defendants Wall and Appleton signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") that they filed with the SEC in connection with the filing of Argo's May 2, 2022 20-F annual report for the fiscal year ended December 31, 2021.  The certifications state, in relevant part:

> 2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
> 3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the company as of, and for, the periods presented in this report[.]

## VII.    LOSS CAUSATION

235.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused Plaintiff and the Class to suffer substantial damages.

236.    During the Class Period, Plaintiff and other Class members purchased Argo securities at artificially inflated prices and suffered substantial losses and damages when the true facts concealed by Defendants' fraud were revealed and/or when the risks concealed by those undisclosed facts materialized.  The price of Argo securities declined significantly causing Plaintiff and other Class members to suffer losses and damages when Defendants' misrepresentations, and/or information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, and/or the foreseeable risks that had been fraudulently concealed by Defendants materialized.

237.    Defendants made false and misleading statements and material omissions regarding the capitalization of Argo's business, its ability to operate the Helios Facility, and its

ability to withstand foreseeable setbacks inherent to cryptocurrency mining operations.  On the strength of these false and misleading statements and material omissions, the price of the Company's securities was artificially inflated to a Class Period high of $20.56 on November 9, 2021.  Those misrepresentations and omissions that were not immediately followed by an upward movement in the price of the Company's securities served to maintain the share price at artificially inflated levels by maintaining and supporting a false perception of Argo's business, operations, performance, and prospects.  When these statements were corrected and/or the risks concealed by them materialized, investors suffered losses as the price of Argo securities declined.

238.    The true facts and risks regarding Argo's capitalization, its ability to operate the Helios Facility, and its ability to withstand foreseeable setbacks inherent to cryptocurrency mining operations which were omitted and/or misrepresented by Defendants eventually caused the price of Argo's securities to decline on two occasions, thereby causing harm to investors.

239.    First, Defendants' statements were partially corrected, and the risks concealed by the undisclosed facts regarding Argo's capitalization, its ability to operate the Helios Facility, and its ability to withstand foreseeable setbacks inherent to cryptocurrency mining operations materialized on June 7, 2022, when Argo issued a press release disclosing that it had mined approximately 25% fewer Bitcoin in May 2022 compared to April 2022 because of, *inter alia*, increased network difficulty, higher electricity prices, and the curtailment of mining operations at its Helios Facility. This caused investors to suffer losses as the price of Argo ADRs dropped $0.28 per ADR, or 4.4% to close at $6.09 per ADR on June 7, 2022. *See* ¶¶ 12, 149.

240.    Then, Defendants' statements were further corrected, and the risks concealed by the undisclosed facts regarding Argo's capitalization, its ability to operate the Helios Facility,

and its ability to withstand foreseeable setbacks inherent to cryptocurrency mining operations materialized on October 7, 2022, when the Company issued a press release disclosing that headwinds in the price of electricity, the geopolitical situation in Europe, and the decline in the price of Bitcoin since March 2022 "have reduced the Company's profitability and free cash flow generation." This caused investors to suffer losses as the price of Argo ADRs dropped $0.97 per ADR, or 23.26%, to close at $3.20 per ADR on October 7, 2022. *See* ¶¶ 14, 174.

241.    Accordingly, as a result of their purchases of Argo's publicly traded securities during the Class Period, Plaintiff and other members of the Class suffered economic losses and damages.

## VIII.   CONTROL PERSON LIABILITY

242.    The Individual Exchange Act Defendants are liable as direct participants with respect to the wrongs complained of herein. In addition, the Individual Exchange Act Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of Section 20(a) of the Exchange Act, and each had the power and influence to cause the Company to engage in the unlawful conduct complained of herein. Because of their positions of control, the Individual Exchange Act Defendants were able to and did, directly or indirectly, control the conduct of Argo's business.

243.    Specifically, because of their positions within the Company, the Individual Exchange Act Defendants possessed the power and authority to control the contents of Argo's SEC filings, annual and quarterly reports, press releases, and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market, including those containing the materially false and misleading statements and omissions of material fact alleged herein. Each of the Individual Exchange Act Defendants, by reason of his/her respective management or board position, had the ability and opportunity to review copies of the

Company's SEC filings, reports, press releases, and other statements alleged herein to be misleading, prior to, or shortly after their issuance or to cause them to be corrected.

244.    By virtue of their positions, the Individual Exchange Act Defendants had access to material non-public information.  Each of the Individual Exchange Act Defendants knew or recklessly disregarded the fact that the adverse facts specified herein had not been disclosed and were being concealed from the public, and that the positive representations which were being made were then materially false and misleading.

