**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| RICHARD HAWES, Individually and on Behalf of All Others Similarly Situated,<br><br>        Plaintiff,<br><br>   v.<br><br>ARGO BLOCKCHAIN PLC, PETER WALL, ALEX APPLETON, MATTHEW SHAW, SARAH GOW, COLLEEN SULLIVAN, and MARIA PERRELLA,<br><br>        Defendants. | Case No. 1:23-cv-07305-CM |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS THE AMENDED COMPLAINT**

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ........................................................................................1

SUMMARY OF FACTUAL ALLEGATIONS ...............................................................3

    A.    Bitcoin Mining And Argo.............................................................................3

    B.    The Helios Facility And Electricity In Texas ...............................................3

    C.    Argo's Financial Position Prior To The IPO ................................................4

    D.    Argo's IPO.....................................................................................................4

    E.    Defendants Continue To Mislead The Market After The IPO ......................5

    F.    The Truth Is Gradually Disclosed To The Market.........................................6

ARGUMENT...................................................................................................................7

I.    THE RELEVANT STANDARDS DO NOT FAVOR DISMISSAL ..................7

II.    THE ALLEGED MISREPRESENTATIONS AND OMISSIONS ARE
ACTIONABLE ..................................................................................................8

    A.    The Securities Act Defendants' Statements In The Offering Documents
Were Materially Misleading .........................................................................8

    B.    The Exchange Act Defendants' Post-IPO Statements Were False And
Misleading...................................................................................................12

        1.    Statements Regarding Argo's Access To Power .......................12

        2.    Statements About Argo's Financial Condition And
Competitiveness........................................................................13

        3.    Defendants' Statements Are Not Protected By The Safe Harbor ..............16

    C.    Defendants' Statements Were Not Puffery..................................................17

III.    THE EXCHANGE ACT DEFENDANTS ACTED WITH SCIENTER...........19

    A.    The EA Defendants Knew Facts Or Had Access To Information About
Argo's Ability To Get A Fixed Price PPA .................................................20

B.    The EA Defendants Had Access To The Omitted Facts Given Their Importance To Argo's Core Operations ...............................................22

C.    Additional Circumstantial Evidence Supports Scienter........................................24

IV.    PLAINTIFF ADEQUATELY ALLEGES CONTROL PERSON VIOLATIONS ...........25

V.    ALTHOUGH UNNECESSARY, AMENDMENT SHOULD BE PERMITTED ............25

CONCLUSION....................................................................................................................25

# TABLE OF AUTHORITIES

**Cases**                                                                                          **Page(s)**

*In re Alstom, SA Sec. Litig.*,
   406 F. Supp. 2d 433 (S.D.N.Y. 2005)..................................................................13, 24

*Altayyar v. Etsy*,
   242 F. Supp. 3d 161 (E.D.N.Y. 2017) ...............................................................18

*In re Avon Sec. Litig.*,
   2019 WL 6115349 (S.D.N.Y. Nov. 18, 2019) (McMahon, J.) ...............................23

*Born v. Quad/Graphics, Inc.*,
   521 F. Supp. 3d 469 (S.D.N.Y. 2021).................................................................22

*Caifa v. Sea Containers Ltd.*,
   525 F. Supp. 2d 398 (S.D.N.Y. 2007)...................................................................7

*City of Birmingham Firemen's & Policemen's Supplemental Pension Sys. v.
   Ryanair Holdings plc*,
   2020 WL 2834857 (S.D.N.Y. June 1, 2020) ...........................................................23

*City of Pontiac Gen. Emps.' Ret. Sys.v. Lockheed Martin Corp.*,
   875 F. Supp. 2d 359 (S.D.N.Y. 2012).................................................................20

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*,
   752 F.3d 173 (2d Cir. 2013)................................................................................18

*City of Roseville Emps.' Ret. Sys. v. EnergySolutions, Inc.*,
   814 F. Supp. 2d 395 (S.D.N.Y. 2011).................................................................19

*Credit Suisse First Bos. Corp.* v. *ARM Fin. Grp., Inc.*,
   2001 WL 300733 (S.D.N.Y. Mar. 28, 2001) ............................................................11

*Cresci v. Mohawk Valley Cmty. Coll.*,
   693 F. App'x 21 (2d Cir. 2017) ..........................................................................25

*Dura Pharms., Inc. v. Broudo*,
   544 U.S. 336 (2005).............................................................................................7

*In re Eletrobras Sec. Litig.*,
   245 F. Supp. 3d 450 (S.D.N.Y. 2017)..................................................................25

*In re Enzymotec Sec. Litig.*,
   2015 WL 8784065 (D.N.J. Dec. 15, 2015) ............................................................9

*In re Facebook, Inc. IPO Sec. & Derivative Litig.*,
   986 F. Supp. 2d 428 (S.D.N.Y. 2013).......................................................................18

*Foman v. Davis*,
   371 U.S. 178 (1962)..................................................................................................25

*Fresno Cnty. Emps.' Ret. Ass'n v. comScore, Inc.*,
   268 F. Supp. 3d 526 (S.D.N.Y. 2017)......................................................................20

*Freudenberg v. E\*Trade Fin. Corp.*,
   712 F. Supp. 2d 171 (S.D.N.Y. 2010)......................................................................15

*Galestan v. OneMain Holdings, Inc.*,
   348 F. Supp. 3d 282 (S.D.N.Y. 2018)......................................................................11

*In re Gen. Elec. Co. Sec. Litig.*,
   857 F. Supp. 2d 367 (S.D.N.Y. 2012)......................................................................17

*Glaser v. The9, Ltd.*,
   772 F. Supp. 2d 573 (S.D.N.Y. 2011)......................................................................21

*Gross v. AT&T Inc.*,
   2021 WL 9803956 (S.D.N.Y. Sept. 27, 2021).........................................................15

*Gross v. GFI Grp., Inc.*,
   162 F. Supp. 3d 263 (S.D.N.Y. 2016)......................................................................18

*In re HEXO Corp. Sec. Litig.*,
   524 F. Supp. 3d 283 (S.D.N.Y. 2021)......................................................................15

*In re Hi-Crush Partners L.P. Sec. Litig.*,
   2013 WL 6233561 (S.D.N.Y. Dec. 2, 2013) ...........................................................23

*Ho v. Duoyuan Glob. Water, Inc.*,
   887 F. Supp. 2d 547 (S.D.N.Y. 2012)......................................................................23

*Horowitz v. Sunlands Tech. Grp.*,
   2021 WL 1224517 (E.D.N.Y. Mar. 31, 2021).........................................................11

*Iowa Pub. Emps.' Ret. Sys. v. MF Glob., Ltd.*,
   620 F.3d 137 (2d Cir. 2010).....................................................................................10

*Ladmen Partners, Inc. v. Globalstar, Inc.*,
   2008 WL 4449280 (S.D.N.Y. Sept. 30, 2008).........................................................19

*Lamartina v. VMware, Inc.*,
   2023 WL 2763541 (N.D. Cal. Mar. 31, 2023)..........................................................11

*Lewy v. SkyPeople Fruit Juice, Inc.*,
　2012 WL 3957916 (S.D.N.Y. Sept. 10, 2012)........................................................................7, 8

*Local No. 38 International Brotherhood of Electrical Workers Pension Fund v.*
　*American Express Co.*,
　724 F. Supp. 2d 447 (S.D.N.Y. 2010)........................................................................21

*Matrixx Initiatives, Inc. v. Siracusano*,
　563 U.S. 27 (2011)........................................................................8

