UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

——————————————————————x

RICHARD HAWES, Individually and on
Behalf of All Others Similarly Situated,

                    Plaintiff,

        -against-                                                    23-cv-7305 (CM)

ARGO BLOCKCHAIN PLC, et al.,

                    Defendants.

——————————————————————x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 10/9/2024

## DECISION AND ORDER GRANTING
## DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT

McMahon, J.:

Defendant Argo Blockchain plc ("Argo") is a publicly traded UK-based cryptocurrency

mining company. Plaintiff and the putative members of the class he represents in this garden-

variety securities fraud class action are a group of investors who claim to have bought Argo's

American Depositary Receipts ("ADRs") in Argo's U.S. IPO and in the aftermarket. Like many

investors in the cryptocurrency arena, they lost money – specifically when, in mid-2022, Argo

announced that unexpected increases in energy prices and a fall in the price of Bitcoin led to a

decline in the price of Argo's shares and ADRs. Plaintiff alleges that Argo and its principals made

false and misleading statements, both in its Registration Statement and following the IPO. These

allegedly misleading statements dealt principally with Argo's capitalization and its ability to

withstand adverse market conditions.

Predictably, these events spawned a securities fraud class action. It was filed on behalf of

two proposed classes: those who purchased Argo ADRs in the IPO (which raised $114.8 million

for Argo) and those who acquired Argo ADRs between September 23, 2021 (the date of the IPO)

and October 10, 2022, the day before Argo's shares hit a low price of $2.19 following a series of negative announcements from the company.

In moving to dismiss the amended class action complaint, Defendants have helpfully created two appendices – one which lists each statement identified in the pleading as misleading in connection with the Registration Statement, and one which lists each statement identified as misleading following the IPO. In these appendices, Defendants identify the legal principles on which they rely to buttress their claim that the pleading is fatally flawed; these include failure to allege contemporaneous falsity and reliance on various types of statements that are not, by their nature, actionable – forward-looking statements, "puffery," and statements of opinion or belief rather than fact. They also set forth, in copious detail, various cautionary statements found elsewhere in the Registration Statement or in Argo's subsequent public statements that render the allegedly misleading disclosures not misleading, either under the "bespeaks caution" doctrine (for statements made in the Registration Statement, which is subject to the 1933 Securities Act) or the "safe harbor" doctrine (for subsequent statements that are challenged as violative of Section 10(b) of the 1934 Securities Exchange Act and Rule 10(b)-5 thereunder). Additionally, Defendants argue that Plaintiff has not managed to plead facts giving rise to a credible inference of scienter on the part of any of the individual defendants.

I commend Defendants for doing what the court would otherwise have had to do – identify every statement that must be evaluated and the rules allegedly applicable to that evaluation. It is an ideal way to set up a motion to dismiss in a securities fraud case. It also makes it easier to evaluate Plaintiff's response to the motion.

As Defendants correctly point out in their Reply Brief, Plaintiff does not respond in similar fashion, by taking each of the 28 allegedly false or misleading statements identified in Defendants'

appendices and explaining why Defendants' specific arguments about that specific statement are wrong. Plaintiff does specifically address the alleged pleading errors in six of the 28 alleged misstatements and offers a rebuttal to one of the disclosed risks identified in the Appendices. It would have been far more helpful to the court if Plaintiff had followed Defendants' lead.[1]

But Plaintiff applies one overarching argument to all the statements addressing Argo's access to power. He alleges that Argo told the market that it planned to enter into a long-term electric power supply contract (Fixed-Price PPA) with Texas' main electric grid operator, implying it met the requirements for purchasing a Fixed-Price PPA. In fact, Plaintiff alleges that Argo was at all times undercapitalized and so was not in compliance with the requirements for obtaining such a contract, a fact that Argo's leadership team had to have known. Plaintiff also claims that Argo falsely asserted, as a matter of fact, that it could control and manage the volatility in cryptocurrency pricing by engaging in planned selling of cryptocurrency over an extended period in advance of forecasted "fiat"[2] cash requirements – a goal it was unable to achieve.

Although Plaintiff sufficiently pleads that two of Defendants' statements are false and/or misleading, he fails to demonstrate the requisite strong inference of scienter. As a result, the motion to dismiss is granted.

Because we have evaluated every statement that is alleged to have been false or misleading individually, I conclude that it would be futile for Plaintiff to try to file a second amended complaint to cure the pleading defects of the first, and I deny the "motion" inserted at the end of the Opposition Brief for leave to amend yet again.

---

[1] Indeed, so helpful have I found the Appendices – and having independently hit, in another case, on the very same strategy of analyzing a motion to dismiss alleged misstatement by alleged misstatement – that I am inclined to make it a rule that all motions to dismiss in securities fraud cases be done in this format.

[2] There are a number of terms used in the Amended Complaint and the alleged misstatements that may be unfamiliar to one uninitiated into CryptoWorld (which includes the court). "Fiat" currency is what I would call "real money" – currency that is backed by a government, such as dollars.

## DISCUSSION

The following are the rules of law the court will use to evaluate Defendants' arguments about why Plaintiff has failed to plead a viable claim under either Securities Act Section 11 or Exchange Act Section 10(b) and Rule 10(b)-5.

**Falsity:** Section 11 claims are subject to Rule 8(a)'s "short plain statement" rule and "Liability against the issuer of a security is virtually absolute, even for innocent misstatements," if misstatements are made. *Wang v. Cloopen Group Holding Ltd*., 661 F. Supp. 3d 208, 224 (S.D.N.Y. Mar. 16, 2023). However, the plaintiff must still allege facts tending to show that particular statements were false/misleading at the time they were made. Additionally, to state a claim under Section 10(b) of the Exchange Act, which is subject to the enhanced pleading requirements of Fed. R. Civ. P. 9 and the Private Securities Litigation Reform Act (PSLRA), the plaintiff must not only identify the statements that are alleged to be fraudulent but also "explain why the statements were fraudulent." *Rombach v. Chang*, 355 F. 3d 164, 172 (2d Cir. 2004); *Lewy v. SkyPeople Fruit Juice, Inc*., No. 11-cv-2700, 2012 WL 3957916, at *7 (S.D.N.Y. Sept. 10, 2012).

The mere fact that an adverse event occurred following the making of a statement to the market, whether in a Registration Statement governed by Section 11 of the Securities Act or a statement subject to Section 10(b) of the Exchange Act, is an insufficient basis from which to infer that the statement was false when made. "Hindsight pleading" – too frequently seen in securities fraud cases – is impermissible, as "without contemporaneous falsity there can be no fraud." *In re Lululemon Sec. Litigation*, 14 F. Supp. 3d 553, 571 (S.D.N.Y. Apr. 18, 2014), *aff'd*.604 F. App'x 62 (2d Cir. 2015). "An earlier statement is not somehow made misleading simply because it failed to foretell a defect [or] problem which later materialized." *Panther Partners, Inc. v. Ikanos Commc'ns, Inc.*, 538 F. Supp. 2d 662, 672 (S.D.N.Y. 2008), *aff'd* 347 F. App'x 617 (2d Cir. 2009).

A plaintiff must, therefore, allege facts "from which the Court can reasonably infer that the statements were false at the time they were made." *Gross v. AT&T Inc.*, 19-cv-2892, 2021 WL 9803956, at *3 (S.D.N.Y. Sept. 27, 2021), *aff'd sub nom. Steamfitters Loc. 449 Pension Plan v. AT&T Inc.*, 2022 WL 17587853 (2d Cir. Dec. 13, 2022).

However, if facts are pleaded tending to indicate that a speaker "did not hold the belief she professed," the statement is actionable, because a statement that is not believed when made is a false statement. *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 186 (2015).

**Materiality/Reasonable Reliance**: Certain types of statements are categorically incapable of being "false" or "misleading" because by their very nature no reasonable investor would rely on them. These include "forward-looking" statements, "puffery" and statements of opinion.

Statements fairly characterized as "forward looking," or predictive, are immaterial as a matter of law as long as they are accompanied by risk disclosure language that "sufficiently warns" an investor that these are not statements of existing fact and are subject to factors "that could cause actual results to differ materially." 15 U.S.C. § 78U-5(c)(1)(A)(i). Such forward-looking statements are frequently couched in terms of belief or expectation; use of the phrases "we expect" or "we believe" is generally taken as an indication that a statement is forward looking – especially when the statement of expectation or belief is coupled with language explaining why things might not work out. *See Medina v. Tremor Video, Inc.,* No. 13-cv-8364, 2015 WL 1000011, at *3 (S.D.N.Y. March 5, 2015), *aff'd*, 640 F. App'x 45 (2d Cir. 2016). Statements of this nature are referred to as being protected by the so-called "bespeaks caution" doctrine (for statements made in a Registration Statement governed by the Securities Act of 1933, 15 U.S.C §§ 77a et seq.) or by the "safe harbor" provisions of the PSLRA, 15 U.S.C. § 78u-5(c)(1)(A)(i), which applies to claims

asserted under the Securities Exchange Act of 1934, 15 U.S.C §§ 78a et seq. In either event, they are not actionable. *See Wang,* 661 F. Supp. 3d at 230.

The same rule and the same protections apply to statements that qualify as "puffery," or corporate optimism – statements that are not "sufficiently specific for an investor to reasonably rely on that statement as a guarantee of some concrete fact or outcome." *City of Pontiac Policemen's & Firemen's Ret. Sys., v. UBS AG,* 752 F.3d 173, 185 (2d Cir. 2014). Again, the use of phrases like "we expect" or "we believe" are signs of puffery, since "such language, at a minimum, signals to prospective investors that the predictions of the Company may not come to fruition." *Ladmen Partners, Inc., v. Globalstar, Inc.,* No. 07-cv-0976, 2008 WL 4449280, at *13 (S.D.N.Y. Sept. 30, 2008). Statements expressing a general view that "things are going well," that a company is "well positioned," or that a year was "successful" are also generally deemed to be puffery, and hence non-actionable. *City of Warwick Mun. Emps. Pension Fund v. Rackspace Hosting, Inc.,* No. 17-cv-3501, 2019 WL 452051, at *4 (S.D.N.Y. Feb. 5, 2019).

As a general rule, statements of opinion, rather than actual fact, are not actionable. *See Omnicare*, 575 U.S. at 186. This is because opinions are "not quantifiable" and "are subject to interpretation." *Altayyar v. Etsy, Inc.*, 242 F. Supp. 3d 161, 174 (E.D.N.Y. Mar. 16, 2017), *aff'd* 731 F. App'x 35 (2d Cir. 2018). However, as the Supreme Court cautioned in *Omnicare*, an opinion can be the basis for a securities fraud claim if an "omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context." *Omnicare*, 575 U.S. at 194.

**Scienter:** In order to state a viable claim under the Exchange Act (but not the Securities Act), a plaintiff must allege facts from which a trier of fact could infer that the misstatement was made with scienter – that is, with knowledge of the statement's incorrectness and/or a motive to

lie or misstate. It is well settled that the pleaded facts, if circumstantial (as they often are), must give rise to a "strong inference" of conscious misbehavior or recklessness. *Tellabs, Inc., v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 322-23 (2007). "Under [the] heightened pleading standard for scienter, a 'complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.'" *Slayton v. Am. Exp. Co.*, 604 F.3d 758, 766 (2d Cir. 2010) (quoting *Tellabs*, 551 U.S. at 324).

Specific factual allegations about events such as "suspiciously timed" stock sales by corporate executives, *In re Oxford Health Plans, Inc.*, 187 F.R.D. 133, 139 (S.D.N.Y. June 8, 1999), or dramatic errors in public announcements, *see Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital, Inc.*, 531 F.3d 190, 195 (2d Cir. 2008), are generally thought of as giving rise to a strong inference of scienter by speakers, because they are indicative of a motive to lie or shade the truth. However, any circumstances that strongly evidence conscious misbehavior or recklessness can give rise to a viable allegation of scienter when "viewed holistically and together with the allegations of motive and opportunity." *New England Carpenters Guaranteed Annuity & Pension Funds v. DeCarlo*, 80 F.4th 158, 177 (2d Cir. 2023).

As mentioned above, the moving Defendants have provided the court with two appendices. Appendix A identifies every allegedly false and misleading statement in the Registration Statement; Appendix B identifies every subsequent disclosure, whether oral or written that Plaintiff alleges to be false or misleading. The appendices will be added to the back of this opinion: the reader can refer to them as necessary. In the text of the opinion, the statements will simply be identified by Appendix (A or B) and statement number (1, 2, . . . n).

I.    **All Claims Asserted Under Section 11 the Securities Act of 1933 Are Dismissed With Prejudice and Without Leave to Amend**

The reader is referred to Appendix A for the text of the referenced statements.

Statement A1 (AC ¶ 69): The statement in essence says that the issuer "believes" that "power efficiency" will become increasingly important "over the long term," and indicates that Argo is "focused" on deploying mining machines at locations with access to reliable, renewable power sources in order to "reduce our power costs." To the extent that this constitutes a statement of present fact – as opposed to a statement of belief that is subject to the bespeaks caution doctrine – not a single fact is pleaded tending to show that the statement is untrue. In fact, Plaintiff pleads facts tending to show that Argo located its mining machines in Texas, where there appeared to be extensive reliable power sources, some of them (including nuclear power) renewable. This means the Amended Complaint actually alleges that the statement is true. The Amended Complaint also contains an extended discussion of the favorable market and political conditions that would allow cryptocurrency miners to obtain plentiful electric power in West Texas. (*See, e.g.*, AC ¶ 53.) Plaintiff alleges no facts from which it could be inferred that Texas was not a place where reliable renewable power sources existed, or that Defendants intended to build facilities anywhere else.

Moreover, this disclosure was accompanied by substantial risk disclosure language, including caveats about Argo's ability to build in Texas (which was not, in the end, its problem) and its ability to obtain electricity from "intermittent" and "variable" renewable energy sources "which may not always be available" at a sufficiently attractive cost – especially given the "unpredictable" nature of power cost fluctuations and state and local regulations. Argo disclosed that any failure to obtain sufficient power on terms and conditions that were "economic and practicable" would have a material adverse impact on its business results.

To the extent that Plaintiff argues that A1 is not subject to the bespeaks caution doctrine because of some undisclosed facts that would tend to seriously undermine the accuracy of the statement, he neither identifies what facts those are nor explains how Defendants were aware of them. *See In re HEXO Corp. Sec. Lit.*, 524 F. Supp. 3d 283, 302 (S.D.N.Y. Mar. 8, 2021). Significantly, the undisclosed statements cannot be about the impossibility of obtaining Fixed-Price PPA contracts,[3] because literally nothing in the Registration Statement identifies such contracts, or any other specific method, as the way that Argo intended to obtain the electric power it needs. Rather, the Registration Statement repeatedly insists that Argo did not know whether it would be able to obtain power at a price it could afford. No reasonable investor could have been misled into thinking otherwise.

I thus agree with Defendants that Statement A1 is not actionable for failure to allege falsity, and as forward looking under the bespeaks caution doctrine. The statement is not "puffery."

Statement A2 (AC ¶ 70): This statement says that Argo "aims" to optimize its mining by identifying and purchasing the most profitable mining machines with industry-leading return on investment, and then actively monitoring and adjusting the operation of those machines to enhance their performance – a strategy that Argo "believed" would enable it to build value over the long term. This is the quintessential forward-looking statement. Plaintiff does not allege that Argo really did not intend to identify and purchase the best machines in the industry, or even that Argo did not actually purchase the machines it thought were the best in the industry – which, by the bye, is no doubt a matter of opinion. Moreover, Argo sufficiently qualified its hope that the strategy of buying the best mining machines would "build value over the long term" by indicating that it was difficult to evaluate its prospects (for building value over the long term), given its lack of any operating

---

[3] Plaintiff's pleading does not specify what he is talking about, so I am only guessing what the "undisclosed facts" might be or to what they might relate.

history and the fact that its business model was "evolving" and "subject to various uncertainties." Indeed, Argo actually said, "from time to time, we may modify aspects of our business model relating to our strategy. We cannot offer any assurance that these or any other modifications will be successful or will not result in harm to our business." And once again, Argo announced that it might not be able to obtain electricity at a "sufficiently firm and unrestricted basis or at a price that we are willing to pay." Investors were clearly warned that this was a novel and risky investment.