## IX.    APPLICABILITY OF THE FRAUD ON THE MARKET DOCTRINE

245.    The false and/or misleading statements alleged herein were material and public and at all relevant times the market for Argo's securities was an efficient market for the following reasons, among others:

a)    Argo's securities were listed on the NASDAQ, a highly efficient market;

b)    As a registered and regulated issuer of securities, Argo filed periodic reports with the SEC, in addition to frequent voluntary dissemination of information;

c)    Argo regularly communicated with public investors through established market communication mechanisms, including through regular dissemination of press releases on national circuits of major newswire services and through other wide-ranging public disclosures such as communications with the financial press and other similar reporting services;

d)    The market reacted to public information disseminated by Argo; and

e)    At least 6 analysts followed Argo's business and wrote reports which were publicly available and affected the marketplace.

246.    As a result of the above, the market for Argo's securities promptly digested current information with respect to the Company from all publicly available sources and reflected such information in the securities' market prices.  The historical trading prices and volumes of Argo securities are incorporated herein by reference.

247.    The material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to overvalue Argo's securities.  Without knowledge of the misrepresented or omitted facts, Plaintiff and other members of the Class purchased Argo securities between the time that Defendants made the material misrepresentations and omissions and the time that the truth or concealed risk was revealed, during which time the price of Argo's securities was artificially inflated by Defendants' misrepresentation and omission.  Thus, a presumption of reliance applies.

## X.    THE AFFILIATED UTE PRESUMPTION

248.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects – information Defendants were obligated to disclose – positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## XI.    NO SAFE HARBOR

249.    The safe harbor provisions for the forward-looking statements under the Private Securities Litigation Reform Act of 1995 are applicable only under certain circumstances that do not apply to any of the materially false and misleading statements and omissions alleged in this Complaint.

250.    First, many of the identified false and misleading statements and omissions herein are not forward-looking statements, but instead are statements of current or historic fact, or are actionable in context because they omit then-existing material facts.

251.    Second, many of the identified false and misleading statements herein were not identified as forward-looking statements.

252.    Third, to the extent there were any forward-looking statements that were identified as such at the time made, those statements also contained statements of present or past facts and so are not entitled to protection under the safe harbor.

253.    Fourth, to the extent there were any forward-looking statements that were identified as such at the time made, there were no meaningfully cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Such statements were also not accompanied by cautionary language that was meaningful because such warnings or "risk" factors contained in, or incorporated by reference in, the relevant press release, SEC filings, earnings call, or other public statements described herein were general, "boilerplate" statements of risk that would affect any technology company, and misleadingly contained no factual disclosure of any of the specific details concerning Argo's capitalization, ability to operate a facility the size and scale of Helios, and ability to withstand foreseeable setbacks inherent to cryptocurrency mining operations, or similar important factors that would give investors adequate notice of such risks.

254.     Fifth, to the extent there were any forward-looking statements, Defendants are liable for those false and misleading forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, or, by reason of what the speaker failed to note, was materially false and/or misleading, and/or that each statement was authorized and/or approved by a director and/or executive officer of Argo who actually knew that each such statement was false or misleading when made.

## CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT

### COUNT I

**For Violations of Section 10(b) of the Exchange Act and Rule 10b-5
Against The Exchange Act Defendants**

255.     Plaintiff re-alleges each allegation above as if fully set forth herein.

256.     This claim is brought under Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5), against the Exchange Act Defendants.

257.     During the Class Period, the Exchange Act Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder by making the false and misleading statements specified herein, including the statements in SEC filings, presentations, press releases, and analyst reports concerning Argo's capitalization, ability to operate a facility the size and scale of Helios, and ability to withstand foreseeable setbacks inherent to cryptocurrency mining operations reviewed by the Exchange Act Defendants, whose truth they knowingly or recklessly disregarded when they failed to disclose material facts necessary to make the statements made, in light of the circumstances under which they were made, not false and misleading.

258.    During the Class Period, the Exchange Act Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5(a) & (c) promulgated thereunder by employing devices, schemes, and artifices to defraud and engaging in acts, practices, and a course of conduct that operated as a fraud or deceit upon Plaintiff and other members of the Class in that the Exchange Act Defendants concealed Argo's capitalization, ability to operate a facility the size and scale of Helios, and ability withstand foreseeable setbacks inherent to cryptocurrency mining operations.

259.    The Exchange Act Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal non-public, adverse material information about the Company's operations and financial condition as reflected in the misrepresentations and omissions set forth above.