*McMahon & Co. v. Wherehouse Ent., Inc.*,
　900 F.2d 576 (2d Cir. 1990)........................................................................8

*Meyer v. Jinkosolar Holdings Co.*,
　761 F.3d 245 (2d Cir. 2014)........................................................................12

*New Orleans Emps. Ret. Sys. v. Celestica, Inc.*,
　455 F. App'x 10 (2d Cir. 2011) ........................................................................22, 23

*Novak v. Kasaks*,
　216 F.3d 300 (2d Cir. 2000)........................................................................20

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
　575 U.S. 175 (2015)........................................................................8

*Panther Partners Inc. v. Ikanos Commn'cs, Inc.*,
　681 F.3d 114 (2d Cir. 2012)........................................................................7, 15

*Patel v. Axesstel, Inc.*,
　2015 WL 631525 (S.D. Cal. Feb. 13, 2015)........................................................................24

*In re Petrobras Sec. Litig.*,
　116 F. Supp. 3d 368 (S.D.N.Y. 2015)........................................................................19

*Puddu v. 6D Glob. Techs., Inc.*,
　742 F. App'x 553 (2d Cir. 2018) ........................................................................20

*Ramzan v. GDS Holdings Ltd.*,
　2020 WL 1689772 (S.D.N.Y. Apr. 7, 2020)........................................................................23

*Rudani v. Ideanomics, Inc.*,
　2020 WL 5770356 (S.D.N.Y. Sept. 25, 2020)........................................................................21

*In re Sadia SA Sec. Litig.*,
　643 F. Supp. 2d 521 (S.D.N.Y. 2009)........................................................................24

*In re Salix Pharms., Ltd.*,
　2016 WL 1629341 (S.D.N.Y. Apr. 22, 2016)........................................................................24

*In re Scholastic Corp. Sec. Litig.*,
    252 F.3d 63 (2d Cir. 2001)......................................................................................21

*In re Signet Jewelers Ltd. Sec. Litig.*,
    2018 WL 6167889 (S.D.N.Y. Nov. 26, 2018) (McMahon, J.) ...................................14, 16, 19

*In re Skechers USA, Inc. Sec. Litig.*,
    444 F. Supp. 3d 498 (S.D.N.Y. 2020)......................................................................22

*Slayton v. Am. Exp. Co.*,
    604 F.3d 758 (2d Cir. 2010)....................................................................................17

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)................................................................................................20

*Tung v. Bristol-Myers Squibb Co.*,
    412 F. Supp. 3d 453 (S.D.N.Y. 2019)......................................................................24

*In re Turquoise Hill Res. Ltd. Sec. Litig.*,
    625 F. Supp. 3d 164 (S.D.N.Y. 2022)......................................................................13

*In re Vivendi Universal, S.A. Sec. Litig.*,
    381 F. Supp. 2d 158 (S.D.N.Y. 2003)......................................................................18

*In re Vivendi, S.A. Sec. Litig.*,
    838 F.3d 223 (2d Cir. 2016)...............................................................................16, 18

*Wang v. Cloopen Grp. Holding Ltd.*,
    661 F. Supp. 3d 208 (S.D.N.Y 2023)....................................................................7, 10

*Wash. State Inv. Bd. v. Odebrecht S.A.*,
    461 F. Supp. 3d 46 (S.D.N.Y. 2020)........................................................................19

*Wilson v. LSB Indus., Inc.*,
    2017 WL 7052046 (S.D.N.Y. Mar. 2, 2017) .........................................................10, 16

*Winter v. Stronghold Digital Mining, Inc.*,
    2023 WL 5152177 (S.D.N.Y. Aug. 10, 2023).........................................................11

*Yannes v. SCWorx Corp.*,
    2021 WL 2555437 (S.D.N.Y. June 21, 2021) ........................................................9, 22

**Statutes**

15 U.S.C. §77z-2(b)(2)(D)..........................................................................................10

15 U.S.C. §78u-5(c)(1)(A)(i) ......................................................................................16

Lead Plaintiff Richard Hawes ("Plaintiff") respectfully submits this memorandum of law in opposition to Defendants' motion to dismiss (ECF No. 49).[1]

**PRELIMINARY STATEMENT**

Defendants materially misled investors that Argo could transition to owning and operating its own Bitcoin mining operation through a plan to "cost-effectively acquire the latest generation mining machines and install them in North American facilities that utilize predominantly renewable and inexpensive power." Such large-scale cryptocurrency mining operations require enormous amounts of computing power and energy. The centerpiece of Argo's plan was its giant Helios Facility ("Helios") in Western Texas, a site chosen supposedly because Texas had "amongst the cheapest power anywhere in the world[.]" In particular, Defendants touted the Company's access to a power purchase agreement ("PPA") that would allow Argo to buy a fixed quantity of energy over a period of time at very favorable prices. With this supposed access to cheap energy, Defendants misrepresented that they had sufficient liquidity and capital to operate Helios for the long term and that they would be able to control and manage the volatility of cryptocurrency pricing. Defendants sold their plan to investors through Argo's IPO and then through public statements to investors on the secondary market.

Unbeknownst to investors, however, at the time of the IPO, Argo was insufficiently capitalized and had too little cash on hand to operate a facility the size and scale of Helios and withstand foreseeable setbacks, such as seasonally higher energy prices and the decrease in the price of Bitcoin. Indeed, the Company's undercapitalization prevented it from being able to acquire a PPA for power at a low fixed price, which acquisition had underpinned the Company's

---

[1] Unless otherwise noted: (1) capitalized terms mean the same as they do in the Amended Class Action Complaint ("AC"), ECF No. 45; (2) all "¶" references are to the AC; (3) all emphases are added; and (4) all internal citations and quotation marks are omitted.

- 1 -

hopes for success.

After the IPO, the Exchange Act ("EA") Defendants continued to make the same false and misleading representations throughout the Class Period while knowingly or recklessly disregarding the truth about Argo's financial position and its access to power.

It started to become impossible to continue to conceal the truth in June 2022, when Argo revealed that it had to curtail its mining operations due to higher energy prices and mined 25% fewer Bitcoin. Just a few months later, Argo disclosed that it was forced to take drastic measures to stave off bankruptcy, including selling thousands of its mining machines. Analysts were shocked and questioned the Company's "clarity" on its finances and operations, and investors lost millions. By the beginning of 2023, Argo had sold Helios and replaced its Chief Technology Officer ("CTO"), CEO, and CFO.

Defendants argue that Plaintiff has failed to sufficiently plead falsity under Section 11 and Section 10(b) because the AC does not allege that the challenged statements were false when made, and that many are inactionable forward-looking statements or puffery. Defendants' contentions miss the mark entirely. The AC describes in detail each of the false and misleading statements and details the grounds for falsity. Indeed, Defendants' post-Class Period admissions and actions, and the accounts of former Argo employees who worked on these issues, support the allegations that Argo did not have sufficient access to low-cost energy, was not sufficiently capitalized and did not have sufficient liquidity to operate Helios. Further, the puffery arguments are misplaced because Defendants' statements were highly material in context and contained concrete misrepresentations. Additionally, no protection is available for the statements Defendants characterize as "forward-looking."

Defendants also argue that Plaintiff has failed to adequately plead scienter with respect to

the §10(b) claims.  This argument too fails.  Defendants were aware of, and had direct access to, information contradicting their false and misleading statements to investors.  Scienter is bolstered by, *inter alia*, the core operations theory and the subsequent departures of Argo's CTO, CEO, and CFO.