The same failure to plead what facts undermining the accuracy of Statement A2 Defendants knew but failed to disclose dooms Plaintiff's argument that this statement is not subject to the bespeaks caution doctrine.

Statement A3 (AC ¶ 71): This statement effectively combines aspects of Statements A1 and A2 – it says that Argo is investing heavily in purchasing, building and operating its mining facilities and states that owning and operating machines that can readily access low cost renewable power, in areas where there is room to expand, will offer competitive advantages. It is qualified by the disclaimer that there are many risks inherent in the development of a new cryptocurrency facility in Texas (where renewable power is ostensibly plentiful and renewable) – risks that cannot be predicted and that could negatively impact Argo's bottom line. Contrary to Plaintiff's position, the fact that portions of this statement deal in present facts (Argo *is investing heavily* in purchasing and building and operating its mining facilities) does not remove this statement from the bespeaks caution doctrine, since, fairly read and in context, the entire statement represents a gauging of future possibilities in light of some present fact that is not alleged to be untrue. As a result, Statement A3 qualifies as forward looking with qualification, and is not actionable. *See Gissin v. Endres*, 739 F. Supp. 2d 488, 505 (S.D.N.Y. Sept. 1, 2010).

The same failure to plead what facts Defendants knew but failed to disclose that would seriously undermine the accuracy of Statement A3 dooms Plaintiff's argument that this statement is not subject to the bespeaks caution doctrine.

Statement A4 (AC ¶ 73): This statement couples an assertion of fact ("Since our inception, we have financed out operations primarily through cash generated by sales of cryptocurrency and sales of equity securities. Our primary requirements for liquidity and capital are to finance working capital, capital expenditures and general corporate purposes.") with a statement of belief about future prospects ("We believe that our sources of liquidity and capital resources will be sufficient to meet our existing business needs for at least the next 12 months.") Nowhere does Plaintiff allege that the provably factual statements about Argo's operations funding or its liquidity requirement are either untrue, or were believed by Argo's management to be untrue at the time the Registration Statement was declared effective (September 22, 2021). The lengthy disclosure of the difficulty of evaluating the future prospects of an untried and untested business provides a more than sufficient caveat to the forward-looking prediction that Argo "believes" its fiscal resources can get it through the first year following the public offering. And while Plaintiff is correct when he asserts that Argo did not disclose that it did not have sufficient liquidity and capital resources to fund operations *beyond that 12 month period*, Argo was not required to make such a prediction. Moreover, given the extensive cautionary language about the volatility of both the cryptocurrency and energy markets, it would likely have had no basis to do so. The fact that Argo did not care to make predictions more than a year out from the IPO does not render its prediction about having enough capital to get through those first 12 months either false or not forward looking. Argo's cautionary disclosures and its reluctance to claim too much was borne out by the undeniable (indeed, pleaded)

facts that the cryptocurrency market had a very good year in 2021, when Bitcoin hit a historic high – but cratered (for Argo and everyone else) in 2022, months after the IPO took place.

Statement A5 (AC ¶ 74): This statement indicates that, in order to control and manage the (fully disclosed) volatility in cryptocurrency pricing, Argo engages (statement of fact) in planned selling of cryptocurrency over an extended period in advance of forecasted fiat cash requirements, and that it expected (forward looking) to be able to sell Bitcoin to satisfy those requirements.

Plaintiff alleges that Argo failed to disclose that it could not control and manage the volatility in cryptocurrency pricing. There are two problems with that argument. First, the Registration Statement specifically and repeatedly disclosed that Argo's results had fluctuated and likely would continue to fluctuate in the future because of that very volatility – an admission that, while Argo might try to control and manage volatility, it could offer no guarantee that its efforts would be successful. Second, Argo specifically disclosed that the primary source of its revenues came from the sale of Bitcoin specifically, and announced that if the price of Bitcoin were to decline – as it did during 2022, well after the effective date of the Registration Statement – Argo's revenues could be adversely affected. The statement about Argo's planned strategy for controlling market volatility is not alleged to be false (because there is no allegation that Argo did not plan to try to control volatility by engaging in the planned selling of Bitcoin), and to the extent it is forward looking, it falls comfortably within the bespeaks caution doctrine. Again, Plaintiff has not identified a single *fact* that was in existence on the effective date of the Registration Statement that would have rendered Argo's disclosures untrue or misleading but that was not disclosed in the Registration Statement.

Statement A6 (AC ¶ 75): This last allegedly false statement in the Registration Statement reads as follows: "Argo's 'investments in mining facilities are designed to significantly expand our

mining capacity and provide us with meaningful control over our mining operations.'" Defendants claim that this statement is not alleged to be false; they are correct. Plaintiff fails to allege any fact tending to show that Argo's investments were not in fact "designed" to allow the company to significantly expand its mining capacity, or to provide it with meaningful control over mining operations. But many a rocket ship "designed" to blast into orbit has blown up on the launch pad; saying that something is "designed" to achieve certain goals does not either expressly or impliedly guarantee that those goals will be achieved. Moreover, this disclosure was accompanied by appropriately meaningful risk disclosure language about the possibility of changes to Argo's evolving business model and the ongoing fluctuation in its operating results "due to the highly volatile nature of digital assets."

Post-Registration Evidence Does Not Change This Result: Plaintiff attempts to buttress his assertion that the Registration Statement was materially false and misleading on September 22, 2021 by citing to information received from Confidential Witnesses who were employed by Argo. However, the allegations relating to the CWs all relate to the period after the effective date of the Statement. For example, CW-1 allegedly had concerns about Argo's financial status when machines sat in a warehouse without being deployed. Unfortunately for Plaintiff, this occurred after the effective date of the IPO. No facts are alleged tending to show that, as of September 22, 2021, anyone at Argo knew that, at some point in the future, machines would be warehoused. In fact, the Amended Complaint affirmatively pleads that CW-1 – and all the other Confidential Witnesses – did not start working at Argo until 2022, well after the IPO took place. (AC ¶ 37)

Plaintiff also relies on an October 2022 report from Barclays Bank, which indicated that it was awaiting "clarity" about Argo's ongoing financial and operational difficulties. But that report came thirteen months after the effective date of the IPO. The Amended Complaint alleges

numerous facts that occurred during those thirteen months – principally a precipitous decline in the price of cryptocurrency generally and Bitcoin in particular starting around May 2022, which is long after the IPO closed. These allegations plausibly tend to indicate that Argo's financial situation and prospects would have looked considerably different in October 2022 than they did in September 2021. While Plaintiff is correct that subsequent developments can sometimes be indicative of known problems in the past, *see, e.g.*, *In re Didi Glob. Inc. Sec. Litig.*, No. 21-cv-05807, 2024 WL 1119483, at *19 (S.D.N.Y. Mar. 14, 2024), that is not the most logical inference one can draw from the pleading he has crafted – a pleading that acknowledges that Bitcoin hit a historic high in the months *after* the IPO, only to crash in the following year. Indeed, the Amended Complaint affirmatively alleges that, in 2021, Argo both ran a profitable business and raised a significant amount of capital. (AC ¶ 128)

In sum, Plaintiff has failed to plead a viable claim that the Registration Statement was false or misleading on the date it became effective – September 22, 2021 – in violation of 15 U.S.C. § 77(k). That being so, his claims under Section 11 must be dismissed. Because, after exhaustive analysis of each of the allegedly false statements, I conclude that there is no reasonable possibility that further amendment of the Amended Complaint would do anything other than lead to another successful motion to dismiss – with consequent waste of scarce judicial resources – I deny Plaintiff leave to further amend his pleading. All claims relating to Section 11 of the '33 Act are dismissed with prejudice.

## II.    All Claims Asserted Under Section 10(b) of the Securities Exchange Act of 1934 Are Dismissed With Prejudice and Without Leave to Amend

The reader is referred to Appendix B for the text of the referenced statements.

### a. Falsity

Appendix B identifies a total of 22 allegedly false or misleading statements that were made by or on behalf of Argo during the 13 months between the IPO and the last date of the proposed Class Period for the Exchange Act Class (October 10, 2022). In his responsive brief on the motion, Plaintiff does not address most of these statements individually. Instead, he classifies those statements into two groups: (1) statements about Argo's financial condition, and (2) statements about its access to power. Although Plaintiff does not choose to analyze every one of the 22 identified misstatements alleged in the Amended Complaint (and included in Appendix B), the court concludes that the statements that fall into the former group are B1, B3, B5, B6, B8, B9, B12, B13, B14, B15, B16, B17, B18, B19, B20, B21, and B22. In the second category are Statements B2, B4, B7, B10, and B11.

Plaintiff argues generally that the statements about Argo's financial condition were false and misleading because Argo failed to disclose that it was undercapitalized and had far too little cash on hand to operate the Helios Facility and withstand any setbacks that might occur in the volatile energy and Bitcoin markets.

Plaintiff argues generally that the statements about Argo's access to power were false and misleading because its management team was aware that Argo could not access power using a Fixed-Price PPA.

So let us begin by examining the statements that relate to Argo's financial condition.

Statement B1 (AC ¶ 130): In this statement, made on an earnings conference call on November 2, 2021, Argo (in the person of Defendant Alex Appleton, the CFO of the company) represented that the company was strengthening its balance sheet, "ha[s] very little debt overall" and that this fact, coupled with a lease, a mortgage, a Bitcoin backed loan, "cash on hand, and our

hodl,[4]" gave Argo "sufficient flexibility to pursue our strategic growth plans in Texas, infrastructure, and machines, et cetera." Plaintiff does not allege that any of these statements is untrue, or plead facts tending to show that Argo had excessive debt, or did not have a lease or a mortgage or the proceeds from a Bitcoin-backed loan. What Plaintiff alleges, in essence, is that possessing these resources did not give Argo "sufficient flexibility" to pursue its strategic vision in the volatile cryptocurrency field. As noted above, Plaintiff identifies the "flaw" in this statement as Argo's failure to disclose that it was undercapitalized and did not have enough cash on hand to operate the Helios Facility in West Texas or to withstand the "foreseeable" vicissitudes of the cryptocurrency business.

But the statement, "We have flexibility" is not capable of being a material misstatement. It is classic puffery and forward looking, predictive of Argo's ability to pivot in the future. The only question is whether this statement falls within the PSLRA's safe harbor because it was accompanied by sufficient risk disclosure. The answer is yes. While opining that Argo had "a decent war chest in this business," the company also admitted that Argo did not have "the same kind of huge amounts of cash in the bank that some of our peers had" to operate in what Argo described as "an expensive business . . . a capital-intensive business."

Statement B3 (AC ¶ 133): In an interview with CNBC on December 21, 2021, Defendant Peter Wall (the CEO of the company) said, "Argo was 'extremely on the profitable end of things *right now*.'" (Emphasis added) Any allegation that this statement is false cannot be reconciled with the pleaded fact, found at AC ¶ 128, that Argo was running a profitable business at the end of 2021.

---

[4] "Hodl" as used in that statement is not a typo. HODL is an acronym commonly used in the cryptocurrency business to describe a particular business strategy. It means "hold on for dear life" and refers to a long-term investment strategy of holding onto cryptocurrency through price fluctuations, rather than selling if the price begins to sink. *See*, www.investopedia.com/terms/h/hodl.asp (last consulted Oct. 9, 2024). Plaintiff pleads this in its Amended Complaint (AC ¶ 125), and in his response to the motion, Plaintiff identifies Argo's "hodl" as Argo's stockpiled Bitcoin. *See* Plaintiff's Brief in Opposition (Dkt. # 54) at 13.

December 21, 2021 is at the end of 2021. To the extent Wall used the word "extremely," the adjective is mere puffery. Wall did not represent that Argo would be "extremely on the profitable end of things" in the future – he limited his comment to "right now." The facts pleaded in the Amended Complaint support a conclusion that this was true.

The argument that the statement was misleading because of Argo's failure to contextualize it by announcing that it was undercapitalized and had insufficient cash to run its business while dealing with volatile markets does not hold water. This is a statement about Argo's profitability – a provable fact. Plaintiff concedes that Argo was profitable at the end of 2021. Nothing in this statement purports to predict Argo's future profitability, so the statement cannot be misleading for failing to point to things that might or might not happen in the future. And if such disclosure were somehow called for, not a single fact is alleged tending to show that Wall believed Argo to be undercapitalized.

Statement B5 (AC ¶ 137): After Appleton lauded a "really pleasing year, and one we're really proud of" – which is a demonstrably true statement, assuming (as I must on this motion) that the allegations of AC ¶ 128 are true – Wall opined that Argo was "well-positioned to continue . . . a very profitable level;" that it had entered into a number of private placements, which strengthened its balance sheet; and that the company's balance sheet at the end of 2021 was stronger than it was a year earlier. The last statement is unquestionably true as a matter of simple fact. Based on the allegations of AC ¶ 128, Argo did have a stronger balance sheet year over year comparing 2021 to 2020; nothing in the Amended Complaint suggests otherwise. Nor does Plaintiff challenge the provable fact that Argo had entered into private placements, which generated funds it could use in its business.

So we are left with the statement that Argo was "well positioned" to continue as a profitable enterprise. That statement of belief is both forward looking and puffery. Nor is it unqualified: in the same conference call, Argo disclosed that the company would require an additional $125 million in capital to complete Phase 1 of the Helios Project – an amount it hoped to raise by issuing and selling some Bitcoin. Furthermore, the entire statement about the strength of Argo's position is modified by the caveat "where we stand today" – today being April 28, 2022. The Amended Complaint alleges no fact tending to indicate that any of the unfavorable developments that were about to upend Argo's forecasts had already occurred by April 28 or were predicted to occur.

Statement B6 (AC ¶ 139): In its Form 20-F, filed with the SEC on May 2, 2022, Argo indicated that it believed that its sources of liquidity and capital resources (identified as cash generated by sales of cryptocurrency and equity securities) would be sufficient to meet the company's existing needs for the next 12 months – a statement identical to one made eight months earlier in the Registration Statement. (Statement A4) No facts are alleged tending to show that Argo's leadership team did not in fact harbor such a belief, or that it would have been unreasonable for them to do so as of May 2, 2022. For example, there is no allegation that Bitcoin's price (which, per publicly available research sites, hovered between $40,000 and $50,000 during April, the month immediately preceding the filing of this 20-F)[5] had declined to such a level as to render it unlikely that Bitcoin sales would provide Argo with the liquidity it required. Of course, in the immediately succeeding weeks the bottom would indeed fall out of the Bitcoin market – but the issue for our purposes is whether the statement (of belief) was untrue when made on May 2. While Plaintiff alleges that this statement was misleading because it failed to disclose that Argo was

---

[5] *See* https://finance.yahoo.com/quote/BTC-USD/history/?period1=1648771200&period2=1653955200 – for the period April 1, 2022 to May 31, 2022 (last consulted Oct. 9, 2024). The court takes judicial notice of the price of Bitcoin, which is a publicly available fact.

undercapitalized and did not have enough cash to continue operations, not a single factual allegation in the pleading suggests that anyone believed that, or had reason to believe it, on May 2.

Additionally, the predictive statement falls within the PSLRA safe harbor. Argo disclosed in the same filing that (1) its operating results fluctuated and might continue to fluctuate due to the volatility of digital assets; (2) its total revenue and cash flow was substantially dependent on the market value of its Bitcoin and the volume of Bitcoin it could profitably mine; (3) its results and financial condition would be adversely affected by a decline in either the market value of Bitcoin or the amount the company could mine; (4) there was no assurance that Bitcoin would maintain its value or that there would continue to be a market for it. These are meaningful caveats modifying the prediction that Argo would have the cash and liquidity it needed to operate the business.