260.    The Exchange Act Defendants each had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth by failing to ascertain and to disclose such facts even though such facts were available to them, or deliberately refrained from taking steps necessary to discover whether the material facts were false or misleading.

261.    As a result of the Exchange Act Defendants' dissemination of materially false and misleading information and their failure to disclose material facts, Plaintiff and Class members were misled into believing that the Company's statements and other disclosures were true, accurate, and complete.

262.    Argo is liable for the acts of the Individual Exchange Act Defendants and other Company personnel referenced herein under the doctrine of respondeat superior, as those persons were acting as the officers, directors, and/or agents of Argo in taking the actions alleged herein.

263.     Plaintiff and Class members purchased Argo ADRs without knowing that the Exchange Act Defendants had misstated or omitted material facts about the Company's operations and financial performance or prospects.  In so doing, Plaintiff and Class members relied directly or indirectly on false and misleading statements made by the Exchange Act Defendants, and/or an absence of material adverse information that was known to Defendants or recklessly disregarded by them but not disclosed in the Exchange Act Defendants' public statements.  Plaintiff and Class members were damaged as a result of their reliance on the Exchange Act Defendants' false statements and misrepresentations and omissions of material facts.

264.     At the time of the Exchange Act Defendants' false statements, misrepresentations and omissions, Plaintiff and Class members were unaware of their falsity and believed them to be true.  Plaintiff and the Class would not otherwise have purchased Argo ADRs had they known the truth about the matters discussed above.

265.     Plaintiff is filing this action within two years after discovery of the facts constituting the violation, including facts establishing scienter and other elements of Plaintiff's claims, and within five years after the violations with respect to Plaintiff's investments.

266.     By virtue of the foregoing, the Exchange Act Defendants have violated § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

267.     As a direct and proximate result of the Exchange Act Defendants' wrongful conduct, Plaintiff and the Class have suffered damages in connection with their purchase of Argo ADRs.

## COUNT II

**For Violations of Section 20(a) of the Exchange Act**
**Against the Individual Exchange Act Defendants**

268.    Plaintiff realleges each allegation above as if fully set forth herein.

269.    This Count is asserted against the Individual Exchange Act Defendants for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), on behalf of all members of the Class.

270.    As set forth above, Argo committed a primary violation of Section 10(b) of the Exchange Act by knowingly and/or recklessly disseminating materially false and misleading statements and/or omissions throughout the Class Period.

271.    Each of the Individual Exchange Act Defendants, by reason of their status as senior executive officers and/or directors of Argo, directly or indirectly, controlled the conduct of the Company's business and its representations to Plaintiff and the Class, within the meaning of § 20(a) of the Exchange Act.  The Individual Exchange Act Defendants directly or indirectly controlled the content of the Company's SEC statements and press releases related to Plaintiff's and the Class's investments in Argo ADRs within the meaning of § 20(a) of the Exchange Act. Therefore, the Individual Exchange Act Defendants are jointly and severally liable for the Company's fraud, as alleged herein.

272.    The Individual Exchange Act Defendants controlled and had the authority to control the content of the Company's SEC statements and press releases.  Because of their close involvement in the every-day activities of the Company, and because of their wide-ranging supervisory authority, the Individual Exchange Act Defendants reviewed or had the opportunity to review these documents prior to their issuance, or could have prevented their issuance or caused them to be corrected.

273.    The Individual Exchange Act Defendants knew or recklessly disregarded the fact that Argo's representations were materially false and misleading and/or omitted material facts when made.  In so doing, the Individual Exchange Act Defendants did not act in good faith.

274.    By virtue of their high-level positions and their participation in and awareness of Argo's operations and public statements, the Individual Exchange Act Defendants were able to and did influence and control Argo's decision-making, including controlling the content and dissemination of the documents that Plaintiff and the Class contend contained materially false and misleading information and on which Plaintiff and the Class relied.

275.    The Individual Exchange Act Defendants had the power to control or influence the statements made, giving rise to the securities violations alleged herein, and as set forth more fully above.

276.    As set forth above, Argo committed a primary violation of Section 10(b) of the Exchange Act by knowingly and/or recklessly disseminating materially false and misleading statements and/or omissions throughout the Class Period as well as by concealing the fact that it had insufficient resources to continue to fund the Company's expansion.

277.    As a direct and proximate result of the Individual Exchange Act Defendants' wrongful conduct, Plaintiff and the Class suffered damages in connection with their purchase of Argo ADRs.