**SUMMARY OF FACTUAL ALLEGATIONS**

### A.      Bitcoin Mining And Argo

Bitcoin mining is the process of creating "new" Bitcoins by devoting computing power to the Bitcoin network that confirms new transactions and creates new Bitcoin.  ¶¶45-47.  This work is performed by high-powered computers known as "miners," or "rigs," that compete to be the first to validate a series of Bitcoin transactions called a "block," and add the block to the blockchain.  ¶¶47, 49.  The more computing power a miner has, the more likely it is to win a block.  ¶48.  Bitcoin mining is extremely energy-intensive.  Therefore, the cost of energy is an important factor in determining the profitability of Bitcoin mining.  ¶52. In 2019, Argo shifted to mining Bitcoin for its own account and in 2021 announced that it planned to "cost-effectively acquire the latest generation mining machines and install them in North American facilities that utilize predominantly renewable and inexpensive power."  ¶59.

### B.      The Helios Facility And Electricity In Texas

The Helios facility in Texas was the centerpiece of Argo's strategy.  ¶¶44, 63.  Texas's main electric grid operator, ERCOT, offers unique programs for large power users such as Bitcoin miners.  ¶¶102-03.  For example, ERCOT gives Bitcoin miners the option to shut down all or part of their operations at peak times in exchange for certain incentives like lower energy prices. ¶103.  ERCOT also offers two types of PPAs – Fixed Price and Spot-Price.  ¶104. Fixed-Price PPAs are the more desireable long-term contracts (over spot-price PPAs) under which a power user agrees to buy a fixed amount of energy over an extended period of time at a

discounted rate, protecting the user against energy price volatility.  *Id.*  However, a commercial purchaser must have adequate credit to purchase a Fixed Price PPA.  ¶¶104-06.  CW-2 stated that "Argo did not have enough capital for the PPA process."  ¶188. His statement was confirmed in a public disclosure by Galaxy, the subsequent purchaser of the Helios facility¶186. Phase 1 of Helios development was scheduled to be completed in the first half of 2022, and included facilities that were expected to support 100 MW of power capacity at an estimated cost of $50 million.  ¶63.  Phase 2 was expected to be completed in the second half of 2022, and would support an additional 100 MW of power capacity at an estimated cost of $30 million.  *Id*. Additional funds would be needed to purchase miners and other things, and so the anticipated initial cost of the Helios facility would be about $200 million.  ¶112.

### C.    Argo's Financial Position Prior To The IPO

Given the anticipated $200 million cost for the early stages of building out Helios, which Argo did not have, Argo entered into a $20 million term loan agreement with Galaxy.  ¶112.  A few months later, in September 2021 Argo entered into a new loan with Galaxy for $25 million to finance Helios's continued development, subsuming the old $20 million loan, making $45 million available to borrow.  ¶113.

### D.    Argo's IPO

In addition to the Galaxy loans, Argo sought additional funds for its expansion through an IPO on September 23, 2021, raising approximately $105 million.  ¶66.  In the IPO offering documents, Argo described its commitment to investing in "[r]eliable, [l]ow-[c]ost, [r]enewable [p]ower," its "Smart Growth" strategy, and its "heav[]y" investments "in purchasing, building, and operating our mining facilities," and that its "investments in mining facilities are designed to significantly expand our mining capacity and provide us with meaningful control over our mining operations."  ¶¶69-71, 75.  The offering documents also touted Argo's liquidity and

capital resources, claiming that "[w]e believe that our sources of liquidity and capital resources will be sufficient to meet our existing business needs for *at least* the next 12 months." ¶73. They also stated that Argo could "control and manage the volatility in crypto currency pricing" by engaging in "planned selling of cryptocurrency over an extended period in advance of forecasted fiat cash requirements." ¶74.

Unbeknownst to investors, however, these claims were false and misleading because Argo was severely undercapitalized, with too little cash on hand to operate a facility like Helios or obtain the Fixed-Price PPA needed to access the low-cost power it touted. ¶76.

### E.    Defendants Continue To Mislead The Market After The IPO

After the IPO, Defendants continued to represent to investors that Argo was in a strong financial position, and that it had sufficient resources to continue to fund Helios well into the future. To support these representations, Defendants told investors that two of Argo's largest financial burdens, the cost of Helios and the cost of power, were not a concern because energy prices in Texas were extremely low, and Phase 1 of Helios was nearly paid off. ¶129.

For example, Argo told investors that energy costs would only be about $0.02 per kWh in part because Argo was planning to enter into a Fixed-Price PPA with ERCOT, which would allow Argo to buy a fixed quantity of energy over an extended period of time at a set, discounted rate. ¶ 7. Argo did not disclose that it did not have sufficient credit for the more desirable Fixed-Price PPA when it announced that it had entered into an alternative agreement known as a Spot-Price PPA, which was based on the index prices for energy. ¶111. As one analyst report noted, "a PPA typically requires a multi-million dollar up front deposit," and this appeared "to be off the table [for Argo] sans an additional capital injection." ¶187. As a result of the less desirable variably-priced agreement Argo entered into, when power prices were high due to increased

demand, Argo had to shut down its mining operations, and when power prices were low, Argo could resume mining Bitcoin.  ¶111.

In reality, however, Argo was still severely undercapitalized and had far too little cash (or Bitcoin) on hand to (1) operate a facility the size and scale of Helios and (2) withstand foreseeable setbacks, such as seasonally higher energy prices and the decrease in the price of Bitcoin.  Its limited hedging maneuvers were in no way adequate to "control" these issues and the EA Defendants knew this.  ¶¶190-234.

### F.    The Truth Is Gradually Disclosed To The Market

Based on the foregoing false and misleading statements, investors believed that Argo was in a strong financial position and was sufficiently capitalized for continued growth.  ¶147.  The truth began to leak out when, on June 7, 2022, Argo disclosed that it mined approximately 25% fewer Bitcoin in May 2022 compared to April 2022 because of, *inter alia*, increased network difficulty, higher electricity prices, and the curtailment of mining operations to reduce its energy use.  *Id*.  On this news, Argo's ADR price fell $0.28 per ADR, or 4.4%, to close at $6.09 per ADR on June 7, 2022.  ¶148.

Argo securities continued to trade at artificially inflated prices, however, because the EA Defendants continued to mislead investors about Argo's resources and ability to get the capital and power needed at Helios.  ¶¶149-67.

On October 7, 2022, Argo unexpectedly announced several bombshell developments to stave off bankruptcy, including entering into an agreement to amend an existing equity financing agreement, plans to sell 3,400 mining machines, and an agreement with a strategic investor that would result in the investor holding 15.46% of Argo's enlarged issued share capital.  ¶¶170-72. This news shocked the market and caused Argo's ADR price to fall $0.97 per ADR, or 23.26%, to close at $3.20 per ADR on October 7, 2022.  ¶173.

Then, on October 11, 2022, Argo further shocked investors with news that in September, it mined 20 fewer Bitcoin than in August 2022, "primarily due to a 12% increase in average network difficulty during September." ¶177. Argo also stated that it was continuing to curtail operations at Helios during periods of high electricity prices and was replacing its CTO. *Id*. On this news, Argo's ADR price fell $0.27 per ADR, or 10.98%, to close at $2.19 per ADR on October 11, 2022. ¶178.