Statement B8 (AC ¶ 142): Here, Appleton stated, during a May 18, 2022 first quarter earnings conference, that the company was in a "healthy position" in terms of its hodl, and so was "well positioned" to fill the gap of $50 million that was needed to "build out the rest of phase 1" of Helios. Appleton also stated that "every day we mine more and more Bitcoin, and so that position, is is, you know, improves with every day that passes." These statements were qualified by the admission that "our overall margin is obviously determined by . . . price of bitcoin, power costs and mining difficulties" and that Bitcoin's price had been "volatile" over "the last few weeks."[6]

Saying that the company was in a "healthy position" or "well positioned" to be able to raise the money it needed in order to complete construction of Helios phase 1 is a statement of opinion. Bitcoin's price decline was a matter of public record which the company certainly did not need to

---

[6] In fact, although the Amended Complaint does not specifically allege this, Bitcoin's price had declined by almost $10,000, or 25%, in the two and one half weeks since the 20-F was filed on May 2. *See* https://finance.yahoo.com/quote/BTC-USD/history/?period1=1648771200&period2=1653955200 – for the period April 1, 2022 to May 31, 2022 (last consulted Oct. 9, 2024).

disclose (though admitting to price volatility is effectively a disclosure that the price had fallen). The remainder of the statement, that Argo continued to mine additional Bitcoin each day, is a provable fact that Plaintiff does not challenge.

* * * * * * * * * * * * * * * * * * * * * * * * * * *

Plaintiff pleads that the above-discussed statements were reflected in favorable analyst reports on Argo that came out in May 2022. (AC ¶ 144) However, June 7, 2022 was, according to Plaintiff, a key date in the Argo story – the date on which the market began learning that things at Argo were not as rosy as its management had been predicting. In a press release issued that day, Argo disclosed that it had mined 25% fewer Bitcoin in May 2022 than it had in April, allegedly due to a confluence of factors, including increased market difficulty, a heat-induced power demand surge in Texas that led the company to cut back on its mining operations, and unplanned downtime at Helios. The following statements about Argo's finances were made contemporaneously with or after the June 7 press release.

Statement B9 (AC ¶ 145): In an interview on the Wolf of All Streets You Tube channel on June 7, the day of the press release, Wall stated, "we feel like we've got an awesome path to capital, to get us to the kind of growth that we need to fully build out the next 800 megawatts over the next couple of years." This statement is not actionable because it is a statement of opinion about getting to "the kind of growth that we need" over the "next couple of years;" it is not a factual statement about current conditions.

Statement B12 (AC ¶ 152): In a CoinDesk interview on June 9, Wall said that Argo had never set unrealistic expectations for the future or overpromised, noted that the market had turned bearish, and said "I like where we're positioned." Without opining one way or another on the issue

20

of actual falsity, this statement – "I like where we're positioned" in a bearish market where "the strong survive" – qualifies as non-actionable puffery.

Statement B13 (AC ¶ 153): At a Q&A session after the company's June 29, 2022 Annual Meeting, Wall said "on top of a kind of low cost of production, our balance sheet is also strong enough to be able to withstand lower prices . . . so we feel like we're in a really good place as a miner, we feel like we're really well positioned, and that's a testament to the work that we did in 2021, and to really kind of overdelivering and under promising, which has kind of been the theme for us for the first half of this year." Defendants insist that this statement is not false, and consists principally of puffery and opinion. I disagree in part. While statements about the balance sheet's being strong enough to withstand lower prices and being well positioned are indeed opinion and puffery, June 29, 2022 was at the end of the second quarter. The price of Bitcoin was continuing to drop; the company had already disclosed that its mining operations had to be cut back and its second quarter margins were declining. Yet Wall stated that the company had been "overdelivering and under promising" – a strange statement to make in light of those developments. "While statements containing simple economic projections, expressions of optimism, and other puffery are insufficient," defendants "may be liable for misrepresentations of existing facts" where a complaint alleges "that the defendants did more than just offer rosy predictions; the defendants stated that [a] situation was 'in good shape' or 'under control' while they allegedly knew that the contrary was true." *Novak v. Kasaks*, 216 F.3d 300, 315 (2d Cir. 2000). Not only does Wall's statement tout Argo's strong returns in 2021, but it also explicitly states that Argo's theme of overdelivering continued throughout "the first half of [2022]" – a period that undeniably covers Argo's "underdelivering" on Bitcoin mining in May 2022 and beyond. For that reason, though it

is a close call, Plaintiff has demonstrated that this statement is sufficiently false and/or misleading to move onto the next stage of analysis.

Statement B14 (AC ¶ 153): At the same Q&A session, Appleton reminded analysts that "We own our own infrastructure. We are close to our machines. This gives us more control in a bear market. We've talked about the runway before . . . we're in a really good place from that point of view . . . maintaining that economic advantage over our peers and the mining margins that you see that we can achieve using our own equipment and from our own facility. So we are well placed." In effect, Appleton said that Argo had advantages over its peers because it had its own facility and equipment.

This statement is not actionable. Defendants are certainly correct that it is not false for Argo to say that it owns its own infrastructure, or to opine that this gives it an economic advantage over its peers. No facts are pleaded tending to show that Appleton did not believe that Argo had an advantage over its peers. To the extent that Appleton used the now-familiar phrase "we are well placed," he was offering an opinion, nothing more.

Statement B15 (AC ¶ 155): In this statement, made in a Q&A session after the Annual General Meeting on June 29, 2022, Wall explained that Argo had already paid for 90% of the machines for the Helios facility and that 95% of the facility was paid for, which meant that the first 3.6 exahash[7] from those machines was on track and paid for. These are all statements of fact – indeed, of past fact – and there is not a single allegation in the Amended Complaint tending to show that any of these assertions of fact was untrue. Plaintiff does not specifically assert in the Amended Complaint that these statements of fact were false or that they were required to be

---

[7] A "hash" is a mathematical function that converts an input of arbitrary length into an output of fixed length. *See* https://www.investopedia.com/terms/h/hash.asp (last consulted Oct. 9, 2024). "Exahash" refers to one quintillion hashes. *See* https://www.investopedia.com/hash-rate-6746261 (last consulted Oct. 9, 2024).

contextualized by disclosures about undercapitalization and an inability to withstand future fluctuations in energy markets and cryptocurrency prices. There is no such requirement.

Statement B16 (AC ¶ 156): At a June 23 web conference, Wall – after indicating that the company had $100 million in revenue the previous year (an ascertainable and apparently true fact) – asserted that first quarter margins were "very strong" and had been "in the top echelon amongst our peers;" he further opined that this was because Argo was "being efficient on our costs, making sure that we have some of the lowest costs in this space for operations." The Amended Complaint contains no allegation tending to show that Argo was not in the top echelon among its peers or that the company did not have some of the lowest operating costs in the space, so there is no allegation that the statement was false when made. Moreover, to the extent that this constituted bragging about Argo's relative position in the market, it is puffery. This statement is not rendered false or misleading because Argo did not reveal that it was undercapitalized or unable to withstand future fluctuations; the statements Wall made (aside from the phrase "very strong") are statements of past or present fact that are capable of being ascertained.

Statement B17 (AC ¶ 158): In its July 7 press release, Argo indicated "the Company is confident that it possesses sufficient liquidity to avoid any potential liquidation" of its Bitcoin-backed loan "if Bitcoin prices continue to decline." The press release also noted that the company had been "using derivatives to limit downside risk" since Q4 of 2021. Plaintiff argues that this statement of confidence should have been qualified by the disclosure that Argo was undercapitalized and unable to withstand market vicissitudes, and in addition to this oft repeated language, adds that Argo's costs had "spiraled out of control" by the time the statement was released. No facts are pleaded tending to show that Argo had not in fact been using derivatives since the fourth quarter of 2021. But, while statements of confidence are ordinarily deemed puffery,

a company's statement that it is "confident of its capacity to meet its anticipated obligations" – like possessing sufficient cash on hand to avoid any potential liquidation of a Bitcoin-backed loan – can be false or misleading when made against the backdrop of an alleged liquidity crisis. *In re Vivendi Universal, S.A. Sec. Litig.*, 381 F. Supp. 2d 158, 181 (S.D.N.Y. Nov. 3, 2003); *see also Bratusov v. Comscore, Inc.*, No. 19-cv-3210, 2020 WL 3447989, at *9 n.6 (S.D.N.Y. June 24, 2020). Assuming, as we must at this stage, the accuracy of Plaintiff's allegations that Argo had "too little cash on hand" and costs that had "spiraled out of control," Plaintiff plausibly alleges that Argo's statement of confidence about avoiding *any* potential liquidation was false and/or misleading when made. *See Novak*, 216 F.3d at 315. This statement advances onto the next stage of analysis.

Statement B18 (AC ¶ 158): The same press release quotes Wall as saying, "We have seen positive results from our risk management strategy through which we have reduced the Company's exposure to its [Bitcoin]-backed loan, and we have hired a full-time derivatives trader." These are statements of ascertainable fact, and no facts are alleged to indicate that they are untrue – that is, that the company had not hired a full-time derivatives trade or seen positive results from its risk management strategy. Wall went on to repeat that "We believe" that Argo "is well positioned to navigate the current market conditions and further increase our efficiencies" – a statement of opinion that is not capable of being materially misleading.

Statement B19 (AC ¶ 161): Statement B19 is actually a series of statements that appear in Argo's August 24, 2022 Form 6-K. The verbiage identified as false and misleading – again, due to Argo's failure to disclose that it was undercapitalized and unable to withstand market vicissitudes – includes the following:

- "Argo is well positioned to weather the current downturn with its large and highly efficient mining infrastructure, runway for growth, and experienced management team, which has successfully navigated the Group through previous crypto winters." As with many statements in which Defendants claim to be "well positioned," this statement is one of belief that is not actionable, being both forward looking and puffery.

- "In response to the challenging market environment, we have adjusted our treasury management strategy." That Argo altered its treasury management strategy is a provable fact, the falsity of which Plaintiff does not allege.

- "Despite the challenging economic environment in 2022, we continue to focus on our strategic priority of completing Phase 1 of Helios and laying the groundwork to further scale operations." Once again, to the extent that this statement regarding Argo's focus constitutes a statement of present fact, not a single fact is pleaded tending to show that the statement is untrue.

- The 6-K also contains a statement of responsibility in which management "confirm[s] that to the best of our knowledge . . . the Interim Report . . . gives a true and fair view of the assets, liabilities, financial position and profit/loss of the Group." Where Plaintiff has failed to allege a false or misleading statement in an underlying filing, a certification attesting to the truth of that filing cannot form an independent basis for liability. This follows from this district's consistent rule that a bare allegation regarding similar certifications pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, Pub. L. 107-204, 116 Stat. 745, "adds nothing." *Rosi v. Aclaris Therapeutics, Inc.*, No. 19-cv-7118, 2021 WL 1177505, at *21 (S.D.N.Y. Mar. 29, 2021). "Either the SEC filings contain materially misleading statements (in which case those statements can form the basis for liability) or they do not contain such statements." *Id.*; *see also In re Glob. Brokerage, Inc.*, No. 1:17-cv-00916, 2019 WL 1428395, at *14 (S.D.N.Y. Mar. 28, 2019); *In re Adient plc Sec.*

*Litig.*, No. 18-cv-9116, 2020 WL 1644018, at *24 (S.D.N.Y. Apr. 2, 2020). Because Plaintiff has "not sufficiently alleged that Defendants made any false or misleading statements with respect to [the underlying filing], Defendants cannot be held liable for their [] certifications on the basis that they failed to disclose issues related to that area." *Adient*, 2020 WL 1644018, at *24.

Statement B20 (AC ¶ 163): This statement, made by Wall at an August 25, 2022, earnings conference, again appears to be principally a statement of fact – noting that mining margin for the first six months of 2022 was 71%, "down from 81% but from the first half of 2021, still a very good margin" and "the highest amongst our peers." No facts are alleged tending to show that Argo's margin was not 71%, that that was not the highest margin in its peer group of miners, or that 71% was not a "very good" margin (which in any event is a statement of opinion). Wall went on to say that he was proud of the team for "continuing to have really good efficiencies, even as, the price of Bitcoin has [fallen] during the first half of the year." Again, no facts are pleaded tending to show that Argo did not have "good efficiencies" and the Amended Complaint affirmatively alleges that the price of Bitcoin did indeed fall during the first half of 2022.

Statement B21 (AC ¶ 163): In an earnings call on August 25, Appleton said, "In terms of our balance sheet, I think the first thing really to mention is how we've despite significant headwinds that we've had this year, our rigorous approach to cash flow and treasury management has meant that we have been cash neutral. So we're well placed there." The first portion of the statement is not alleged to be false because, despite allegations that Argo had insufficient cash on hand to execute certain plans, there is no allegation that Argo was not "cash neutral," or was operating with a negative balance sheet, at the time the statement was made. The second portion of the statement – that Argo was "well placed" – is once again an opinion, not a falsifiable fact.

Statement B22 (AC ¶ 166): Finally, on September 9, 2022, Wall said, in an operational update video, that Argo has "a derivatives trader that's now in place, and he is very focused on managing our treasury, making sure he's protecting the downside given all of the volatility that's going on, as well as making sure that we are able to benefit from the upside that we believe is coming in, you know, in the medium and long term, we are still bullish on Bitcoin in the long term, and again, are actively using, you know, derivatives to make sure that we're, you know, getting the balancing act right." Once again, the fact that Argo had a derivatives trader in place is not alleged to be untrue; neither is there any allegation that he was not focused on achieving the result that Wall said he was trying to achieve. The statement is alleged to be misleading because of Argo's failure to disclose that it was undercapitalized and unable to withstand market vicissitudes – in other words, for failing to disclose information that might tend to undercut the ability of the derivatives trader to achieve the results he was undoubtedly trying to achieve. While this allegation has been held to be insufficient when made against many of the previous alleged misstatements, it is even less compelling in the context of a statement that specifically acknowledges and addresses the difficulty of navigating "all of the volatility that's going on" in the crypto market.

We now turn to the statements that relate to Argo's access to cheap energy.

Statement B2 (AC ¶ 132): On two occasions, in interviews conducted on November 21, 2021 and December 16, 2021, Defendant Wall "told the market that in Texas, Argo had access to 'the cheapest power anywhere in the world' at less than two cents a kilowatt hour." Defendants argue that this statement is not false, in that West Texas did indeed offer the cheapest power anywhere in the world to cryptocurrency miners. But Plaintiff argues that this statement was misleading because Argo failed to reveal that this "cheapest power" was available only by obtaining a Fixed-Price PPA – a contract for which Argo was allegedly ineligible due to a lack of

creditworthiness. Plaintiff further argues that there were "requirements" for obtaining a Fixed-Price PPA – "requirements" that took the form on an unspecified amount of cash, letters of credit, or a guarantee, none of which Argo could meet, as was known to its management team.

If Plaintiff's allegation is true, then Defendants may well have omitted information that was necessary to make the flat assertion that Argo had access to this power not misleading.

The problem, of course, is that there is something missing from the Amended Complaint. It certainly alleges facts from which one could infer that, if there were requirements or qualifications for a PPA, Argo's management team would have known what those requirements were. Frankly, the mere fact that they managed the company gives rise to that inference. While Defendants argue that nowhere in this statement did Argo guarantee that it could enter into a Fixed-Price PPA, that misses the point. The statement flatly said that Argo "had access" to power at less than two cents a KWH – not that it might have access, not that it hoped to have access, but that it in fact had access to that power. If there was some requirement that disqualified Argo from getting access to power at this very low price, it had to be disclosed in order to make the statement not misleading.

But the pleading does not allege facts from which one could infer that there actually were such requirements, or what they might be. In fact, it alleges only that ERCOT – the Electric Reliability Council of Texas, which controls access to electricity in West Texas – "*often* requires some form of credit support, either liquid credit support in the form of cash or letters of credit, or a guarantee from the buyer in order to prove that it will be able to pay for the contracted energy." (AC ¶ 105) (emphasis added) "Often" is not "always." Had the pleading alleged that ERCOT *always* imposed such a requirement before allowing a Bitcoin miner to enter into a Fixed-Price PPA, Argo's statement that it "had access to the cheapest power anywhere in the world" would

arguably fall outside the safe harbor, and be actionable. But the Amended Complaint alleges only that ERCOT *sometimes* imposed such a requirement – meaning that it is not possible to infer, from the facts pleaded, that Argo's management team knew that the company would be unable to procure power on such favorable terms when the statement was made. And if there were firm requirements for obtaining a Fixed-Price PPA, the Amended Complaint does not allege what they are – making it impossible to ascertain whether the facts about Argo that are alleged rendered it impossible, or even unlikely, that Argo could obtain a Fixed-Price PPA.