## CLASS ACTION ALLEGATIONS

278.    Plaintiff brings this action pursuant to Rule 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of himself and all persons and entities that purchased or otherwise acquired: (1) Argo ADRs pursuant and/or traceable to the Offering Documents issued in connection with the Company's initial public offering conducted on or about September 23,

2021; and/or (2) Argo securities between September 23, 2021 and October 10, 2022, both dates inclusive (the "Class Period"), and were damaged thereby.

279.     Excluded from the Class are the Defendants named herein, members of their immediate families, any firm, trust, partnership, corporation, officer, director or other individual or entity in which a Defendant has a controlling interest or which is related to or affiliated with any of the Defendants, and the legal representatives, heirs, successors-in-interest or assigns of such excluded persons.

280.     The members of the Class are so numerous that joinder of all members is impracticable.  During the Class Period, Argo ADRs were actively traded on the NASDAQ, which is an efficient market.  While the exact number of Class members cannot be determined at this early stage, Plaintiff believes that thousands of people held Argo ADRs during the Class Period.  Record owners and other members of the Class may be identified from records maintained by Argo or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

281.     Plaintiff's claims are typical of the claims of the other members of the Class.  All members of the Class were similarly affected by Defendants' allegedly wrongful conduct in violation of the Exchange Act and Securities Act as complained of herein.

282.     Plaintiff will fairly and adequately protect the interests of the Class and has retained counsel competent and experienced in class action and securities litigation.  Plaintiff has no interests that are contrary to or in conflict with those of the Class.

283.     Common questions of law and fact exist as to all members of the Class, and predominate over any questions solely affecting individual members of the Class.  The questions of law and fact common to the Class include, *inter alia*:

a)      Whether the federal securities laws were violated by Defendants' acts as alleged herein;

b)      Whether statements made by Defendants during the Class Period contained untrue statements of material fact and/or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

c)      Whether and to what extent Defendants' material untrue statements and/or omissions of material fact caused the market price of Argo ADRs to be artificially inflated during the Class Period;

d)      Whether Defendants acted with the requisite level of scienter with respect to the Exchange Act claims;

e)      Whether the Individual Exchange Act Defendants and Individual Securities Act Defendants were controlling persons of Argo;

f)      Whether reliance may be presumed pursuant to the *Affiliated Ute* presumption, fraud-on-the-regulatory process, or fraud-on-the-market doctrine for the Exchange Act Claims; and

g)      Whether the Class members have sustained damages, and if so, the proper measure of damages.

284.    Plaintiff knows of no difficulty that will be encountered in the management of this action that would preclude its maintenance as a class action.

285.    A class action is superior to all other available methods for the fair and efficient adjudication of this action because, among other things, joinder of all members of the Class is impracticable.  In addition, since the damages suffered by individual members of the Class may

be relatively small, the expense and burden of individual litigation would make it nearly

impossible for members of the Class to bring individual actions.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and the Class, prays for relief and

judgment, including:

A.     Determining that the Securities Act Counts I through II and the Exchange Act

Counts I through II of this action are a proper class action under Federal Rules of Civil

Procedure 23, certifying Plaintiff as Class Representative under Rule 23 of the Federal Rules of

Civil Procedure, and certifying Plaintiff's counsel as Class Counsel;

B.     Awarding compensatory damages in favor of Plaintiff and the other Class

members against all Defendants, jointly and severally, for all damages sustained as a result of

Defendants' wrongdoing, in an amount to be determined at trial, including pre-judgment and

post-judgment interest, as allowed by law;

C.     Awarding rescissory damages in favor of Plaintiff and the other Class members

where appropriate against all Defendants, jointly and severally, for all injuries sustained as a

result of Defendants' wrongdoing, in an amount to be determined at trial, including pre-judgment

and post-judgment interest, as allowed by law;

D.     Awarding extraordinary, equitable, and/or injunctive relief as permitted by law

(including, but not limited to, rescission);

E.     Awarding Plaintiff and the Class their costs and expenses incurred in this action,

including reasonable counsel fees and expert fees; and

F.     Awarding such other and further relief as may be just and proper.

## JURY TRIAL DEMAND

Plaintiff hereby demands a trial by jury on all triable claims.

Dated:     September 25, 2023

**FARUQI & FARUQI, LLP**

By: _/s/ James M. Wilson, Jr.__

James M. Wilson, Jr.
Robert W. Killorin
Megan M. Remmel
**FARUQI & FARUQI, LLP**
685 Third Avenue, 26th Floor
New York, NY 10017
Telephone: 212-983-9330
Facsimile: 212-983-9331
Email: jwilson@faruqilaw.com
         rkillorin@faruqilaw.com
         mremmel@faruqilaw.com

*Attorneys for Lead Plaintiff Richard Hawes*