## ARGUMENT

## I.    THE RELEVANT STANDARDS DO NOT FAVOR DISMISSAL

To state a claim under Section 11, Plaintiff is only required to allege that Argo's offering documents "(1) contained an untrue statement of material fact; (2) omitted to state a material fact required to be stated therein; or (3) omitted to state a material fact necessary to make the statement therein not misleading." *Caifa v. Sea Containers Ltd.*, 525 F. Supp. 2d 398, 408 (S.D.N.Y. 2007).

Section 11 claims are subject to Rule 8(a)'s "short and plain statement" requirement. *Panther Partners Inc. v. Ikanos Commn'cs, Inc.*, 681 F.3d 114, 120 (2d Cir. 2012). Under Section 11, "[l]iability against the issuer of a security is virtually absolute, even for innocent misstatements, while other defendants bear the burden of demonstrating due diligence." *Wang v. Cloopen Grp. Holding Ltd.*, 661 F. Supp. 3d 208, 224 (S.D.N.Y 2023).

To state a claim under Section 10(b), Plaintiff must allege, *inter alia*: (1) a material misrepresentation or omission; and (2) scienter. *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005). To satisfy Rule 9(b) and the PSLRA, a plaintiff need only "(1) specify the statements that the plaintiff contends were fraudulent; (2) identify the speaker; (3) state where and when the statements were made; and (4) explain why statements were fraudulent." *Lewy v.*

*SkyPeople Fruit Juice, Inc.*, 2012 WL 3957916, at *7 (S.D.N.Y. Sept. 10, 2012).

The AC meets all of the respective standards for Plaintiff's §§11 and 10(b) claims.

**II.    THE ALLEGED MISREPRESENTATIONS AND OMISSIONS ARE ACTIONABLE**

Statements are actionable if they are either false or misleading.  *See Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37 (2011).  An "untrue statement of a material fact" is a false statement.  *Id.*  "[L]iterally accurate" statements "can become, through their context and manner of presentation, devices which mislead investors."  *McMahon & Co. v. Wherehouse Ent., Inc.*, 900 F.2d 576, 579 (2d Cir. 1990).

**A.    The Securities Act Defendants' Statements In The Offering Documents Were Materially Misleading**

The Registration Statement ("RS") misleadingly touted Argo's access to reliable, low-cost and renewable power and ability to expand its mining capacity.  ¶¶69-71, 75.  For example, it stated, "[b]y owning and operating our mining machines at facilities that offer competitive advantages, including access to ***reliable, low-cost***, renewable power and room for expansion, we expect to have greater control over the timing of the purchase and deployment of our mining machines."  ¶71; *see also* ¶¶69-70, 75.  The RS also stated that Argo could "control and manage the volatility in cryptocurrency pricing" by "engag[ing] in planned selling of cryptocurrency over an extended period in advance of forecasted fiat cash requirements."  ¶74.

Additionally, the RS opined, "we believe that our sources of liquidity and capital resources will be sufficient to meet our existing business needs for ***at least*** the next 12 months."  ¶73. *See Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 194 (2015) (explaining that opinions are misleading if an "omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context").

These statements gave investors the misleading impression that Argo was in a financial

position to weather the foreseeable setbacks to Bitcoin mining, like increased energy costs and Bitcoin price volatility, and that it was in a position to access the "reliable, low-cost, renewable power" it touted.  The misleading impression created by these statements was made possible by Argo's failure to disclose that it was too undercapitalized to be able to get the Fixed-Price PPA that it needed to have a chance at accessing the reliable, low-cost power it touted, withstand the aforementioned foreseeable setbacks, and meet its existing business needs for at least 12 months. ¶76.  *See In re Enzymotec Sec. Litig.*, 2015 WL 8784065, at *3, *13 (D.N.J. Dec. 15, 2015) (statements regarding company's abilities to meet its goals were actionable where defendants failed to disclose "formidable hurdles" to achieving them).

Defendants complain that Plaintiff has not adequately alleged that these statements were false or misleading when made because Plaintiff relies on later events.  The Second Circuit has made clear, however, that plaintiffs may rely on later events to establish what facts existed at the relevant time.  *See Yannes v. SCWorx Corp.*, 2021 WL 2555437, at *7 (S.D.N.Y. June 21, 2021).

Here, it was necessarily the case that Argo was undercapitalized at the time of the IPO because Argo could not meet its existing business needs or enter into a Fixed-Price PPA despite raising ***millions*** shortly thereafter.  Specifically, Argo raised an additional $170 million in loans and equipment financing agreements between the IPO and May 2022.  *See* ¶¶116-23.  Yet, on June 7, 2022—less than 9 months after the IPO—Argo revealed that it had to curtail its mining operations to save money due to increased Bitcoin network difficulty and higher electricity prices, leading it to mine 25% fewer Bitcoin in May 2022.  ¶147.  Argo's undercapitalization and inability to meaningfully withstand the volatility in cryptocurrency prices at all relevant times was further exposed on October 7, 2022, when the Company announced that it had to take several drastic actions to stave off bankruptcy in the face of entirely foreseeable events, such as a

- 9 -

decrease in Bitcoin prices, increase in electricity prices, and the resulting decrease in Argo's mining margin.  ¶169.  As Galaxy, which bought Helios shortly thereafter explained, Argo did not have the credit necessary to obtain a Fixed-Price PPA.  *See* ¶186.

Defendants argue that the challenged statements are puffery (addressed in §II.C below), and/or "protected" forward-looking statements.  However, the PSLRA's safe harbor does not apply to forward-looking statements made in connection with an initial public offering.  15 U.S.C. §77z-2(b)(2)(D).  Thus, the statements are only "protected" if they are subject to the "bespeaks caution" doctrine, which provides that "forward-looking statements are shielded from liability when accompanied by meaningful cautionary language."  *Wang*, 661 F. Supp. 3d at 230. The bespeaks caution doctrine does not apply here.

First, mixed statements of present/future fact are not protected by the bespeaks caution doctrine with respect to the portion of the statement that refers to the present.  *See Iowa Pub. Emps.' Ret. Sys. v. MF Glob., Ltd.*, 620 F.3d 137, 144 (2d Cir. 2010).  Several of the statements Defendants challenge as forward-looking contain present representations about Argo's business that are not subject to the bespeaks caution doctrine.  *See, e.g.,* ¶71 (A3)[2] ("By ***owning and operating*** our mining machines ***at facilities*** that offer competitive advantages, ***including access to reliable, low-cost, renewable power*** . . . we expect to . . . ." ¶74(A5) ("To control and manage the volatility in cryptocurrency pricing, we ***engage*** . . . .").

Second, the bespeaks caution doctrine does not "protect[] material omissions."  *Wilson v. LSB Indus., Inc.*, 2017 WL 7052046, at *3 (S.D.N.Y. Mar. 2, 2017).  Here, Plaintiff alleges that Defendants failed to disclose that Argo was insufficiently capitalized to access the Fixed-Price

---

[2]      Unless otherwise noted, all citations to "A__" or "B__" are to Appendices A and B to Defendants' Motion to Dismiss (ECF Nos. 50-1, 50-2).

PPA to get the low-cost power it touted and operate Helios long-term—facts which if disclosed "would have influenced the decisions of reasonable investors as to the purchase or sale of the Company's securities." *Galestan v. OneMain Holdings, Inc.*, 348 F. Supp. 3d 282, 304 (S.D.N.Y. 2018).