Statement B4 (AC ¶ 135): Argo's Form 6-K, filed on April 27, 2022, indicated that the company's strategic focus for 2022 was to "execute on our plans at Helios and to scale our operations." Plaintiff does not allege that this statement is false or misleading. Instead, he focuses on the statement that Argo's "runway for growth" – fueled, apparently by an interconnection agreement that provided the company "with access to up to an additional 600 MW of capacity" – was unmatched by Argo's peers. This statement, like so many others, is alleged to have been false and misleading only in that Argo failed to say that it was undercapitalized and unable to withstand the vicissitudes of a volatile market.

Defendants argue that the statement is not false, and qualifies as puffery. They also rely on the safe harbor that the PSLRA provides for forward-looking statements, noting that the 6-K discloses that Argo's activities "expose it to a variety of financial risks: market risk, credit risk and liquidity risk," that the company "is dependent on the state of the cryptocurrency market and general sentiment of crypto assets as a whole," and that "there is no assurance that any digital asset, including bitcoin, will maintain its value or that there will be meaningful levels of trading activities to support markets in any digital asset." In other words, the 6-K disclosed that investing in Argo carried risk, that Argo's profitability was not solely a function of its efforts, and that there was no

assurance that sales of Bitcoin – identified as the source of its operating cash – would continue to generate the same level of funds.

The statement is forward looking only with respect to the phrase about Argo's runway for growth providing the company with a robust foundation on which to scale efficiently and profitably. The remainder of the statement, which Plaintiff does not highlight, is comprised of puffery and factual statements that Plaintiff has not alleged are false.

Statement B7 (AC ¶ 141): In its Form 20-F, dated May 2, 2022, Argo "again reiterated how inexpensive power at Helios Facility would be, stating that [Argo] 'anticipate[s] that our net electricity costs will be below $0.02/kWh after including the benefits of participating in demand response programs offered by' ERCOT." To the extent that Plaintiff alleges that this forward-looking statement is misleading because it does not explain that Argo would not be able to obtain a fixed-price contract at the indicated level – a general allegation that would appear to be directed to this particular statement – Argo makes sufficient disclosure elsewhere in the same document that undercuts any such argument. For example, "We may not be able to secure access to electricity on a sufficiently firm and unrestricted basis or at a price that we are willing to pay," and "We may be affected by price fluctuations in the wholesale and retail power markets." The former statement undercuts any suggestion that Argo was promising that it could obtain power as cheaply as two cents/kwh; and the latter undercuts any suggestion that Argo would certainly be able to obtain a fixed-price contract (a fixed-price contract would insulate Argo from "fluctuations" in the wholesale and retail power markets; so disclosing that it might be affected by such fluctuations sufficiently disclosed that there could be no assurance that such a contract would be forthcoming). As for the argument about the failure to disclose Argo's undercapitalization, there is no need to qualify this factual assertion regarding the anticipated electricity cost, as the qualifications

proposed by Plaintiff would not tend to make the facts asserted any more true than they already are.

Statement B10 (AC ¶ 149): In the June 7, 2022 Wolf of All Street You Tube video, Wall spoke about Argo's desire to "bet on ourselves." Specifically, he said, "You need rigs, you need power, and you need capital. If you think about 2021, we used our Nasdaq IPO and a couple other little fundraisers before that to get the capital we needed to get the power and the rigs that we needed. We now have an enormous runway of power. 800 megawatts of power in West Texas in a particular part of the grid where there's an overabundance of renewable energy. That is a lot of it's going to waste because there's not enough transmission lines to take that power to market in Southern Texas. Texas is an energy island. You can't export across the state line . . . . That power that's generated in Texas has to stay in Texas. It's not connected to the national grid. On top of that, Texas is also a competitive grid. It's a deregulated market. Meaning, you can buy your power from a host of retailers, and because of that, ERCOT, who manages the grid, incentivizes large load users like ourselves to participate in these demand response programs. What they call ancillary services. These auxiliary services allow miners to shut down." Like so many other statements, this one is alleged to be false and misleading because it fails to disclose that the company was undercapitalized and so unable to withstand market fluctuations.

Defendants argue that the statement is simply a true statement of facts: that crypto miners need "rigs", "power," and "capital;" that Argo had raised capital through the 2021 IPO and other "fundraisers" in order to purchase power and rigs; that there are 800 MW of power in West Texas that can neither be fully utilized in Texas nor exported for use elsewhere in the United States; that this power exists in a deregulated market; and that ERCOT incentivizes large load users (like Argo) to participate in demand response programs. Defendants are correct. Not a single fact is alleged in

the Amended Complaint tending to show that any of these statements is false as a simple matter of fact.

<u>Statement B11 (AC ¶ 150)</u>: During the same interview, Wall said that there was not a lot of power demand in the regions where the Helios Facility was located, but there was an overabundance of supply. Again, this is a simple statement of fact and nothing in the Amended Complaint tends to show that the fact asserted is false. Nor would any statement about Argo's capital structure tend to make the statement of fact not misleading.

### b. Scienter

After painstaking analysis, we have identified a total of two potentially actionable statements that were made following Argo's June 7, 2022 announcement of decreased Bitcoin mining activity. Defendants argue that the claims based on these alleged misstatements, brought against Defendants Argo, Wall, and Appleton, should nonetheless be dismissed because Plaintiff has failed to plead scienter. The first statement, B13 (AC ¶ 153), was made by Defendant Wall on June 29, 2022, and the second statement, B17 (AC ¶ 158), was made on July 7, 2022 in an official Argo press release.

To state a valid claim under Section 10(b) and Rule 10b-5, a plaintiff must plead with particularity facts that give rise to a strong inference "that the defendant acted with scienter, a mental state embracing intent to deceive, manipulate, or defraud." *Tellabs*, 551 U.S. at 319, 323 (internal citations omitted). "Under the heightened pleading standard for scienter, a 'complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.'" *Slayton*, 604 F.3d at 766 (quoting *Tellabs*, 551 U.S. at 324). "To apply this standard, this Court must 'take into account plausible opposing inferences' and must consider 'plausible, nonculpable explanations for

the defendant's conduct, as well as inferences favoring the plaintiff.' The inference of scienter 'must be more than merely "reasonable" or "permissible"—it must be cogent and compelling, thus strong in light of other explanations.'" *Schiro v. Cemex, S.A.B. de C.V.*, 396 F.Supp.3d 283, 300 (S.D.N.Y. July 12, 2019) (quoting *Tellabs*, 551 U.S. at 323-24).

A plaintiff can satisfy this pleading requirement by alleging facts showing either: (1) the defendant's motive and opportunity to commit fraud; or (2) strong circumstantial evidence of the defendant's conscious misbehavior or recklessness. *In re Avon Sec. Litig.*, No. 19-cv-01420, 2019 WL 6115349, at *19 (S.D.N.Y. Nov. 18, 2019) (citing *ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 198-99 (2d Cir. 2009)). Plaintiff proceeds via the second path by attempting to show strong circumstantial evidence of Defendants' conscious misbehavior or recklessness. Without "a motive for a defendant to commit fraud, 'the strength of the circumstantial allegations [of conscious misbehavior or recklessness] must be correspondingly greater.'" *In re: Petrobras Sec. Litig.*, No. 14-cv-9662, 2016 WL 1533553, at *2 (S.D.N.Y. Feb. 19, 2016) (quoting *In re Advanced Battery Techs., Inc.*, 781 F.3d 638, 644 (2d Cir. 2015)). Where a plaintiff alleges that the defendants knew about or had access to contrary facts, the plaintiff "must specifically identify the reports or statements containing this information." *Novak*, 216 F.3d at 309.

As the two remaining statements pertain to Argo's capitalization and costs, the court's analysis of scienter focuses on whether Plaintiff has alleged a strong inference that Defendants knew or were reckless in not knowing, at the time these statements were made, that Argo's costs had spiraled out of control and that the company was severely undercapitalized. Plaintiff contends that Defendants, "had possession of or access to information indicating that their statements regarding the state of [Argo's] finances were false and/or misleading," in part because they had "possession of or access to information showing Argo's operating costs and balance sheet."

(AC ¶¶ 190-91) He also includes information allegedly provided by three confidential witnesses who formerly worked at Argo's Helios facility in the following roles: (i) a supervisor (from January 2022 to an undisclosed date); (ii) a data technician (from May 2022 to December 2022); and (iii) a data center manager (from January 2022 to December 2022). (*See id*. ¶¶ 37-39)

On the issue of Argo's costs, Plaintiff alleges that Appleton and Wall, "were aware of the amount of Bitcoin being mined and the energy costs of doing so in real time." (*Id*. ¶ 192) As evidence, Plaintiff explains that one of the confidential witnesses understood "that all of Argo's executives . . . monitored Grafana," which was a third-party software that "showed how much Bitcoin was being mined in real time" and "collected data regarding the energy costs of mining." (*Id*.) Plaintiff also explains that Appleton and Wall were aware of the costs of operating Helios because "they frequently discussed such costs, indicating that they either reviewed those costs and knew what they were talking about, or were reckless in speaking about operating costs without reviewing that information." (*Id*. ¶ 193) For example, Plaintiff alleges that the following statements show that Defendants had knowledge of Argo's costs: on April 28, 2022, Appleton stated on a conference call that "in terms of operating costs and expenses, yes, they have increased" (*id*.); on June 7, 2022, Wall stated in an operational video "There was higher temperatures in Texas for the month of May, and so we curtailed, we voluntarily curtailed, a couple of times, energy prices went up, we gave that power back to the grid" (*id*. ¶ 194); on August 5, 2022, Wall stated in another operational video "so for the Helios Power Update month of July and also for June and also for this month our power costs in Texas are higher than we expected them to be" (*id*. ¶ 195); and finally on August 25, 2022, Wall stated during a conference call that "we had higher operating costs at Helios than we anticipated, largely due to higher power prices," and, "We've had some

issues on the cost side with the higher cost at Helios, which we believe are temporary as we ramp up operations" (*id*. ¶ 196).

On the issue of capitalization, Plaintiff similarly alleges that Wall and Appleton's statements during the Class Period demonstrate an extensive knowledge about Argo's financial positions and balance sheet – "specifically, the amount of cash Argo had on hand." (*Id*. ¶ 197). On November 2, 2021, Appleton allegedly said that Argo, "had $86 million of cash on hand at the end of the quarter;" during an April 28, 2022 earnings conference call, Appleton allegedly touted a "very strong balance sheet" with "net assets . . . well into the $200 million -- $ 200 million or so" (*id*. ¶ 198); and during an August 25, 2022 earnings conference call, Appleton allegedly stated that, "despite significant headwinds that we've had this year, our rigorous approach to cash flow and treasury management has meant that we've been cash neutral" (*id*. ¶ 199). During the same August 25, 2022 earnings call, Wall is alleged to have said "for the quarter, we had a net loss of $38 million, which is driven mostly by the $38 million negative change in fair market value of our Bitcoin holdings." (*Id*.) Plaintiff also points to Wall's monthly operational updates on mining revenue, Bitcoin holdings, and mining margin as evidence that he "was frequently apprising himself of the Company's financial position." (*Id*. ¶ 200)

In addition to the facts alleged above, Plaintiff details Defendants' possession of or access to information about "[the] requirements for obtaining a Fixed-Price PPA" (*id*. ¶ 202), "Argo's loans with Galaxy and its equipment financing agreements with NYDIG" (*id*. ¶ 208), and "its significant holdings in Bitcoin . . . and, in turn, the fact that the decrease in the price of Bitcoin was a foreseeable setback inherent to any cryptocurrency mining operation" (*id*. ¶ 220). Because the two remaining statements primarily concern Argo's costs and capitalization, these allegations

are relevant only to the extent they add to the broader picture of Defendants' knowledge of these aspects of Argo's finances.

Plaintiff faces two fundamental issues in establishing scienter as to either remaining statement.

First, although Plaintiff alleges a great deal of information that Defendants knew about Argo's financials, he fails to allege what information known by the Defendants was *contrary* to its statement that Argo was "confident that it possesses sufficient liquidity to avoid any potential liquidation." (AC ¶ 158) "In order to allege scienter based on access to information, however, a plaintiff must either 'specifically identify the reports or statements that are contradictory to the statements made' or 'provide specific instances in which Defendants received information that was contrary to their public declarations.'" *Schiro*, 396 F. Supp. 3d at 308 (quoting *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 588 (S.D.N.Y. 2011)). Plaintiff at no point identifies a report or internal statement known to Defendants that would tend to undermine Argo's ability to avoid potential liquidation of its loan. Instead, Plaintiff gestures broadly at internal financial data that could either have supported or contradicted Defendants' statements – we just don't know which. Bare facts that Defendants were aware of, or even fluent in the details of, Argo's financials are not allegations that the Defendants were aware that Argo's costs, cash on hand, or capitalization was anything other than Argo claimed it to be. Therefore, "Plaintiff has not 'specifically identified any reports or statements' or any dates or time frame in which Defendants were put on notice of contradictory information." *Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of Commerce*, 694 F. Supp. 2d 287, 300 (S.D.N.Y. Mar 17, 2010) (quoting *Teamsters Local 445*, 531 F.3d at 196).

Second, as to the statement regarding Argo's claimed "overdelivering" during a period of clear and present "underdelivering," (AC ¶ 158), Plaintiff fails to allege a strong inference that "defendants' comfort . . . based on a more optimistic view of otherwise publicly available financial information," can be deemed the sort of "extreme departure from the standards of ordinary care" capable of establishing scienter through recklessness. *Jones v. Perez*, 550 F. App'x 24, 27 (2d Cir. 2013) (internal citations omitted). This is especially true where "the public was generally aware that [a defendant] was experiencing difficulties." *Id*. at 26. As Plaintiff alleges, the June 7, 2022 operational update preceding this statement, "began to leak the truth about Argo's operations and financial condition, including at the Helios Facility." (AC ¶ 147). The fact that a statement may be "sloppy, contradictory and poorly drafted," does not mean that it is "consistent with the 'reckless disregard for the truth' required to allege scienter." *In re Sunedison Sec. Litig.*, 300 F. Supp. 3d 444, 493 (S.D.N.Y. Mar. 6, 2018) (quoting *S.E.C. v. Obus*, 693 F.3d 276, 286 (2d Cir. 2012)). While Wall may have arguably been negligent in his use of the word "overdelivering" after having recently announced a decrease in Argo's Bitcoin mining, Plaintiff has not alleged the facts that, if proved, would demonstrate "highly unreasonable" conduct "representing an extreme departure from the standards of ordinary care." *In re Advanced Battery Techs., Inc.*, 781 F.3d 638, 644 (2d Cir. 2015). This is especially true where the at-issue statement was followed and contradicted by Wall's subsequent statement that "[Argo] had a rough month in May." (Dkt. # 51 Ex. 4 at 12)

To the extent that Plaintiff's arguments regarding either statement are premised on Defendants' knowing failure to provide details about Argo's cost issues, "the allegation that defendants behaved recklessly is weakened by their disclosure of certain financial problems prior to the deadline to file its financial statements." *Rombach*, 355 F.3d at 176. The evidence included in the Amended Complaint to demonstrate Defendants' knowledge of Argo's costs, with no

exception, consists of disclosures about Argo's cost problems made both before and after the at-issue statements: "yes, [operating costs and expenses] have increased;" "energy prices went up;" "power costs in Texas are higher than we expected;" "we had higher operating costs at Helios than we anticipated." (AC ¶¶ 192-96) No reasonable person would deem Plaintiff's insistence that Argo was fraudulently concealing a decaying balance sheet to be "at least as compelling as any plausible opposing inference" – such as a company, whose executives had great faith in an untried and unpredictable product, walking investors through its hardships every step of the way. *Tellabs*, 551 U.S. at 313.