Third, the doctrine does not permit "cautionary words about future risk" to "insulate from liability the failure to disclose that the risk has transpired." *Horowitz v. Sunlands Tech. Grp.*, 2021 WL 1224517, at *3 (E.D.N.Y. Mar. 31, 2021). "In other words, a warning framed in hypothetical terms does not apprise a reasonable investor of actual misconduct." *Id.* Here, Defendants point to the RS's warnings that Argo's "operating results have fluctuated and may continue to fluctuate significantly due to the highly volatile nature of digital assets," that Argo "may be affected" by fluctuating energy prices and digital asset prices, and that Argo "may not be able to secure access to electricity on a sufficiently firm and unrelated basis or at a price [it is] willing to pay." Mem. of Law in Supp. of Defs.' Mot. to Dismiss the Am. Compl. 8-9 (ECF No. 50). But these "hypothetical statements" did nothing to warn investors about Argo's then-**current** undercapitalization which made it a near-certainty that Argo would be unable to obtain the Fixed-Price PPA it needed to access the reliable, low-cost power that was key to Argo's future. ¶204; *Winter v. Stronghold Digital Mining, Inc.*, 2023 WL 5152177, at *9 (S.D.N.Y. Aug. 10, 2023) ("[b]ecause Defendants' statements were hypothetical and the warned-of risks were not, the cautionary statements are not curative" under the bespeaks caution doctrine); *Credit Suisse First Bos. Corp.* v. *ARM Fin. Grp., Inc.*, 2001 WL 300733, at *8 (S.D.N.Y. Mar. 28, 2001) (even "warnings of specific risks . . . do not shelter defendants from liability if they fail to disclose hard facts critical to appreciating the magnitude of the risks described[]"); *Lamartina v. VMware, Inc.*, 2023 WL 2763541, at *12 (N.D. Cal. Mar. 31, 2023) (warning that "operating

- 11 -

results may fluctuate significantly" was inadequate).

## B.    The Exchange Act Defendants' Post-IPO Statements Were False And Misleading

### 1.    Statements Regarding Argo's Access To Power

After the IPO, the EA Defendants continued to mislead investors about Argo's ability to access reliable, low-cost power and obtain a Fixed-Price PPA.  For example, on November 2, 2021 and December 16, 2021, Wall told the market that Argo had access to "the cheapest power anywhere in the world" at less than $0.02/kWh without disclosing that it did not have sufficient credit worthiness to obtain a Fixed-Price PPA.  ¶132.  On May 2, 2022, Defendants told the market that they "anticipate" that Argo's "net electricity costs will be below $0.02/kWh after including the benefits of participating in demand response programs offered by" ERCOT.  ¶141. On June 7, 2022, Wall stated that "[w]e now have an enormous runway of power.  800 megawatts of power in West Texas in a particular part of the grid where there's an overabundance of renewable energy," "ERCOT, who manages the grid, incentivizes large load users like ourselves to participate in these demand response programs," ¶149, and "[t]here's just not a lot of power demand in those regions, but there's an abundance of supply, ¶150.

However, on May 2, 2022, the EA Defendants, withno mention of their financial issues and lack of credit-worthiness, represented that Argo would not enter into a Fixed-Price PPA due to "really high" energy costs, ¶111, and on August 5, 2022 and September 9, 2022, Argo conveyed to investors that it was "evaluating options for a long-term, fixed price PPA," ¶108.

To the extent Defendants argue that such statements cannot be misleading because they did not "guarantee" Argo could get a Fixed Price PPA, they miss the point.  By choosing to "speak" about PPAs and Argo's ability to access low-cost power, Defendants had "a duty to tell the whole truth."  *Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 250 (2d Cir. 2014).  By

omitting to disclose that Argo was undercapitalized and therefore was not presently qualified to obtain the Fixed-Price PPA needed to access reliably low-cost power (even if energy prices went down), Defendants created "an impression of a state of affairs that differ[ed] in a material way from the one that actually exist[ed]" and therefore was misleading to a reasonable investor. *See In re Alstom, SA Sec. Litig.*, 406 F. Supp. 2d 433, 453 (S.D.N.Y. 2005); *In re Turquoise Hill Res. Ltd. Sec. Litig.*, 625 F. Supp. 3d 164, 228-32 (S.D.N.Y. 2022) (finding falsity where plaintiffs alleged defendants attributed a delay to one thing when it was primarily due to another reason).

### 2.    Statements About Argo's Financial Condition And Competitiveness

Defendants made numerous false and misleading statements about Argo's financial condition and competitiveness, stating, *inter alia*:

- Argo's "cash on hand" and "hodl" [stockpiled bitcoin] provides it with "sufficient flexibility to pursue our strategic growth plans in Texas, infrastructure, and machines, et cetera," ¶130 (Nov. 2, 2021);

- Argo was on "the extreme end of profitability right now," ¶133 (Dec. 21, 2021);

- "This runway for growth is unmatched by Argo's peers, and we have built a robust foundation upon which we can scale efficiently and profitably," ¶135 (Apr. 27, 2022);

- "[W]e're well-positioned to continue on the growth phase and continue a very profitable level," Argo has a "very strong balance sheet," and "stand[s] in a very strong position, because . . . we've got on our balance sheet a significant amount of Bitcoin as well.  So we are not wholly reliant on debt.   In fact, we can almost self-mine," and are "in [a] really strong position to move forward.  Our debt market remains strong."  ¶137 (Apr. 28, 2022); and

- "We believe that our sources of liquidity and capital resources will be sufficient to

- 13 -

meet our existing business needs for at least the next 12 months." ¶139 (May 2, 2022).[3]

These statements gave investors the false and misleading impression that Argo was in a financial position to access the low-cost power it touted and weather the foreseeable setbacks to Bitcoin mining, like increased energy costs and the decreasing price of Bitcoin. Thus, by making these statements, Defendants had a duty to disclose the fact that Argo was not sufficiently capitalized and had far too little cash on hand to do so. ¶¶131, 134, 136, 138, 140.

Once again, Defendants complain that Plaintiff has not adequately pleaded that these problems were in existence at the time the statements were made. But as explained above, Argo was undercapitalized at the time of the IPO, and continued to be thereafter as illustrated by Argo's increasing debt, inability to get a Fixed-Price PPA, and the eventual revelation that Argo never had the requisite credit to obtain one. *See* §II.A, *supra*.

Thus, the truth was inconsistent with Defendants' representations. For example, the slice of reality investors glimpsed on June 7, 2022—when it was revealed that Argo mined 25% fewer Bitcoin in May 2022 because it had to curtail operations to save money—completely belied Defendants' statements made just a month earlier. That is, "[w]e believe that our sources of liquidity and capital resources will be sufficient to meet our existing business needs for at least the next 12 months," ¶139 (May 2, 2022), and "we're in a very healthy position", and that Argo is "well positioned" to fill the $50 million "gap" for the rest of Phase I of the Helios build out, and "every day we mine more and more Bitcoin, and so that position . . . improves with every day that passes[,]" ¶142 (May 18, 2022). *See In re Signet Jewelers Ltd. Sec. Litig.*, 2018 WL 6167889, at *11-12 (S.D.N.Y. Nov. 26, 2018) (McMahon, J.) (finding "purported descriptions of

---

[3]    This statement is an actionable opinion as explained in §II.A, *infra*.

the health of the business," *i.e.,* Signet's credit portfolio was "strong" or "very healthy," to be actionable in context). Clearly, Argo was mining significantly less Bitcoin in May, and having considerable trouble coming up with the funds needed to run Helios without taking drastic measures.[4]