Plaintiff's final three supplemental scienter arguments are also unconvincing.

Plaintiff argues that "knowledge of the facts underlying the fraudulent scheme may be imputed to the Individual Exchange Act Defendants" because "the fraud alleged herein relates to the core business of Argo." (AC ¶ 225) The so-called "core operations doctrine" provides that, "When a plaintiff has adequately alleged that the defendant made false or misleading statements, the fact that those statements concerned the core operation of the company supports the inference that the defendant knew or should have known the statements were false when made." *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 489 (S.D.N.Y. July 7, 2004). While the Second Circuit "has not expressly determined if the core operation doctrine remains applicable to proving scienter after the enactment of the PSLRA," *In re Plug Power, Inc. Sec. Litig.*, No. 21-cv-2004, 2023 WL 5577276, at *21 (S.D.N.Y. Aug. 29, 2023), it has suggested that courts can consider core operations allegations as a supplementary means to plead scienter, "even if they cannot establish scienter independently." *New Orleans Emples. Ret. Sys. v. Celestica, Inc.*, 455 F. App'x 10, 14 n.3 (2d Cir. 2011). Courts in this district have understood this instruction to mean that while "core operations" allegations can contribute supplemental support to a plaintiff's

scienter claims, they cannot in and of themselves be enough to plead scienter. *See, e.g., In re Skechers USA, Inc. Sec. Litig.*, 444 F. Supp. 3d 498, 529 (S.D.N.Y. Mar. 12, 2020) (collecting cases). "In the utter absence of any other evidence of fraudulent intent, the doctrine itself is insufficient to give rise to the necessary inference." *Id*.

The same fundamental problem with Plaintiff's scienter argument returns here: he has not adequately alleged that there was information pertaining to the core operations of Argo that *contradicted* Defendants' statements. As other courts in this district have done, I find that Plaintiff's core operations theory fails to cure the defect in its scienter pleading. *See Glaser*, 772 F. Supp. 2d at 596; *Shemian v. Rsch. In Motion Ltd.*, No. 11-cv-4068, 2013 WL 1285779, at *18 (S.D.N.Y. Mar. 29, 2013), *aff'd*, 570 F. App'x 32 (2d Cir. 2014).

Next, Plaintiff argues that Defendants' scienter is bolstered by the departure of Argo's CTO following a disappointing Bitcoin mining update and the subsequent departures of Argo's CEO and CFO a month after Argo announced the sale of its Helios Facility. "[A] resignation can establish scienter only if the plaintiff alleges independent evidence corroborating that the employee who resigned held a culpable state of mind." *Schiro*, 396 F. Supp. 3d at 303. As Defendants correctly argue, Plaintiff fails to tie Argo's executive departures to any evidence of fraud, alleging instead that the departures broadly coincided with disappointing corporate announcements. "As presently pleaded, the terminations and resignations 'are at least as consistent with punishing those at the helm for their poor judgment and leadership' as with their 'relating to concocting a scheme to defraud shareholders.'" *In re Lottery.com, Inc. Sec. Litig.*, No. 1:22-cv-07111, 2024 WL 454298, at *35 (S.D.N.Y. Feb. 6, 2024) (quoting *Lighthouse Fin. Grp. v. Royal Bank of Scot. Grp., PLC*, 902 F. Supp. 2d 329, 343 (S.D.N.Y. Sept. 27, 2012), *aff'd sub nom. IBEW Loc. Union No. 58 Pension Tr. Fund & Annuity Fund v. Royal Bank of Scot. Grp.*, PLC, 783 F.3d 383 (2d Cir. 2015)).

Finally, despite Plaintiff's claims, Defendants' signing of SOX certifications fails to demonstrate a strong inference of scienter for the reasons discussed in detail above. While Plaintiff argues in its Opposition Brief that to sign the certifications, Defendants "necessarily needed access to information about Helios's operating costs," (Dkt. # 54 at 24-25), Plaintiff again "fails to point to any document, report, or oral statement showing that the Defendants knew at the time that their statements regarding [Argo's financials] were false or misleading." *Saraf v. Ebix, Inc.*, 632 F. Supp. 3d 389, 399 (S.D.N.Y. Sept. 30, 2022).

For these reasons, Plaintiff fails to demonstrate a strong inference of scienter on the part of any of the individual Defendants as to either of the two remaining false and/or misleading statements. "Because [Plaintiff] has failed to plead facts showing that 'someone whose intent could be imputed to the corporation acted with the requisite scienter,' [he] has also failed to plead corporate scienter." *Swanson et al. v. Danimer Sci., Inc., et al.*, 2024 WL 4315109, at *3 (2d Cir. Sept. 27, 2024) (quoting *Jackson v. Abernathy*, 960 F.3d 94, 98 (2d Cir. 2020)).

### III. All Claims Asserted Under Section 15 of the Securities Act and Section 20(a) of the Securities Exchange Act of 1934 Are Dismissed With Prejudice and Without Leave to Amend

Section 15 of the Securities Act and Section 20(a) of the Exchange Act establish joint and several liability for every person who, directly or indirectly, controls any person liable for a primary violation under the respective acts. *See* 15 U.S.C. §§ 77o(a); 78t(a). "To establish a prima facie case of control person liability, a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in

some meaningful sense, a culpable participant in the controlled person's fraud." *ATSI Communs., Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 108 (2d Cir. 2007).

Because Plaintiff fails to allege any primary securities law violation by any defendant in this case, Plaintiff's claims under Section 15 of the Securities Act and Section 20(a) of the Exchange Act are dismissed. *See Lau v. Opera Ltd.*, 527 F. Supp. 3d 537, 562 (S.D.N.Y. Mar. 13, 2021).

## CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss the Amended Complaint is GRANTED. The Clerk of the court is directed to remove Docket No. 49 from the Court's list of pending motions and to close the file. As previously explained, I find that it would be futile for Plaintiff to file a second amended complaint to cure the pleading defects of the first, and the "motion" inserted at the end of the Opposition Brief is denied.

This constitutes the decision and order of the court. It is a written decision.

Dated: October 9, 2024

_____

U.S.D.J.

BY ECF TO ALL COUNSEL

# Appendix A

*Murphy v. Argo Blockchain plc et al,*
Case No. 1:23-cv-07305-CM

Appendix A
**Chart of Alleged Misstatements – Securities Act[1]**

| # | AC ¶¶ | Statement in Registration Statement ("RS") | Defenses | Risk Disclosure Language (where applicable) |
|---|---|---|---|---|
| A1 | 69 | "***Reliable, Low-Cost, Renewable Power.*** We believe the combination of increased mining difficulty, driven by greater hash rates, and the periodic adjustment of reward rates, such as the halving of Bitcoin rewards, will drive the increasing importance of power efficiency in cryptocurrency mining over the long term. As a result, we are focused on deploying our mining machines at locations with access to reliable, renewable power sources, as successfully doing so should enable us to reduce our power costs." <br><br> (RS at 3 (emphasis added by Plaintiffs).) | Forward-looking <br><br> Puffery | "***We are subject to many risks related to the development of a new cryptocurrency mining facility in Texas. Delays or disruptions in our development of the Texas facility could materially and adversely affect our results of operations and financial condition.*** <br> As part of our evolving strategy focused on owning and operating our own mining facilities, we are developing a new mining facility in Texas, where we expect to obtain more than 90% of our power requirements from reliable renewable power sources at less than the current cost of fossil fuel energies in other locations. However, development of our Texas mining facility may be subject to unexpected problems and delays that could adversely impact our ability to develop or operate the project as planned or increase the costs of the project. Some of the risks inherent in the development and construction of a new mining facility or the extension of an existing mining facility include uncertainties regarding: <br><br> • timing and cost of construction of the facility, which can be considerable; <br> • availability and cost of mining equipment; |

---

[1] Plaintiffs reference or quote the Registration Statement cited herein in the Amended Complaint. For the Court's convenience, it can access the referenced Registration Statement using the embedded hyperlink found in the citation to the source.

| # | AC ¶¶ | Statement in Registration Statement ("RS") | Defenses | Risk Disclosure Language (where applicable) |
|---|---|---|---|---|
| | | | | • availability and cost of skilled labor, power, water and transportation;<br><br>• availability and cost of appropriate power arrangements;<br><br>• the successful development and implementation of new technologies and processes related to mining, such as immersion technology;<br><br>• applicable requirements under local and state laws and time needed to obtain the necessary environmental and other governmental permits and approvals; and<br><br>• availability of funds to finance construction and development.<br><br>Delays in obtaining necessary permits and approvals and broader social or political opposition to cryptocurrency mining may increase the cost, timing and complexity of the development and construction of our Texas facility. Accordingly, such facility may not be developed as planned or may be less profitable than anticipated or even be loss-making. Additionally, given current lead times for new mining hardware, we may need to commit to purchasing mining machines in advance of the facility becoming fully operational and,if so, may not have the power capacity to support these mining machines at our other hosted and owned facilities. A failure or material delay in our ability to develop and operate the new facility in accordance with, or in excess of, expectations could have a material adverse effect on our business, prospects, financial condition and operating results." (RS at 14.) |

| # | AC ¶¶ | Statement in Registration Statement ("RS") | Defenses | Risk Disclosure Language (where applicable) |
|---|---|---|---|---|
| | | | | "*We may not be able to secure access to electricity on a sufficiently firm and unrestricted basis or at a price that we are willing to pay.* Cryptocurrency mining is dependent on access to stable and reliable electricity supply. There has been a substantial increase in the demand for electricity for cryptocurrency mining, and this has had varying impacts on local electricity supply. Additionally, we currently rely on renewable sources of power and plan to increase our reliance on renewable sources of power in the future. Renewable power is generally an intermittent and variable source of electricity, which may not always be available. Because the electrical grid has very little storage capacity, the balance between electricity supply and demand must be maintained at all times to avoid a blackout or other cascading problem. Intermittent sources of renewable power are challenging because they disrupt the conventional methods for planning the daily operation of the electrical grid. Their power fluctuates over multiple time horizons, forcing the grid operator to adjust its day-ahead, hour-ahead, and real-time operating procedures. <br><br> Should our operations require more electricity than can be supplied in the areas where our mining facilities are located or should the electrical transmission grid and distribution systems be unable to provide the continuous, steady supply of electricity required, we may have to limit or suspend activities or reduce the speed of our proposed expansion, either voluntarily or as a result of either quotas imposed by energy companies or governments, or increased prices for certain |

| # | AC ¶¶ | Statement in Registration Statement ("RS") | Defenses | Risk Disclosure Language (where applicable) |
|---|---|---|---|---|
| | | | | users (such as us). If we are unable to procure electricity at a suitable price, we may have to shut down our operations in that particular jurisdiction either temporarily or permanently. Additionally, our cryptocurrency mining machines would be materially adversely affected by a power outage. Given the power requirement, it would not be feasible to run mining machines on back-up power generators in the event of a government restriction on electricity or a power outage, which may be caused by weather, acts of God, wild fires, pandemics, falling trees, falling distribution poles and transmission towers, transmission and distribution cable cuts, other force majeure events in the electricity and natural gas markets and/or the negligence or malfeasance of others. If we are unable to receive adequate power supply and are forced to reduce our operations due to the availability or cost of electrical power, our business would experience materially negative impacts. . . . If we are unable to receive adequate power supply and are forced to reduce our operations due to the availability or cost of electrical power, our business would experience materially negative impacts." (RS at 36-37.) *"**We may be affected by price fluctuations in the wholesale and retail power markets.** While we anticipate that the majority our power arrangements will contain fixed power prices, we expect that they may contain certain price adjustment mechanisms in case of certain events. Furthermore, some portion of our power arrangements |

| # | AC ¶¶ | Statement in Registration Statement ("RS") | Defenses | Risk Disclosure Language (where applicable) |
|---|---|---|---|---|
| | | | | is expected to be priced by reference to published index prices and, thus, reflect market movements.<br><br>Market prices for power, generation capacity and ancillary services, are unpredictable. Depending upon the effectiveness of any price risk management activity undertaken by us, an increase in market prices for power, generation capacity, and ancillary services may adversely affect our business, prospects, financial condition, and operating results. Long- and short-term power prices may fluctuate substantially due to a variety of factors outside of our control, including, but not limited to:<br><br>• changes in power transmission or fuel transportation capacity constraints or inefficiencies;<br>• volatile weather conditions, particularly unusually hot or mild summers or unusually cold or warm winters;<br>• technological shifts resulting in changes in the demand for power or in patterns of power usage, including the potential development of demand-side management tools, expansion and technological advancements in power storage capability and the development of new fuels or new technologies for the production or storage of power;<br>• federal and state power, market and environmental regulation and legislation; and<br>• changes in capacity prices and capacity markets.<br><br>If we are unable to secure power supply at prices or on terms acceptable to us, it would have a material adverse effect on our |

| # | AC ¶¶ | Statement in Registration Statement ("RS") | Defenses | Risk Disclosure Language (where applicable) |
|---|---|---|---|---|
| | | | | business, prospects, financial condition, and operating results." (RS at 38.)<br><br>"***As a result of state and local regulations over electric distribution utilities and retail electricity suppliers, we may not be able to obtain electricity on terms and conditions that are economic and practicable.***<br>To the extent that our consumption of electricity is viewed as a retail sale of electricity, then state and local authorities will have jurisdiction over such retail sale and the distribution of electricity to our retail use. Such regulation and costs as required by state and local authorities may not be economic or practicable for our mining operations. . . ." (RS at 38.) |

| # | AC ¶¶ | Statement in Registration Statement ("RS") | Defenses | Risk Disclosure Language (where applicable) |
|---|---|---|---|---|
| A2 | 70 | *"Smart Growth.* We aim to optimize our mining by **identifying and purchasing the most profitable mining machines with industry-leading returns on investment and actively monitoring and adjusting the operation of those machines to enhance their performance**. We believe this smart-growth strategy, including our commitment to mining efficiency and return on investment in mining machines, will enable us to build value over the long term." <br><br> (RS at 3 (emphasis added by Plaintiffs).) | Forward-looking <br><br> Puffery | ***"Due to our limited operating history, it may be difficult to evaluate our business and future prospects, and we may not be able to achieve or maintain profitability in any given period.*** <br> . . . While our annual net revenue has increased since our formation, there is no assurance that this growth rate will continue in future periods . . . . We may not generate sufficient revenue to achieve positive cash flow from operations or profitability in any given period, and our limited operating history and the volatile nature of our business and the cryptocurrency industry make it difficult to evaluate our current business and our future prospects. We have encountered and will continue to encounter risks and difficulties, including, but not limited to those described in this section. If we do not manage these risks successfully, our business may be adversely impacted. If our growth rate were to decline significantly or become negative, it could adversely affect our operating results and financial condition. If we are not able to achieve or maintain positive cash flow from operations, our business may be adversely impacted and we may require additional financing, which may not be available on favorable terms or at all, or which would be dilutive to our ADS holders." (RS at 13.) <br><br> ***"We have an evolving business model, which is subject to various uncertainties.*** <br> Our business model has significantly evolved since our incorporation and we expect it to continue to do so in the future. For example, in the past, we operated as a mining-as-a- |

| # | AC ¶¶ | Statement in Registration Statement ("RS") | Defenses | Risk Disclosure Language (where applicable) |
|---|---|---|---|---|
| | | | | service ("MaaS") business. Beginning in 2019, in the face of an industry-wide downturn, we terminated our MaaS contracts and commenced mining for our own account. As digital assets and blockchain technologies become more widely available, we expect the services and products associated with them to evolve. In order to stay current with the industry, our business model may need to evolve as well. As a result, from time to time, we may modify aspects of our business model relating to our strategy. We cannot offer any assurance that these or any other modifications will be successful or will not result in harm to our business. These modifications may increase the complexity of our business and place significant strain on our management, personnel, operations, systems, technical performance, financial resources and internal financial control and reporting functions. We may not be able to manage growth effectively, which could damage our reputation, limit our growth and negatively affect our operating results. Further, we cannot provide any assurance that we will successfully identify all emerging trends and growth opportunities within the cryptocurrency industry and we may lose out on such opportunities. Such circumstances could have a material adverse effect on our business, prospects, financial condition and operating results." (RS at 13.)<br><br>"***There are risks related to technological obsolescence, the vulnerability of the global supply chain for cryptocurrency mining hardware to disruption, and difficulty in obtaining new hardware which may have a negative effect on our business.*** |