Defendants nonetheless continued to mislead the market thereafter, characterizing Argo as having "a kind of low cost of production," and "with a "balance sheet strong enough to be able to withstand lower prices," ¶153; that 95% of Helios and 90% of the machines therein had been paid for and therefore "the first 3.6 exahash [an exahash is one quintillion computations] from those 20k machines is on track and paid for," ¶155; and believed that Argo was "well positioned to navigate the current market conditions and further increase our efficiencies," and "confident that it possesses sufficient liquidity to avoid any potential liquidation," ¶158. Similar statements abound. *See, e.g.,* ¶161 ("we are well positioned to weather the current downturn"); ¶163 ("our rigorous approach to cash flow and treasury management has meant that we have been cash neutral. So we're well placed there."). Given these representations, a reasonable investor would not expect Argo to be just a few months away from selling thousands of mining machines, let alone the Helios facility that was the centerpiece of its business. ¶¶168-73, 183. *See Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 185-86, 191 (S.D.N.Y. 2010) (statements that defendants maintained a "disciplined" focus on risk mitigation actionable where

---

[4]    Defendants' authorities are therefore inapposite. *See Gross v. AT&T Inc.*, 2021 WL 9803956, at *6 (S.D.N.Y. Sept. 27, 2021) (no facts supported that AT&T knew at launch time that its product would not be profitable, and "anecdotal incidents of improper sales tactics" were insufficient to show problem was widespread); *Ikanos*, 347 F. App'x at 620 (chip defect that did not emerge until Jan. 2006 did not render Sept. 2005 statements about quality control actionable); *In re HEXO Corp. Sec. Litig.*, 524 F. Supp. 3d 283, 300-02 (S.D.N.Y. 2021) (no facts suggesting that defendants could have known at time of IPO that a key customer would fail to meet a purchase commitment 9 months later).

there was a "glaring disparity" between those statements and the company's actual operations).

### 3. Defendants' Statements Are Not Protected By The Safe Harbor

Defendants assert that several of the challenged statements are protected by the PSLRA's safe harbor for forward-looking statements and the bespeaks caution doctrine.

However, once again, many of the statements Defendants challenge as forward-looking are mixed statements of present/future fact and are not protected by the safe harbor with respect to the portion of the statement that refers to the present. *See* §II.A, *infra.* For example, Defendants cite to several statements that contain present representations about Argo's business. *See, e.g.,* ¶130 (B1) ("Argo ***has*** sufficient flexibility . . . "); ¶135 (B4) ("This runway for growth ***is*** unmatched . . . and we ***have built*** a robust foundation . . ."); ¶137 (B5) ("we're well-positioned," "very pleased," "***where we stand today, we stand*** in a very strong position"); ¶142 (B8) ("we're in a very healthy position ***at the moment***, "we're well positioned"). *See In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 245 (2d Cir. 2016) ("strong growth prospects and a very strong balance sheet" was actionable as a present representation"); *Signet*, 2018 WL 6167889, at *13 (statements about Signet's "strong" and "very healthy" credit portfolio "spoke to a present state of affairs").

Furthermore, "neither the PSLRA safe harbor, nor the bespeaks caution doctrine" protects the material omissions alleged here, as explained in §II.A, *supra*. *See Wilson*, 2017 WL 7052046, at *3.

The safe harbor and bespeaks caution doctrine are also inapplicable because Defendants' statements were not accompanied by meaningful cautionary language. *See* 15 U.S.C. §78u-5(c)(1)(A)(i). To be meaningful, "[c]autionary language must be ***extensive and specific***. A vague or blanket (boilerplate) disclaimer which merely warns the reader that the investment has

risks will ordinarily be inadequate[.] . . . To suffice, the cautionary statements must be **substantive and tailored to** the specific future projections" at issue. *Slayton v. Am. Exp. Co.*, 604 F.3d 758, 772 (2d Cir. 2010). As explained above, Defendants' hypothetical warnings that it "may" not be able to get power at the right price, and that energy prices and Bitcoin prices may fluctuate and "adversely affect" Argo, do not adequately warn investors. *See* §II.A.

Third, these statements were made with actual knowledge of the omitted or misrepresented facts under the safe harbor. The Second Circuit has held that a speaker has actual knowledge of the falsity of a forward-looking statement if the speaker has actual knowledge that one or more of the following implicit factual representations is not true: "(i) that the statement is genuinely believed; (ii) that there is a reasonable basis for that belief; and (iii) that the speaker is not aware of any undisclosed facts tending to seriously undermine the accuracy of the statement." *In re Gen. Elec. Co. Sec. Litig.*, 857 F. Supp. 2d 367, 388 (S.D.N.Y. 2012) (quoting *Slayton*, 604 F.3d at 774). The statements challenged as forward-looking were misleading because Defendants lacked a reasonable basis for them and were aware of "undisclosed facts tending to seriously undermine the accuracy of the statement[s]." *Id.* That is, by omitting that Argo was too undercapitalized to operate Helios or obtain a Fixed-Price PPA, investors were misled as to the likelihood that Argo would be able to meet its existing business needs during the next 12 months (¶139 (B6)), access power at $0.02/kWh (¶141 (B7)), or otherwise continue to operate the Company in the near-term without taking drastic measures (¶¶130, 135, 137, 142 (B1, B4-B5, B8)).

Thus, there is no protection for Defendants' statements.

### C.    Defendants' Statements Were Not Puffery

The statements alleged to be false were highly specific and in no way could be interpreted as mere puffery. Courts are generally reluctant to rule on claims of puffery at the

pleading stage because the analysis "depends on all relevant circumstances of the particular case and is generally not an appropriate basis on which to dismiss a complaint." *See In re Vivendi Universal, S.A. Sec. Litig.*, 381 F. Supp. 2d 158, 182 (S.D.N.Y. 2003).  Puffing statements are "too general to cause a reasonable investor to rely on them" and thus "lack the sort of definite positive projections that might require later correction." *See Vivendi*, 838 F.3d at 245.  However, "[s]tatements are not puffery if shareholders could reasonably interpret them as material misstatements[,]" which depends on the context in which they were made.  *Gross v. GFI Grp., Inc.*, 162 F. Supp. 3d 263, 268 (S.D.N.Y. 2016).

The statements regarding Argo's liquidity, capitalization, and power access were readily capable of verification and therefore do not constitute puffery.  *See, e.g.,* ¶132 (Argo had "access to the cheapest power anywhere in the world" at less than $0.02/kWh); ¶111 (representing that Argo could not enter into a Fixed-Price PPA due to "really high" energy costs); ¶108 ("evaluating options for a long-term, fixed price PPA"); *see In re Facebook, Inc. IPO Sec. & Derivative Litig.*, 986 F. Supp. 2d 428, 463, 465, n.22 (S.D.N.Y. 2013) (statements that "[n]o trading platform on the planet is faster or more scalable," and that company had "on-time, on-target, and ready-to-launch technology . . . . were readily capable of verification" and therefore not puffery).[5]

Further, where the context makes it such that "a reasonable investor could rely on [the statements] as reflective of the true state of affairs at the Company," the statements are not

---

[5]    Defendants' authorities are distinguishable.  *See City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 186 (2d Cir. 2013) (statements that UBS prioritized "*adequate* diversification of risk" and "avoidance of *undue* concentrations" were too open-ended "to constitute a guarantee that UBS would not accumulate a $100 billion . . . portfolio"); *Altayyar v. Etsy*, 242 F. Supp. 3d 161, 174 (E.D.N.Y. 2017), *aff'd* 731 F. App'x 35 (2d Cir. 2018) ("genuine" and "authentic" statements not actionable in context ).

inactionable puffery.  *In re Petrobras Sec. Litig.*, 116 F. Supp. 3d 368, 381 (S.D.N.Y. 2015).