| # | AC ¶¶ | Statement in Registration Statement ("RS") | Defenses | Risk Disclosure Language (where applicable) |
|---|---|---|---|---|
| | | | | Our mining operations can only be successful and ultimately profitable if the costs, including hardware and electricity costs, associated with mining cryptocurrencies, including Bitcoin, are lower than the revenue we are able earn from mining such cryptocurrencies. Over the course of our mining operations, our mining machines experience ordinary wear and tear, and may also face more significant malfunctions caused by a number of extraneous factors beyond our control. . . . These repair and upgrading processes require substantial and continuous capital investment, and we may face challenges in doing so on a timely and cost-effective basis. In addition, there is no guarantee that our mining machines will be free from defect or failure, and any such failures or defects could require us to seek replacements for newly acquired mining machines. . . ." (RS at 33.) <br><br> "***Our mining facilities and mining equipment may experience damages, including damages that are not covered by insurance.*** <br> Our current mining operations in Canada and the United States are, and any future mining facilities we establish or which we mine from will be, subject to a variety of risks relating to physical condition and operation[.] . . . [O]ur hosted and owned facilities could be materially adversely affected by local or regional failures in infrastructure, a power outage or loss of access to the electrical grid or loss by the grid of cost-effective sources of electrical power generating capacity (including but not limited to increased charges or costs applicable to specific sectors in line with national or regional policies). Given the |

| # | AC ¶¶ | Statement in Registration Statement ("RS") | Defenses | Risk Disclosure Language (where applicable) |
|---|---|---|---|---|
| | | | | power requirement, it would not be feasible to run our mining machines on back-up power generators in the event of a power outage. We cannot control the supply of electricity used by its operations nor do we have alternate sources of off-grid supply. . . Climate related events have the potential to disrupt our business and may cause us to experience higher attrition, losses and additional costs to resume operations. <br><br> The performance and reliability of our mining technology will also be critical to our reputation and our operations. If there are any technological issues with our mining equipment, our entire fleet could be affected. In particular, any error or failure may significantly delay response times or even cause our mining operations to fail. . . ." (RS at 34-35.) <br><br> ***"We may not be able to secure access to electricity on a sufficiently firm and unrestricted basis or at a price that we are willing to pay.*** <br> Cryptocurrency mining is dependent on access to stable and reliable electricity supply. There has been a substantial increase in the demand for electricity for cryptocurrency mining, and this has had varying impacts on local electricity supply. Additionally, we currently rely on renewable sources of power and plan to increase our reliance on renewable sources of power in the future. Renewable power is generally an intermittent and variable source of electricity, which may not always be available. Because the electrical grid has very little storage capacity, the balance between electricity supply and demand must be maintained at all times to avoid a blackout |

| # | AC ¶¶ | Statement in Registration Statement ("RS") | Defenses | Risk Disclosure Language (where applicable) |
|---|---|---|---|---|
| | | | | or other cascading problem. Intermittent sources of renewable power are challenging because they disrupt the conventional methods for planning the daily operation of the electrical grid. Their power fluctuates over multiple time horizons, forcing the grid operator to adjust its day-ahead, hour-ahead, and real-time operating procedures. . .  If we are unable to receive adequate power supply and are forced to reduce our operations due to the availability or cost of electrical power, our business would experience materially negative impacts." (RS at 36-37.) |

| # | AC ¶¶ | Statement in Registration Statement ("RS") | Defenses | Risk Disclosure Language (where applicable) |
|---|---|---|---|---|
| A3 | 71 | *"Own and Operate Our Mining Facilities.* **We are investing heavily in purchasing, building and operating our mining facilities.** By owning and operating our mining machines at facilities that **offer competitive advantages**, including access to reliable, low-cost, renewable power and room for expansion, we expect to have greater control over the timing of the purchase and deployment of our mining machines. We also may enhance our ability to intelligently and quickly adapt our operating model and reap savings compared to paying for outsourced operations and infrastructure." <br><br> (RS at 3 (emphasis added by Plaintiffs).) | Not false <br><br> Forward-looking <br><br> Puffery | "***We are subject to many risks related to the development of a new cryptocurrency mining facility in Texas. Delays or disruptions in our development of the Texas facility could materially and adversely affect our results of operations and financial condition.*** <br> As part of our evolving strategy focused on owning and operating our own mining facilities, we are developing a new mining facility in Texas, where we expect to obtain more than 90% of our power requirements from reliable renewable power sources at less than the current cost of fossil fuel energies in other locations. However, development of our Texas mining facility may be subject to unexpected problems and delays that could adversely impact our ability to develop or operate the project as planned or increase the costs of the project. Some of the risks inherent in the development and construction of a new mining facility or the extension of an existing mining facility include uncertainties regarding: <br> . . . <br> • availability and cost of skilled labor, power, water and transportation; <br> • availability and cost of appropriate power arrangements; <br> . . . <br> Additionally, . . . we may . . . not have the power capacity to support these mining machines at our other hosted and owned facilities. A failure or material delay in our ability to develop and operate the new facility in accordance with, or in excess of, expectations could have a material adverse effect on our |

| # | AC ¶¶ | Statement in Registration Statement ("RS") | Defenses | Risk Disclosure Language (where applicable) |
|---|---|---|---|---|
| | | | | business, prospects, financial condition and operating results." (RS at 14.)<br><br>"***There are risks related to technological obsolescence, the vulnerability of the global supply chain for cryptocurrency mining hardware to disruption, and difficulty in obtaining new hardware which may have a negative effect on our business.***<br>Our mining operations can only be successful and ultimately profitable if the costs, including hardware and electricity costs, associated with mining cryptocurrencies, including Bitcoin, are lower than the revenue we are able earn from mining such cryptocurrencies. . . " (RS at 33.)<br><br>"***We may not be able to secure access to electricity on a sufficiently firm and unrestricted basis or at a price that we are willing to pay.***<br>Cryptocurrency mining is dependent on access to stable and reliable electricity supply. There has been a substantial increase in the demand for electricity for cryptocurrency mining, and this has had varying impacts on local electricity supply. Additionally, we currently rely on renewable sources of power and plan to increase our reliance on renewable sources of power in the future. Renewable power is generally an intermittent and variable source of electricity, which may not always be available. Because the electrical grid has very little storage capacity, the balance between electricity supply and demand must be maintained at all times to avoid a blackout or other cascading problem. Intermittent sources of renewable |

| # | AC ¶¶ | Statement in Registration Statement ("RS") | Defenses | Risk Disclosure Language (where applicable) |
|---|---|---|---|---|
| | | | | power are challenging because they disrupt the conventional methods for planning the daily operation of the electrical grid. Their power fluctuates over multiple time horizons, forcing the grid operator to adjust its day-ahead, hour-ahead, and real-time operating procedures. <br><br> Should our operations require more electricity than can be supplied in the areas where our mining facilities are located or should the electrical transmission grid and distribution systems be unable to provide the continuous, steady supply of electricity required, we may have to limit or suspend activities or reduce the speed of our proposed expansion, either voluntarily or as a result of either quotas imposed by energy companies or governments, or increased prices for certain users (such as us). If we are unable to procure electricity at a suitable price, we may have to shut down our operations in that particular jurisdiction either temporarily or permanently. Additionally, our cryptocurrency mining machines would be materially adversely affected by a power outage. Given the power requirement, it would not be feasible to run mining machines on back-up power generators in the event of a government restriction on electricity or a power outage, which may be caused by weather, acts of God, wild fires, pandemics, falling trees, falling distribution poles and transmission towers, transmission and distribution cable cuts, other force majeure events in the electricity and natural gas markets and/or the negligence or malfeasance of others. If we are unable to receive adequate power supply and are forced to reduce our operations |

| # | AC ¶¶ | Statement in Registration Statement ("RS") | Defenses | Risk Disclosure Language (where applicable) |
|---|---|---|---|---|
| | | | | due to the availability or cost of electrical power, our business would experience materially negative impacts.<br><br>Certain government actors have begun to intervene with the supply of electrical energy to cryptocurrency miners. . . .<br><br>If we are unable to receive adequate power supply and are forced to reduce our operations due to the availability or cost of electrical power, our business would experience materially negative impacts."<br>(RS at 36-37.)<br><br>"***We may be affected by price fluctuations in the wholesale and retail power markets.***<br>While we anticipate that the majority our power arrangements will contain fixed power prices, we expect that they may contain certain price adjustment mechanisms in case of certain events. Furthermore, some portion of our power arrangements is expected to be priced by reference to published index prices and, thus, reflect market movements.<br><br>Market prices for power, generation capacity and ancillary services, are unpredictable. Depending upon the effectiveness of any price risk management activity undertaken by us, an increase in market prices for power, generation capacity, and ancillary services may adversely affect our business, prospects, financial condition, and operating results. Long- and short-term power prices may fluctuate substantially due to a variety of factors outside of our control, including, but not limited to: |

| # | AC ¶¶ | Statement in Registration Statement ("RS") | Defenses | Risk Disclosure Language (where applicable) |
|---|---|---|---|---|
| | | | | • changes in power transmission or fuel transportation capacity constraints or inefficiencies; <br> • volatile weather conditions, particularly unusually hot or mild summers or unusually cold or warm winters; <br> • technological shifts resulting in changes in the demand for power or in patterns of power usage, including the potential development of demand-side management tools, expansion and technological advancements in power storage capability and the development of new fuels or new technologies for the production or storage of power; <br> • federal and state power, market and environmental regulation and legislation; and <br> • changes in capacity prices and capacity markets. <br><br> If we are unable to secure power supply at prices or on terms acceptable to us, it would have a material adverse effect on our business, prospects, financial condition, and operating results." (RS at 38.) |

| # | AC ¶¶ | Statement in Registration Statement ("RS") | Defenses | Risk Disclosure Language (where applicable) |
|---|---|---|---|---|
| A4 | 73 | "Since our inception, we have financed our operations primarily through **cash generated by sales of cryptocurrency and sales of equity securities**. Our primary requirements for liquidity and capital are to finance working capital, capital expenditures and general corporate purposes. **We believe that our sources of liquidity and capital resources will be sufficient to meet our existing business needs for *at least* the next 12 months.** From time to time, we may raise additional capital through the issuance of debt or equity securities or additional borrowings to the extent required, or to the extent that we believe such capital is available on favorable terms. **Our primary sources of liquidity are our cash and cash equivalents and cryptocurrency held in treasury.**" (RS at 82 -83 (emphasis added by Plaintiffs).) | Not false<br><br>Forward-looking<br><br>Puffery | "***Due to our limited operating history, it may be difficult to evaluate our business and future prospects, and we may not be able to achieve or maintain profitability in any given period.*** We began our operations in December 2017, and since our incorporation our business model has evolved significantly. While our annual net revenue has increased since our formation, there is no assurance that this growth rate will continue in future periods and you should not rely on the revenue growth of any given period as an indication of our future performance. We may not generate sufficient revenue to achieve positive cash flow from operations or profitability in any given period, and our limited operating history and the volatile nature of our business and the cryptocurrency industry make it difficult to evaluate our current business and our future prospects. We have encountered and will continue to encounter risks and difficulties, including, but not limited to those described in this section. If we do not manage these risks successfully, our business may be adversely impacted. If our growth rate were to decline significantly or become negative, it could adversely affect our operating results and financial condition. If we are not able to achieve or maintain positive cash flow from operations, our business may be adversely impacted and we may require additional financing, which may not be available on favorable terms or at all, or which would be dilutive to our ADS holders." (RS at 13.) |

| # | AC ¶¶ | Statement in Registration Statement ("RS") | Defenses | Risk Disclosure Language (where applicable) |
|---|---|---|---|---|
| | | | | "***We may be unable to raise additional capital needed to grow our business.*** We may need to raise additional capital to fund our operations, pursue our growth strategies, including potential acquisitions of complementary businesses, and respond to competitive pressures or unanticipated working capital requirements. For example, in January 2021 and March 2021, we raised gross proceeds of £22.4 million and £26.8 million, respectively, in private placements and subscriptions of our ordinary shares. We may not be able to obtain additional debt or equity financing on favorable terms, if at all, which could impair our growth and adversely affect our existing operations. If we raise additional equity financing, our ADS holders may experience significant dilution of their ownership interests, and the per ADS value of our ordinary shares could decline. Furthermore, if we incur additional debt financing, the holders of debt likely would have priority over the holders of ADSs on order of payment preference. We may be required to accept terms that restrict our ability to incur additional indebtedness or to take other actions including terms that require us to maintain specified liquidity or other ratios that could otherwise not be in the interests of our ADS holders." (RS at 13.)<br><br>"***Our operating results have fluctuated and may continue to fluctuate significantly due to the highly volatile nature of digital assets.*** All of our sources of revenue are dependent on digital assets and the broader blockchain ecosystem. Due to the highly volatile nature of the blockchain ecosystem and the prices of |

| # | AC ¶¶ | Statement in Registration Statement ("RS") | Defenses | Risk Disclosure Language (where applicable) |
|---|---|---|---|---|
| | | | | digital assets, our operating results have fluctuated, and may continue to fluctuate, significantly from period to period in accordance with market sentiments and movements in the broader blockchain ecosystem. In particular, our operating results may continue to fluctuate significantly as a result of a variety of factors, many of which are unpredictable and in certain instances are outside of our control . . . [I]t is difficult for us to forecast growth trends accurately and our business and future prospects are difficult to evaluate, particularly in the short term. In addition, as a result of the rapidly evolving nature of our business and the blockchain ecosystem, period-to-period comparisons of our operating results may not be meaningful, and you should not rely upon them as an indication of future performance. Annual expenses reflected in our financial statements may be significantly different from historical rates. Our operating results in one or more future periods may fall below the expectations of securities analysts and investors. As a result, the trading price of our ADSs may increase or decrease significantly." (RS at 14-15.)<br><br>"***A majority of our revenue is currently derived from mining Bitcoin. If demand for Bitcoin declines and is not replaced by new demand for cryptocurrencies we are able to mine, our business, operating results and financial condition could be adversely affected.***<br>For the six months ended June 30, 2021 and year ended December 31, 2020, we derived the majority of our net revenue from transaction fees and cryptocurrency rewards generated in connection with mining Bitcoin. As such, in addition to the |

| # | AC ¶¶ | Statement in Registration Statement ("RS") | Defenses | Risk Disclosure Language (where applicable) |
|---|---|---|---|---|
| | | | | factors impacting the broader blockchain ecosystem and the prices of digital assets described in this section, our business may be adversely affected if the market for Bitcoin deteriorates or if its price declines[.] . . ."  (RS at 16-17.) |

| # | AC ¶¶ | Statement in Registration Statement ("RS") | Defenses | Risk Disclosure Language (where applicable) |
|---|---|---|---|---|
| A5 | 74 | "To **control and manage the volatility in cryptocurrency pricing**, we engage in **planned selling of cryptocurrency over an extended period in advance of forecasted fiat cash requirement**s. In the future, as with any business which mines a commodity, we expect to sell Bitcoin to **satisfy our fiat cash requirements**, at least until Bitcoin is accepted more broadly as a medium of exchange."<br><br>(RS at 83 (emphasis added by Plaintiffs).) | Not false<br><br>Forward-looking<br><br>Puffery | "***Our operating results have fluctuated and may continue to fluctuate significantly due to the highly volatile nature of digital assets.***<br>All of our sources of revenue are dependent on digital assets and the broader blockchain ecosystem. Due to the highly volatile nature of the blockchain ecosystem and the prices of digital assets, our operating results have fluctuated, and may continue to fluctuate, significantly from period to period in accordance with market sentiments and movements in the broader blockchain ecosystem. In particular, our operating results may continue to fluctuate significantly as a result of a variety of factors, many of which are unpredictable and in certain instances are outside of our control, including:<br><br>• changes in the legislative or regulatory environment, or actions by governments or regulators that impact the cryptocurrency industry generally, or our operations specifically;<br>• difficulty obtaining new hardware and related installation costs;<br>• access to cost-effective sources of electrical power;<br>• evolving cryptographic algorithms and emerging trends in the technology securing blockchains, including proof-of-stake;<br>• Changes in the development, usage, and market preferences for the cryptocurrencies we mine;<br>• adverse legal proceedings or regulatory enforcement actions, judgments, settlements or other legal proceeding and enforcement-related costs; |