Here, Defendants' supposedly "puffing" statements regarding Argo's access to low-cost reliable

power, its competitive advantage over other miners to create new Bitcoin, and its ability to

continue to fund its operations were made in the context of repeatedly reassuring investors with

respect to these issues, while concealing information that contradicted these statements.  *See e.g.,*

¶¶69(A1), 71(A3) (regarding access to "reliable, low-cost, renewable power"), ¶135(B4)

("runway for growth" "unmatched" by "peers"), ¶137(B5) ("well positioned to continue on the

growth phase[,]" "very strong balance sheet"),  ¶142(B8) ("well positioned" to fill $50 million

"gap" for rest of Helios Phase I; "in a very healthy position at the moment in terms of our

hodl[,]").  *See, e.g., Signet*, 2018 WL 6167889, at *11 (statements "made repeatedly in an effort

to reassure the investing public about matters particularly important to the company and

investors, . . . may become material"); *Wash. State Inv. Bd. v. Odebrecht S.A.*, 461 F. Supp. 3d

46, 73-74 (S.D.N.Y. 2020) (statement about "competitive advantages" not puffery in context);

*City of Roseville Emps.' Ret. Sys. v. EnergySolutions, Inc.*, 814 F. Supp. 2d 395, 412 (S.D.N.Y.

2011) (statements that company believed itself to be "well-positioned" to get certain contracts

were actionable); *cf. Petrobras*, 116 F. Supp. 3d at 381 (repeated statements about the company's

integrity were not puffery in context).[6]

## III.    THE EXCHANGE ACT DEFENDANTS ACTED WITH SCIENTER

In evaluating scienter, "[t]he inquiry . . . is whether *all* of the facts alleged, taken

collectively, give rise to a strong inference of scienter, not whether any individual allegation,

---

[6]      In *Ladmen Partners, Inc. v. Globalstar, Inc.*, 2008 WL 4449280, at *5, *13-14 (S.D.N.Y. Sept. 30, 2008), statements of "belief, expectation, and intention" regarding the quality and longevity of the company's satellites were not actionable where investors were informed that over 15% of the satellites had failed, 30% experienced S-band antenna problems, and there were no facts suggesting that defendants knew the S-band problem was worse than they let on.

scrutinized in isolation, meets that standard." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-23 (2007).  A plaintiff may satisfy the scienter standard "by alleging facts to show either (1) that defendants had the motive and opportunity to commit fraud, ___or___ (2) strong circumstantial evidence of conscious misbehavior or recklessness." *Puddu v. 6D Glob. Techs., Inc.*, 742 F. App'x 553, 556 (2d Cir. 2018); *see also Novak v. Kasaks*, 216 F.3d 300, 311 (2d Cir. 2000).  Any "tie on scienter goes to the plaintiff." *City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 372 (S.D.N.Y. 2012).

When considered holistically, Plaintiff's allegations establish scienter.

### A.    The EA Defendants Knew Facts Or Had Access To Information About Argo's Ability To Get A Fixed Price PPA

The EA Defendants' own statements establish that they knew or had access to ERCOT's requirements for obtaining a Fixed-Price PPA and Argo's ability to meet them at all relevant times.  For example, the RS, signed by Wall and Appleton, ¶68, mentions "the availability and cost of appropriate power arrangements[,]" as a risk to Argo's ability to access reliable low-cost power, App'x A at 2, which would necessarily include a Fixed-Price PPA.  Argo's July 2022 Operational Update provided that it was "evaluating options for a long-term, fixed price PPA to sign in the near future." ¶203.  Argo and Wall echoed these statements in August 2022 as well. *Id*.  To evaluate those options, the EA Defendants necessarily needed to know what the criteria were to obtain that PPA, including the credit standards.  ¶¶202-07.

In addition to having knowledge of or access to the criteria for obtaining a Fixed-Price PPA, the EA Defendants necessarily knew or had access to facts pertaining to whether Argo could meet that criteria because they made numerous detailed statements throughout the Class Period about Helios' operational costs, and Argo's balance sheet, loans, and equipment financing agreements. *See, e.g.*, ¶¶193-201; 208-19.  *Fresno Cnty. Emps.' Ret. Ass'n v. comScore, Inc.*,

268 F. Supp. 3d 526, 552 (S.D.N.Y. 2017) (defendants' extensive discussions about a topic supported scienter). According to CW-3, Appleton and Wall also knew or had access to how much Bitcoin Argo mined and the energy costs of doing so in real time through Argo's Grafana software. ¶¶39, 192. This is corroborated by their own statements regarding Helios' energy costs, and mechanical and networking issues during the Class Period. *See* ¶¶192-94. *See In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 76-77 (2d Cir. 2001) (scienter may be inferred when executives receive "daily, weekly, and monthly" reports, such as computer runs, about increasing product returns but "mak[e] public statements that painted a different picture").

Thus, contrary to Defendants' arguments, the EA Defendants necessarily had knowledge of or access to information contradicting their public statements about Argo's access to reliable, low-cost renewable power and the Company's financial health in the form of Argo's own balance sheets, financial statements, loan agreements, and real-time operational data, and their necessary access to ERCOT's requirements for a Fixed-Price PPA. ¶¶209-14; *see Rudani v. Ideanomics, Inc.*, 2020 WL 5770356, at *7 (S.D.N.Y. Sept. 25, 2020) (scienter may be inferred where executives had access to financial records of unprofitability and signed purchasing agreements).

Defendants also erroneously argue that CW-2 is Plaintiff's only support for the allegation that Argo was insufficiently capitalized to enter into a Fixed Price PPA. *See e.g.,* ¶188.[7] This is

---

[7] Unlike the CWs in *Local No. 38 International Brotherhood of Electrical Workers Pension Fund v. American Express Co.*, 724 F. Supp. 2d 447, 460 (S.D.N.Y. 2010), *aff'd* 430 F. App'x 63 (2d Cir. 2011) who worked at American Express, a large company, CW-2 worked at Argo, a small company, and was on the ground at Helios and was therefore in a better position to make observations about Argo's financial condition. In *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 594-95 (S.D.N.Y. 2011), CW-4 did not have personal knowledge of his own allegations and his allegation "purport[edly] read [the executive's] mind," CW-3 here had personal knowledge of Grafana, and his understanding that Wall and Appleton routinely monitored this software was

demonstrably wrong.  In addition to the fact that Argo never entered into the Fixed Price PPA, Galaxy was able to enter into one for the Helios facility immediately after buying it due to Galaxy's "credit-worthiness" and "balance sheet." ¶¶186-87.  Indeed, Argo could not even meet the requirements despite raising $170 million after the IPO.  ¶219.  Defendants are incorrect that Galaxy's statements were only about *its* financial position—Galaxy also discussed why Argo was unable to enter into a Fixed-Price PPA.  ¶186 (***"[w]hile the previous owner"—Argo—"was . . . unable to enter into fixed price hedges***, we do have this capability due to our credit-worthiness . . . ";  Helios was "unable to access" a Fixed-Price PPA "before our stewardship with it, and so our balance sheet has allowed us to actually do that," which "created value on day one for the Helios site. It wasn't unlocking prior to that.").  "[D]rawing all inferences in the plaintiff's favor, as the Court must" at this stage, there is sufficient evidence to show Argo was too undercapitalized at all relevant times to obtain a Fixed-Price PPA, and that Defendants knew or were aware of these material facts which were not disclosed to investors.[8]  *SCWorx*, 2021 WL 2555437, at *5.[9]

**B.    The EA Defendants Had Access To The Omitted Facts Given Their Importance To Argo's Core Operations**

The importance of an issue to a corporation supports an inference of executive scienter as to adverse facts regarding that core issue.  *See New Orleans Emps. Ret. Sys. v. Celestica, Inc.*,

---

corroborated by Defendants' own statements about Helios mining operations, ¶¶142, 147 153, 156, 163, 194, 196.