| # | AC ¶¶ | Statement in Registration Statement ("RS") | Defenses | Risk Disclosure Language (where applicable) |
|---|-------|---------------------------------------------|----------|---------------------------------------------|
| | | | | <ul><li>the development and introduction of existing and new products and technology by us or our competitors;</li><li>increases in operating expenses that we expect to incur to grow and expand our operations and to remain competitive;</li><li>system failure or outages, including with respect to our mining hardware, power supply and third-party networks;</li><li>breaches of security or data privacy;</li><li>our ability to attract and retain talent; and</li><li>our ability to compete.</li></ul>As a result of these and other factors, it is difficult for us to forecast growth trends accurately and our business and future prospects are difficult to evaluate, particularly in the short term. In addition, as a result of the rapidly evolving nature of our business and the blockchain ecosystem, period-to-period comparisons of our operating results may not be meaningful, and you should not rely upon them as an indication of future performance. Annual expenses reflected in our financial statements may be significantly different from historical rates. Our operating results in one or more future periods may fall below the expectations of securities analysts and investors. As a result, the trading price of our ADSs may increase or decrease significantly."  (RS at 14-15.)<br><br>"***Our total revenue and cash flow is substantially dependent on the market value of digital assets and the volume of digital assets received from our mining efforts. If such market value*** |

| # | AC ¶¶ | Statement in Registration Statement ("RS") | Defenses | Risk Disclosure Language (where applicable) |
|---|-------|---------------------------------------------|----------|----------------------------------------------|
| | | | | ***or volume declines, our business, operating results and financial condition would be adversely affected.*** We currently generate substantially all of our revenue from rewards and transaction fees received for successfully validating a "block" of transactions on the Bitcoin blockchain. Similarly, our operating cash flow is substantially dependent on our ability to sell cryptocurrency for fiat currency as needed. As such, any declines in the amount of cryptocurrencies that we successfully mine, the price of such cryptocurrencies or market liquidity for cryptocurrencies and digital assets generally would adversely affect our revenue and ability to fund our operations. The price of cryptocurrencies and digital assets and associated demand for buying, selling, and trading cryptocurrencies and digital assets have historically been subject to significant volatility. For example, Bitcoin's aggregate market value exceeded $1 trillion in February 2021 compared to $160 billion in February 2020, based on Bitcoin prices quoted on major exchanges. The price and trading volume of any digital asset is subject to significant uncertainty and volatility, depending on a number of factors[.] . . . There is no assurance that any digital asset, including Bitcoin, will maintain its value or that there will be meaningful levels of trading activities to support markets in any digital asset. A decline in the market value of digital assets or in the demand for trading digital assets could lead to a corresponding decline in the value of our cryptocurrency assets, the number of |

| # | AC ¶¶ | Statement in Registration Statement ("RS") | Defenses | Risk Disclosure Language (where applicable) |
|---|---|---|---|---|
| | | | | transactions on the relevant blockchain network and, as such, the opportunities to earn block rewards and transaction fees, our returns on investments in mining machines, and could adversely affect our business, operating results and financial condition. Further, to the extent that investors perceive investment in our ADSs as a proxy for exposure to the digital asset industry more generally, volatility in the value of cryptocurrencies could have immediate and substantial effects on the price of our ADSs, irrespective of the actual effect on our business.

Digital assets may be subject to momentum pricing due to speculation regarding future appreciation or depreciation in value, leading to greater volatility. Momentum pricing typically is associated with growth stocks and other assets whose valuation, as determined by the investing public, accounts for future changes in value. It is possible that momentum pricing of digital assets has resulted, and may continue to result, in speculation regarding future changes in the value of digital assets, making digital assets' prices more volatile. As a result, digital assets may be more likely to fluctuate in value due to changing investor confidence, which could impact future appreciation or depreciation in digital asset prices. As a result, our business, operating results and financial condition could be adversely affected.

The market value of digital assets may also be affected by the activities of "professionalized" mining operations. Over the past two years, digital asset mining operations have evolved |

| # | AC ¶¶ | Statement in Registration Statement ("RS") | Defenses | Risk Disclosure Language (where applicable) |
|---|---|---|---|---|
| | | | | from individual users mining with computer processors, graphics processing units and first-generation ASIC mining machines to businesses with sophisticated operations using the latest ASIC technology, particularly operations mining Bitcoin. These professionalized mining operations are of a greater scale than individual and casual miners and have more defined and regular expenses and liabilities. These regular expenses and liabilities require professionalized mining operations to maintain profit margins on the sale of mined digital assets, including Bitcoin. To the extent the price of digital assets decline and such profit margin is constrained, professionalized miners may be incentivized to more immediately sell any digital assets, including Bitcoin, earned from mining operations, whereas it is believed that individual miners in past years were more likely to hold newly mined digital assets for more extended periods. If professional mining operations were to collectively implement strategies to immediately sell newly mined digital assets, including Bitcoin, it would greatly increases the available trading supply of such digital assets, creating downward pressure on the market price." (RS at 15-16.)<br><br>"***A majority of our revenue is currently derived from mining Bitcoin. If demand for Bitcoin declines and is not replaced by new demand for cryptocurrencies we are able to mine, our business, operating results and financial condition could be adversely affected.***<br>For the six months ended June 30, 2021 and year ended December 31, 2020, we derived the majority of our net revenue |

| # | AC ¶¶ | Statement in Registration Statement ("RS") | Defenses | Risk Disclosure Language (where applicable) |
|---|---|---|---|---|
| | | | | from transaction fees and cryptocurrency rewards generated in connection with mining Bitcoin. As such, in addition to the factors impacting the broader blockchain ecosystem and the prices of digital assets described in this section, our business may be adversely affected if the market for Bitcoin deteriorates or if its price declines[.] . . ."  (RS at 16 -17.) |

*Murphy v. Argo Blockchain plc et al,*
Case No. 1:23-cv-07305-CM

| # | AC ¶¶ | Statement in Registration Statement ("RS") | Defenses | Risk Disclosure Language (where applicable) |
|---|---|---|---|---|
| A6 | 75 | "Argo's 'investments in mining facilities are designed to significantly expand our mining capacity and provide us with meaningful control over our mining operations.'" <br><br> (RS at 87.) | Not false | "***We have an evolving business model, which is subject to various uncertainties.*** <br><br> Our business model has significantly evolved since our incorporation and we expect it to continue to do so in the future. For example, in the past, we operated as a mining-as-a-service ("MaaS") business. Beginning in 2019, in the face of an industry-wide downturn, we terminated our MaaS contracts and commenced mining for our own account. As digital assets and blockchain technologies become more widely available, we expect the services and products associated with them to evolve. In order to stay current with the industry, our business model may need to evolve as well. As a result, from time to time, we may modify aspects of our business model relating to our strategy. We cannot offer any assurance that these or any other modifications will be successful or will not result in harm to our business. These modifications may increase the complexity of our business and place significant strain on our management, personnel, operations, systems, technical performance, financial resources and internal financial control and reporting functions. We may not be able to manage growth effectively, which could damage our reputation, limit our growth and negatively affect our operating results. Further, we cannot provide any assurance that we will successfully identify all emerging trends and growth opportunities within the cryptocurrency industry and we may lose out on such opportunities. Such circumstances could have a material adverse effect on our business, prospects, financial condition and operating results." (RS at 13.) |

| # | AC ¶¶ | Statement in Registration Statement ("RS") | Defenses | Risk Disclosure Language (where applicable) |
|---|---|---|---|---|
| | | | | "***Our operating results have fluctuated and may continue to fluctuate significantly due to the highly volatile nature of digital assets.*** All of our sources of revenue are dependent on digital assets and the broader blockchain ecosystem. Due to the highly volatile nature of the blockchain ecosystem and the prices of digital assets, our operating results have fluctuated, and may continue to fluctuate, significantly from period to period in accordance with market sentiments and movements in the broader blockchain ecosystem. In particular, our operating results may continue to fluctuate significantly as a result of a variety of factors, many of which are unpredictable and in certain instances are outside of our control[.]" (RS at 14-15.)<br><br>"We believe these strategic investments will generate long-term returns in the form of controlled access to low cost, responsible sources of power and differentiate us from our competitors. However, in the near term this transition will result in heightened capital expenditures and operating expense, may result in disruptions to our operations and may not yield the return on investment that we expect." (RS at 76.) |

# Appendix B

**Appendix B**
**Chart of Alleged Misstatements – Exchange Act[1]**

| # | AC ¶¶ | Statement/Source | Defenses | Risk Disclosure Language (where applicable) |
|---|---|---|---|---|
| B1 | 130 | "[O]ur balance sheet is being strengthened significantly this year, especially taking into account the recent capital raise, as part of the NASDAQ listing. In addition, I'd also highlight our holding, which at the end of September, our digital currencies holding was 1,836 Bitcoin, which at that time, was valued at $79 million, as of the end of September . . . ***We have very little debt overall,*** even [adding that in], we have the lease, we have the mortgage, and we have that Bitcoin backed loan. And [W]ith ***that cash on hand, and our hodl, you know, Argo has sufficient flexibility to pursue our strategic growth plans in Texas, infrastructure, and machines, et cetera***." <br><br> (Haims Decl., Ex. 1, Argo Earnings Conference Call, Nov. 2, 2021 (Appleton) (emphasis added by Plaintiffs).) | Not false <br><br> Forward-looking <br><br> Puffery | "And we don't necessarily, going back to earlier this year, ***we didn't have the same kind of huge amounts of cash in the bank that some of our peers had***." (Argo Earnings Conference Call (Q&A Session) Tr. p.25, Nov. 2, 2021 (Wall) (emphasis added).) <br><br> In discussing additional equity offering by Argo to raise capital, Peter Wall stated, "And if you go back to 2020, we sold a lot of Bitcoin. And in retrospect, that was a painful. You look back and you're like, no, btu [sic] the Bitcoin we sold in 2020, but we didn't have a choice. We didn't have opportunities or very few opportunities for debt and equity. Then fast forwarded this year, we've done, we've pulled on the debt lever, we've pulled on the equity lever… [***T]hat's a decent war chest in this business, but this is an expensive business. It's a capital-intensive business***." (Argo Earnings Conference Call (Q&A Session) Tr. p.16, Nov. 2, 2021 (Wall) (emphasis added).) <br><br> "So as at the end of September, we had $45 million loan with Galaxy[,] we've paid $25 million of that back ***leaving us with remaining $20 million Bitcoin backed loan with Galaxy***. |

---

[1] Plaintiffs reference or quote each source cited herein in the Amended Complaint. For the Court's convenience, it can access most referenced sources using the embedded hyperlink found in the citation to the statement source. All other referenced sources that are not readily accessible are affixed as an exhibit to the concurrently filed Declaration of Joel C. Haims ("Haims Decl.").

*Murphy v. Argo Blockchain plc et al,*
**Case No. 1:23-cv-07305-CM**

| # | AC ¶¶ | Statement/Source | Defenses | Risk Disclosure Language (where applicable) |
|---|---|---|---|---|
| | | | | We have very little debt overall, even adding that in, ***we have the lease, we have the mortgage[,] and we have that Bitcoin backed loan***." (Argo Earnings Conference Call Tr. p.12, Nov. 2, 2021 (Appleton) (emphasis added)). |
| B2 | 132 | "Wall told the market that in Texas, Argo had access to 'the cheapest power anywhere in the world' at less than two cents a kilowatt hour." <br><br> (Interview, Nov. 21, 2021 & Dec. 16, 2021 (Wall).) | Not false <br><br> Puffery | N/A. |
| B3 | 133 | "Argo was '***extremely on the profitable end of things right now***.'" <br><br> "Wall added that despite more mining machines coming online, Argo's 'margins are still very, very strong and you know ***we are on the extreme end of profitability right now***.'" <br><br> (CNBC Interview, Dec. 21, 2021 (Wall) (emphasis added by Plaintiffs).) | Not false <br><br> Puffery | N/A. |
| B4 | 135 | "Our strategic focus in 2022 is to execute on our plans at Helios and to scale our operations. As we near the completion of Helios Phase 1, Argo is poised to significantly increase its hash rate and continue building out infrastructure. While Phase 1 of Helios will utilize 200 MW of electricity, our interconnection agreement | Not false <br><br> Forward-looking <br><br> Puffery | "The Group's activities expose it to a variety of financial risks: market risk, credit risk and liquidity risk. […] <br><br> **Market Risk** <br><br> The Group is dependent on the state of the cryptocurrency market and general sentiment of crypto assets as a whole." |

| # | AC ¶¶ | Statement/Source | Defenses | Risk Disclosure Language (where applicable) |
|---|---|---|---|---|
| | | provides us with access to up to an additional 600 MW of capacity. ***This runway for growth is unmatched by Argo's peers, and we have built a robust foundation upon which we can scale efficiently and profitably***."<br><br>(Argo 2021 Form 6-K, April 27, 2022 (emphasis added by Plaintiffs).) | | (Argo 2021 Form 6-K, p.24, April 27, 2022.) |
| B5 | 137 | "So a really pleasing year, and one we're really proud of. And 'd say, ***we're well-positioned to continue on the growth phase and continue a very profitable level. The balance sheet. So this year, as Peter said, –we've had a number of private placements which has really strengthened the balance sheet. So you could see the end of the year, we've got a very strong balance sheet, significantly stronger than last year in terms of our net***. Our net assets are well into the $200 million -- $220 million or so. . . . And we're seeing continued downward pressure on the cost of capital. ***So we're very pleased with where we sat. And as we look forward, we look forward with optimism into the coming year*** ..."<br><br>"We think we have more room to take on more debt, and still stay within our prudent internal EBITDAs, debt ratios, et cetera, et cetera, and all of those good things. ***But where we stand today, we stand in a very strong position, because we*** | Not false<br><br>Forward-looking<br><br>Puffery | "[H]ow we're going to finance our growth in 2022. ***So in order to complete Phase 1 of Helios, which includes both a little bit more capital into infrastructure, and then machines to fully build out the 200 megawatts, we need roughly $125 million of additional capital.*** And as I've said many times, we have three levers which we can pull on when we're raising capital[,] debt, equity and selling bitcoin. Right now, we plan to raise the additional capital through a combination of debt and bitcoin."<br><br>(Argo Earnings Conference Call Tr. p.12, April 28, 2022 (Wall) (emphasis added).) |

*Murphy v. Argo Blockchain plc et al,*
Case No. 1:23-cv-07305-CM

| # | AC ¶¶ | Statement/Source | Defenses | Risk Disclosure Language (where applicable) |
|---|---|---|---|---|
| | | *don't – we've got on our balance sheet a significant amount of Bitcoin as well.* So we are not wholly reliant on debt. *In fact, we could almost self mine* – and use the –and look at using just parts of debt, et cetera. As we said, that's going to be our process going forward. *So we're in really strong position to move forward. Our debt market remains strong.*" <br><br> (Haims Decl., Ex. 2, Argo Earnings Conference Call, April 28, 2022 (Appleton) (Emphasis added by Plaintiffs).) | | |
| B6 | 139 | "Since our inception, we have financed our operations primarily through cash generated by sales of cryptocurrency and sales of equity securities. Our primary requirements for liquidity and capital are to finance working capital, capital expenditures and general corporate purposes. *We believe that our sources of liquidity and capital resources will be sufficient to meet our existing business needs for at least the next 12 months.*" <br><br> (Argo 2021 Form 20-F, May 2, 2022 (emphasis added by Plaintiffs).) | Not false <br><br> Forward-looking <br><br> Opinion | "*Our operating results have fluctuated and may continue to fluctuate significantly due to the highly volatile nature of digital assets.* <br><br> All of our sources of revenue are dependent on digital assets and the broader blockchain ecosystem. Due to the highly volatile nature of the blockchain ecosystem and the prices of digital assets, our operating results have fluctuated, and may continue to fluctuate, significantly from period to period in accordance with market sentiments and movements in the broader blockchain ecosystem. <br>… <br>*Our total revenue and cash flow is substantially dependent on the market value of digital assets and the volume of digital assets received from our mining efforts. If such market value or volume declines, our business, operating results and financial condition would be adversely affected.* |