[8]    *In re Skechers USA, Inc. Sec. Litig.*, 444 F. Supp. 3d 498, 528 (S.D.N.Y. 2020), the allegations were insufficient to show that an internal expense *forecast* was contrary to what the defendants told the market; here, Plaintiff alleges that the facts defendants had at the time through real-time data on mining operations, the Fixed-Price PPA requirements, and other current financials showed Argo was undercapitalized at all relevant times.

[9]    *Born v. Quad/Graphics, Inc.*, 521 F. Supp. 3d 469, 480-81 (S.D.N.Y. 2021) is inapposite because here, Plaintiff has specifically identified what information was known or recklessly disregarded by the Exchange Act defendants regarding the Company's ability to get a Fixed-Price PPA—*e.g.*, the requirements to get one and Argo's ability to meet those requirements.

455 F. App'x 10, 14 n.3 (2d Cir. 2011). "Core operations include matters critical to the long term viability of the company and events affecting a significant source of income." *In re Avon Sec. Litig.*, 2019 WL 6115349, at \*20 (S.D.N.Y. Nov. 18, 2019) (McMahon, J.). During the Class Period, mining operations at the Helios facility and access to low-cost power clearly were core operations and Argo's primary source of revenue all of which were discussed regularly during earnings calls. ¶¶225-28. As Wall said himself, "I can't overstate how important that . . . low-cost renewable power [in Texas] is going to be for us to be the captains of our own ship, for us to be able to control all aspects of our mining operations." ¶227; *see also* ¶226. Obtaining a Fixed-Price PPA was critical to that ability. Wall and Appleton, as senior level officers who were tasked with overseeing the Company's operations, and their statements during the Class Period indicate that they were heavily involved in the day-to-day operations at Helios and in obtaining low-cost power to operate Helios. ¶¶135, 137, 139, 141-42, 145, 149, 152-53, 155-56, 158, 161, 163; *see In re Hi-Crush Partners L.P. Sec. Litig.*, 2013 WL 6233561, at \*26 (S.D.N.Y. Dec. 2, 2013).[10]

Furthermore, Wall and Appleton, as CEO and CFO, respectively, had duties to monitor and necessarily had access to the relevant financial information that showed Argo was insufficiently capitalized to meet ERCOT's requirements for a Fixed Price PPA at the time Defendants made their statements. *See Ho v. Duoyuan Glob. Water, Inc.*, 887 F. Supp. 2d 547, 575 (S.D.N.Y. 2012). Argo was also a small company, with only 7-100 employees from 2021

---

[10]    Defendants' authorities merely confirm that the core operations doctrine is one factor that may support an overall inference of scienter. *See City of Birmingham Firemen's & Policemen's Supplemental Pension Sys. v. Ryanair Holdings plc*, 2020 WL 2834857, at \*4 (S.D.N.Y. June 1, 2020). And unlike in *Ramzan v. GDS Holdings Ltd.*, 2020 WL 1689772, at \*5 (S.D.N.Y. Apr. 7, 2020), Plaintiff is not relying solely on the EA Defendants' positions at Argo to allege scienter.

through 2022.  ¶229; *see Patel v. Axesstel, Inc.*, 2015 WL 631525, at \*11 (S.D. Cal. Feb. 13, 2015) ("defendants here are not officers in a large company who may be removed from the details of a specific business line or remote business activity.").

Thus, due to the importance of Helios and access to low-cost power "during the relevant period, [the Individual Defendants] should have been aware of" the misrepresented and omitted facts at issue.  *In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 433, 459–60 (S.D.N.Y. 2005).

### C.    Additional Circumstantial Evidence Supports Scienter

The CTO's ouster on October 11, 2022, and Appleton and Wall's abrupt resignations within eight days of each other "to pursue other opportunities" are further evidence of scienter. ¶¶177, 231; *see In re Sadia SA Sec. Litig.*, 643 F. Supp. 2d 521, 534 (S.D.N.Y. 2009) (termination of officer and resignations of two other officers supported inference of scienter); *In re Salix Pharms., Ltd.*, 2016 WL 1629341, at \*15 (S.D.N.Y. Apr. 22, 2016) (resignation of CFO the day of company's revelation supported inference of scienter).  Notably, the CTO's departure was announced on October 11, 2022, just four days after the October 7, 2022 bombshell disclosures and the same day Argo disclosed further problems at Helios.  ¶¶15, 177.  Appleton's and Wall's resignations were *less than six weeks* after Argo announced that it was selling its biggest asset, Helios, to Galaxy (¶184), but *about one month **before*** Galaxy revealed that, unlike Argo, Galaxy had the financial capability to follow through with the Fixed-Price PPA (¶186), contradicting Defendants' prior claims (¶¶203, 207).   This situation is therefore unlike the one in *Tung v. Bristol-Myers Squibb Co.*, 412 F. Supp. 3d 453, 461 n.4 (S.D.N.Y. 2019), where the relevant resignation happened many months after any relevant events occurred.

Wall and Appleton's SOX certifications are also probative of scienter, ¶234, as they necessarily needed access to information about Helios's operating costs and ability to obtain a

- 24 -

Fixed Price PPA, and therefore knew or recklessly disregarded the inaccuracies in the filing.  *See In re Eletrobras Sec. Litig.*, 245 F. Supp. 3d 450, 468 (S.D.N.Y. 2017).

## IV.    PLAINTIFF ADEQUATELY ALLEGES CONTROL PERSON VIOLATIONS

The Securities Act Defendants' only argument with respect to Plaintiffs' §§15 and 20(a) claims are that the AC fails to adequately plead a primary violation of §§11 and 10(b).  Because Plaintiff has adequately pleaded §§11 and 10(b) claims, Plaintiff's §§15 and 20(a) claims survive.

## V.    ALTHOUGH UNNECESSARY, AMENDMENT SHOULD BE PERMITTED

If the Court grants Defendants' motion, Plaintiff respectfully requests leave to amend the Complaint.  *Foman v. Davis*, 371 U.S. 178, 182 (1962) ("Rule 15(a) declares that leave to amend 'shall be freely given when justice so requires'; this mandate is to be heeded"); *see also Cresci v. Mohawk Valley Cmty. Coll.*, 693 F. App'x 21, 25 (2d Cir. 2017) ("[t]he proper time for a plaintiff to amend the complaint is when the plaintiff learns from the District Court in what respect the complaint is deficient.").

## CONCLUSION

Based on the foregoing, Plaintiff respectfully requests that the Court deny Defendants' motion in its entirety.  Alternatively, Plaintiff requests leave to amend the AC.

 DATED: January 8, 2024

FARUQI & FARUQI, LLP

s/James M. Wilson, Jr.
JAMES M. WILSON, JR.
ROBERT W. KILLORIN

685 Third Avenue, 26th Floor
New York, NY 10017
Telephone: 212-983-9330
Facsimile: 212-983-9331

jwilson@faruqilaw.com
rkillorin@faruqilaw.com

*Lead Counsel for Lead Plaintiff*