*Murphy v. Argo Blockchain plc et al,*
Case No. 1:23-cv-07305-CM

| # | AC ¶¶ | Statement/Source | Defenses | Risk Disclosure Language (where applicable) |
|---|---|---|---|---|
| | | | | We currently generate substantially all of our revenue from cryptocurrency rewards and transaction fees received for successfully proposing a valid 'block' of transactions on the Bitcoin blockchain. Similarly, our operating cash flow is substantially dependent on our ability to sell cryptocurrency for fiat currency as needed. As such, any declines in the amount of cryptocurrencies that we successfully mine, the price of such cryptocurrencies or market liquidity for cryptocurrencies and digital assets generally would adversely affect our revenue and ability to fund our operations.<br>…<br>There is no assurance that any digital asset, including Bitcoin, will maintain its value or that there will be meaningful levels of trading activities to support markets in any digital asset. A decline in the market value of digital assets or in the demand for trading digital assets could lead to a corresponding decline in the value of our cryptocurrency assets…"<br><br>(Argo 2021 Form 20-F, pp.11-13, May 2, 2022.) |
| B7 | 141 | "Defendants again reiterated how inexpensive power at Helios Facility would be, stating that they 'anticipate that our net electricity costs will be below \$0.02/kWh after including the benefits of participating in demand response programs offered by' ERCOT."<br><br>(Argo 2021 Form 20-F, May 2, 2022.) | Not false<br><br>Forward-looking | ***"We may not be able to secure access to electricity on a sufficiently firm and unrestricted basis or at a price that we are willing to pay.***<br><br>Cryptocurrency mining is dependent on access to stable and reliable electricity supply. There has been a substantial increase in the demand for electricity for cryptocurrency mining[.] |

| # | AC ¶¶ | Statement/Source | Defenses | Risk Disclosure Language (where applicable) |
|---|---|---|---|---|
| | | | | … <br> Should our operations require more electricity than can be supplied in the areas where our mining facilities are located or should the electrical transmission grid and distribution systems be unable to provide the continuous, steady supply of electricity required, we may have to limit or suspend activities or reduce the speed of our proposed expansion, either voluntarily or as a result of either quotas imposed by energy companies or governments, or increased prices for certain users (such as us). If we are unable to procure electricity at a suitable price, we may have to shut down our operations in that particular jurisdiction either temporarily or permanently. Additionally, our cryptocurrency mining machines would be materially adversely affected by a power outage. <br> … <br> ***We may be affected by price fluctuations in the wholesale and retail power markets.*** <br> While we anticipate that the majority of our power arrangements will contain fixed power prices, we expect that they may contain certain price adjustment mechanisms in case of certain events. Furthermore, some portion of our power arrangements is expected to be priced by reference to published index prices and, thus, reflect market movements. <br><br> Market prices for power, generation capacity and ancillary services, are unpredictable. Depending upon the effectiveness of any price risk management activity undertaken by us, an increase in market prices for power, |

| # | AC ¶¶ | Statement/Source | Defenses | Risk Disclosure Language (where applicable) |
|---|---|---|---|---|
| | | | | generation capacity, and ancillary services may adversely affect our business, prospects, financial condition, and operating results." <br><br> (Argo 2021 Form 20-F, pp.35-37, May 2, 2022.) |
| B8 | 142 | "***We're in a very healthy position at the moment in terms of our hodl, how much of our hodl is unencumbered, or is capitalized against loan, et cetera, and we're very comfortable with our position today. So, in terms of filling that gap for the $50 million that we talked about to build out the rest of phase 1, we're well positioned. And of course, every day we mine more and more Bitcoin, and so that position, is is, you know, improves with every day that passes***." <br><br> (Haims Decl., Ex. 3, Argo Earnings Conference Call, May 18, 2022 (Appleton) (emphasis added by Plaintiffs).) | Not false <br><br> Forward-looking <br><br> Puffery | In the Q&A session of the conference call, to answer question on margin expectations, Peter Wall stated: "I think our overall margin is obviously determined by a number of factors, price of bitcoin, power costs and mining difficulty. We have expected this year that mining difficulty would continue to rise throughout the year. ***Bitcoin price is going [to] be Bitcoin price. We are bullish long term, but in the short term, as we saw over the last few weeks. Bitcoin can be volatile. So in terms of margin expectations. It's not just our power costs that are going to determine what our overall margin is***." (emphasis added.) <br><br> (Argo Earnings Conference Call Tr. p.15, May 18, 2022 (Wall).) |
| B9 | 145 | "So on the capital side, so we used our capital from 2021 to get where we are now, so now looking at capital, looking at just the second half of this year and 2023, ***how are we going to continue to grow? And that's a question that a lot of investors ask right?*** They're like, great Peter, you've got all of this power, great, you've got a great relationship with intel, how are you going to fund it? Are you going to sell equity again? Are you going to dilute us? . . . Are you | Not false <br><br> Opinion | N/A |

| # | AC ¶¶ | Statement/Source | Defenses | Risk Disclosure Language (where applicable) |
|---|---|---|---|---|
| | | going to sell bitcoin? Or are you going to take on debt, those are the levers, right? Debt, equity, and bitcoin. So we have not, I'm going to leave you hanging on this, because we have not announced our capital plan yet, our numbers are coming out soon, . . . ***but we feel like we've got an awesome path to capital, to get us to the kind of growth that we need to fully build out the next 800 megawatts over the next couple of years***." <br><br> (Wolf of All Streets YouTube Show, June 7, 2022 (Wall) (emphasis added by Plaintiffs).) | | |
| B10 | 149 | "In general, from our approach, we like to bet on ourselves. Again, we haven't announced it. We're leaning a certain way, but when the time is right, we'll announce it. Scott, in this space, in the mining space, you need three things. It's a simple business. ***You need rigs, you need power, and you need capital. If you think about 2021, we used our Nasdaq IPO and a couple other little fundraisers before that to get the capital we needed to get the power and the rigs that we needed. We now have an enormous runway of power. 800 megawatts of power in West Texas in a particular part of the grid where there's an overabundance of renewable energy. That is a lot of it's going to waste because there's not enough transmission lines to take that power to*** | Not false | N/A. |

| # | AC ¶¶ | Statement/Source | Defenses | Risk Disclosure Language (where applicable) |
|---|---|---|---|---|
| | | *market in Southern Texas. Texas is an energy island. You can't export across the state line to New Mexico or to Oklahoma. That power that's generated in Texas has to stay in Texas. It's not connected to the national grid. On top of that, Texas is also a competitive grid. It's a deregulated market. Meaning, you can buy your power from a host of retailers, and because of that, ERCOT, who manages the grid, incentivizes large load users like ourselves to participate in these demand response programs. What they call ancillary services. These auxiliary services allow miners to shut down.*"<br><br>(Wolf of All Streets YouTube Show, June 7, 2022 (Wall) (emphasis added by Plaintiffs).) | | |
| B11 | 150 | "During the same interview, Wall stated that with respect to the location of the Helios Facility '[t]here's not a load. There's just not a lot of power demand in those regions, but there's an overabundance of supply.'"<br><br>(Wolf of All Streets YouTube Show, June 7, 2022 (Wall).) | Not false | N/A. |
| B12 | 152 | "In 2021, when things were crazy and everyone was raising equity, we went out and we did that. We IPO'ed in the NASDAQ. We raised a couple hundred million dollars last year, but ultimately | Not false<br><br>Puffery | N/A |

| # | AC ¶¶ | Statement/Source | Defenses | Risk Disclosure Language (where applicable) |
|---|---|---|---|---|
| | | for us, ***we never set unrealistic, unrealistic expectations for the future.*** We always knew that there might be a drawback. ***We didn't over-promise anything. So our motto has been, you know, under-promise over-deliver.***…"It's going to be a really interesting second half of the year because, you know, ***the strong survive the bear markets***, you know, so you gotta be smart and you gotta be strong, and I ***I like where we're positioned***." <br><br> ([CoinDesk Interview, June 9, 2022](#) (Wall) (emphasis added by Plaintiffs).) | | |
| B13 | 153 | "[O]n ***top of a kind of low cost of production, our balance sheet is also strong enough to be able to withstand lower prices*** and then potentially take advantage of an increased market share that would come with that and then any potential downturn in the price of machines. ***So we feel like we're in a really good place as a miner, we feel like we're really well positioned, and that's a testament to the work that we did in 2021, and to really kind of overdelivering and under promising***, which has kind of been the theme for us for the first half of this year." <br><br> (Haims Decl., Ex. 4, Q&A session after Annual General Meeting, June 29, 2022 (Wall) (emphasis added by Plaintiffs).) | Not false <br><br> Puffery <br><br> Opinion | N/A. |

| # | AC ¶¶ | Statement/Source | Defenses | Risk Disclosure Language (where applicable) |
|---|---|---|---|---|
| B14 | 153 | "***We own our own infrastructure. We are close to our machines. This gives us more control in a bear market. We've talked about the runway before and Peter has talked about the runway that we have in Texas.*** We have the ability to control what we own and how we manage it. ***So, we're in a really good place from that point of view***. We're also developing propriety emerging technology and designing custom rigs to use Intel chips. And we are still very profitable, and in terms of mining. We're in that Tier A and that's how you should think about this. That's how we think about it, ***maintaining that economic advantage over our peers and the mining margins that you see that we can achieve using our own equipment and from our own facility. So we are well placed***" <br><br>(Haims Decl., Ex. 4, Q&A session after Annual General Meeting, June 29, 2022 (Appleton) (emphasis added by Plaintiffs).) | Not false <br><br> Puffery | N/A. |
| B15 | 155 | "During the Q&A session, in order to assure the market that Argo was in a strong financial position, Wall explained that the majority of the Helios Facility had already been paid for, stating, 'the good news is that we have paid for over 90% of those machines, you know, the 20,000 machines that we ordered from Bitmain that are being installed. The other good news is that, you | Not false | N/A. |

*Murphy v. Argo Blockchain plc et al,*
Case No. 1:23-cv-07305-CM

| # | AC ¶¶ | Statement/Source | Defenses | Risk Disclosure Language (where applicable) |
|---|---|---|---|---|
| | | know, 95% of the facility is paid for, for that first 200 megawatts of phase 1. All of which means that the first 3.6 hash from those 20k machines is on track and is paid for.'" <br><br> (Haims Decl., Ex. 4, Q&A session after Annual General Meeting, June 29, 2022 (Wall).) | | |
| B16 | 156 | "We did $100 million in revenue last year, that's USD, and this year, with the additional capacity coming online, we expect to mine a significant amount of bitcoin on a monthly basis. What does our margin look like? Our margins for 2021 were fantastic, even for the first quarter of this year, they have been very strong. ***You know, definitely in the top echelon amongst our peers, and that's really just by being able to optimize our capex and really kind of protecting, being efficient on our costs, making sure that we have some of the lowest costs in this space for operations***." <br><br> (Sequire Decentralized Web Conference, June 23, 2022 (Wall) (emphasis added by Plaintiffs).) | Not false <br><br> Puffery | N/A. |
| B17 | 158 | ***"The Company is confident that it possesses sufficient liquidity to avoid any potential liquidation*** of the BTC-backed loan if Bitcoin prices continue to decline. Since Q4 2021, the Company has been using derivatives to limit downside risk." | Not false <br><br> Puffery | N/A. |

| # | AC ¶¶ | Statement/Source | Defenses | Risk Disclosure Language (where applicable) |
|---|---|---|---|---|
| | | (Argo Press Release, July 7, 2022 (emphasis added by Plaintiffs).) | | |
| B18 | 158 | "Wall also stated, '*We have seen positive results from our risk management strategy* through which we have reduced the Company's exposure to its BTC-backed loan, and we have hired a full-time derivatives trader. *We believe the Company is well positioned to navigate the current market conditions and further increase our efficiencies.*'"<br><br>(Argo Press Release, July 7, 2022 (emphasis added by Plaintiffs).) | Not false<br><br>Puffery<br><br>Opinion | N/A. |
| B19 | 161 | "During the period, there has been a global macroeconomic pullback as investors and central bankers grapple with inflation, the war in Ukraine, and rising interest rates. These headwinds have impacted all financial assets, including Bitcoin and the equity of publicly traded Bitcoin miners.<br><br>*Argo is well positioned to weather the current downturn with its large and highly efficient mining infrastructure, runway for growth, and experienced management team, which has successfully navigated the Group through previous crypto winters. In response to the challenging market environment, we have* | Not false<br><br>Puffery | N/A. |

| # | AC ¶¶ | Statement/Source | Defenses | Risk Disclosure Language (where applicable) |
|---|---|---|---|---|
| | | ***adjusted our treasury management strategy***. Throughout the period, we have been steadily selling Bitcoin, utilizing derivatives to obtain a higher realized price than simply selling into the market. In Q2 2022, we sold Bitcoin at an average realized price of approximately $28,500, realizing hedge gains in excess of $1,500 per Bitcoin. Proceeds from these sales have been used for operating expenses, capital expenditures, and to reduce exposure on our Bitcoin-backed loan.<br><br>***Despite the challenging economic environment in 2022, we continue to focus on our strategic priority of completing Phase 1 of Helios and laying the groundwork to further scale operations.***<br><br>\* \* \*<br>Responsibility Statement. ***We confirm that to the best of our knowledge:***<br><br>• ***the Interim Report*** has been prepared in accordance with International Accounting Standards 34, Interim Financial Reporting; and<br>• ***gives a true and fair view of the assets, liabilities, financial position and profit/loss of the Group***;" | | |

| # | AC ¶¶ | Statement/Source | Defenses | Risk Disclosure Language (where applicable) |
|---|---|---|---|---|
| | | (Argo 2022 Form 6-K, Aug. 24, 2022 (emphasis added by Plaintiffs).) | | |
| B20 | 163 | "***Mining margin for the first six months of 2022 was 71%, continues to be the highest amongst our peers, down from 81% but from the first half of 2021, still a very good margin. I'm proud of the team for continuing to have really good efficiencies, even as, the price of Bitcoin has [fell] during the first half of the year***. And the mining margin of 71% translates to an average cost per Bitcoin of roughly $10,000. And again, that's for the first half of the year." <br><br> (Haims Decl., Ex. 5, Argo Earnings Conference Call, Aug. 25, 2022 (Wall) (emphasis added by Plaintiffs).) | Not false <br><br> Puffery | N/A. |
| B21 | 163 | "***In terms of our balance sheet, I think the first thing really to mention is how we've despite significant headwinds that we've had this year, our rigorous approach to cash flow and treasury management has meant that we have been cash neutral. So we're well placed there***." <br><br> (Haims Decl., Ex. 5, Argo Earnings Conference Call, Aug. 25, 2022 (Appleton) (emphasis added by Plaintiffs).) | Not false <br><br> Puffery | N/A. |
| B22 | 166 | "In terms of our HODL, we sold about 450 bitcoin this month, ended the month just under 1,100 bitcoin, . . . ***We have a derivatives trader*** | Not false <br><br> Opinion | N/A. |

| # | AC ¶¶ | Statement/Source | Defenses | Risk Disclosure Language (where applicable) |
|---|---|---|---|---|
| | | *that's now in place, and he is very focused on managing our treasury, making sure he's protecting the downside given all of the volatility that's going on, as well as making sure that we are able to benefit from the upside that we believe is coming in, you know, in the medium and long term, we are still bullish on Bitcoin in the long term, and again, are actively using, you know, derivatives to make sure that we're, you know, getting the balancing act right.*" (Argo August 2022 Operational Update Video, Sept 9, 2022 (Wall) (emphasis added by Plaintiffs).) | | |